Blair v. Ridgely et al.

———◄●○●►———

FRANCIS P. BLAIR, Plaintiff in Error, *v.* STEPHEN RIDGELY and JOHN S. THOMPSON, Defendants in Error.

1. *Constitution—State—United States—Sovereignty.*—The States, when they entered the Union, retained all their original power and sovereignty, except so much as they expressly surrendered to the Federal Government, or they were expressly prohibited from exercising: subject to these exceptions, they are independent commonwealths, and are the exclusive judges of what is just and proper for their own safety, welfare and happiness. Prior to the adoption of the Federal Constitution the respective States possessed unlimited and unrestricted sovereignty, and retained the same ever afterward, except so far as they granted certain powers to the General Government, or prohibited themselves from doing certain acts. Every State reserved to itself the exclusive right of regulating its own internal government and police.

2. *Constitution — Republican Government—State—Missouri.*—The admission of Missouri into the Union as one of the States was a direct and positive declaration by Congress that the government created by its Constitution was republican in form, and that its Constitution was not inconsistent with that of the United States.

3. *Government — People — Constitution—Elections—Voters.*—In common language, when we speak of the people, we mean all the inhabitants of a State; but this is not so when we speak of the people in a political sense. In speaking of the people as a body politic, we speak only of that portion of the inhabitants who are entrusted with the political power. *The people,* for political purposes, must be synonymous with qualified voters. If the power to regulate the internal government and police of a State reside in the people, then it is their peculiar and exclusive province to say and determine what shall constitute any inhabitant a qualified voter. Upon the exercise of this power by the people of a State there is no restriction or restraint imposed by the Constitution of the United States, for there is not to be found in that instrument a single sentence, paragraph, or word, which gives the National Government power over the qualifications of voters in any of the States; and the direct opposite is affirmed in the article provid-

ing that "the powers not delegated to the United States by the Constitution, nor prohibited to it by the States, are reserved to the States respectively or to the people."

4. *Elective Franchise—Voters—Constitution.*—Outside of society, and disconnected with political society, no person has or can exercise the elective franchise *as a natural right,* and he only receives it upon entering into the social compact subject to such qualifications as may be prescribed by the State or body politic. The State of Missouri having sovereign power to regulate its own internal government, and to prescribe the qualifications which shall authorize any inhabitant to exercise the elective franchise therein, the oath prescribed in Art. II., §§ 2 & 6, of the Constitution as one of the qualifications for voting does not violate any of the provisions of the Constitution of the United States.

*Error to St. Louis Circuit Court.*

*S. T. Glover,* for plaintiff in error.[*]

The general proposition which I shall endeavor to establish is, that the supposed constitutional provisions relied on by the defendants to support their demurrer are no constitutional provisions at all; that they are binding on nobody and affect nobody's rights; that they are in violation of the Constitution of the United States, and mere nullities.

The plaintiff will contend (1) that sec. 3 of art. 2 is a bill of attainder, in the meaning of the Constitution of the United States (art. 1, § 10); and being null and void, for that reason all other sections in aid of it are also null and void. Attainder is a legal term which we derive from the English common law. From the same source we learn there were two sorts of attainder—1. Attainder by judicial conviction in the ordinary course of law; 2. Attainder by bill, that is, by legislative or parliamentary enactment. Now, if we can clearly ascertain what judicial attainder is, it will assist us in identifying the qualities of an attainder by bill. All the criminal law writers assert that attainder means literally a staining. And inasmuch as one convicted of a capital offence at common law was thereby deprived of all credit, reputation and right as a citizen and a man, he was by that law considered stained or blackened in his name and character. The word employed in the law Latin to express this staining or blackening was *attinctus,* and hence the word "attainder."

"This attainder (says Stephens, 4 Com. 446) is the stain

---

[*] On account of the permanent interest of the principles considered and decided in this case, the arguments of counsel are given very much at length.

Blair v. Ridgely et al.

or corruption of the blood of a criminal capitally condemned. He is no longer of any credit or reputation ; he cannot be a witness in any court, neither is he capable of performing the functions of another man." Another consequence of the attainder at the common law was forfeiture and corruption of blood of the convict, so that he could neither inherit lands nor other hereditaments from his ancestors, nor retain those he was already in possession of, nor transmit them by descent to any heir"—1 Tom. Jac. Law Dic. 163. So we perceive it was not conviction which constituted attainder, but it was the disabilities, disqualifications and disfranchisements annexed to the conviction. The conviction was one thing, the attainder another. A man may be tried judicially and condemned as a felon, but he is not attainted unless, as at common law, these disabilities, or some of them, are inseparably annexed to his conviction. It is perfectly in the power of the Legislature to limit the extent of the attainder, or to take it entirely away, leaving the conviction in full force. The British Parliament, in 1798, passed an act so far limiting the force of attainder within the realm as to declare that "no attainder should work corruption of blood or forfeiture longer than the life of the convict."

The same limit has been fixed by the Constitution of the United States, and many, if not all, our State Constitutions, and by the course of American legislation the extent of a judicial attainder is often made to vary according to the crime to which it is annexed.

In Missouri, the disabilities which constitute the judicial attainder on conviction of crime are as follows : Disqualification to serve as juror in any case; to vote at any election ; to hold any office of honor, profit or trust ; to be sworn as a witness in any cause, or to practise as an attorney or counsellor at law within the State—R. C. 1855, p. 557, § 13 ; p. 568, § 46; p. 586, § 70; p. 608, § 47; p. 635, § 56; pp. 278 –9, §§ 6 & 11.

The court will observe that under some of these statutes the convict is so far deprived of his credit and honor, and stained in his reputation as a citizen, that he is by conviction denied the right to vote at an election or hold an office; that by others he is prohibited, after conviction, to sit as a juror in any court, and by others he is so completely attainted as to be declared infamous as a man as well as a citizen, unworthy to be sworn as a witness because deemed incapable of speaking the truth.

In every one of these statutes the attainder is annexed to the offence of the convict as part of his punishment as distinctly as the other penalties of the criminal code, whether it be fine, forfeiture, imprisonment, or death; and a pardon by the Governor of the offence removes the disabilities just as it does the other punishments of the offender—R. C. 1855, p. 643, § 26. Having ascertained the nature of a judicial attainder, we are prepared for the consideration of attainder by bill.

The Constitution of the United States declares (art. 1, sec. 10) "no State shall pass    *    *    .*    any bill of attainder," leaving judicial attainder still in the hands of the courts.

This is more evident from another clause in the Constitution of the United States—art 3, § 3 : "No attainder of treason shall work corruption of blood, or forfeiture of estate, except during the life of the person attainted." This section can only allude to judicial attainder, since bills of attainder are prohibited.

What is a bill of attainder? It is fair to conclude that it is an infliction by a bill, by legislative or convention ordinance, of the same disqualifications and disabilities, or some of them, which constitute judicial attainder. In other words, it is an attempt to attaint one or more persons by a legislative act, contrary to the ordinary course of judicial proceedings, to the same effect that such persons might be attainted judicially. Whether an attainder be inflicted by the judgment of a court, or by an act of a legislative body, it is the same. The difference between judicial attainder and attainder by bill consists only in the hand that inflicts it. If the fastening upon the citizen the disability to vote, to hold office, or to sit on a jury, for some act of his, be attainder when inflicted in the ordinary course of judicial proceedings, the same disabilities must certainly be an attainder when for some act of his they are inflicted by a bill.

And so Judge Story supposes when he says, "Bills of attainder, as they are technically called, are such special acts of the Legislature as inflict capital punishments upon persons supposed to be guilty of high offences, such as treason or felony, without any conviction in the ordinary course of judicial proceedings;    *    *    *    *    if an act inflict a milder punishment than death, it is called a bill of pains and penalties. But in the sense of the Constitution it seems that bills of attainder include bills of pains and penalties"—3 Sto. Com. 209, § 1338. The meaning of which is that a mere

bill of pains and penalties is prohibited by the Constitution. To constitute a bill of attainder it is not essential that every possible penalty or disability be inflicted, and every possible stain and dishonor be imposed. If any penalty or disability, or any stain or dishonor, be imposed on the person by bill, and for an offence either before or after the fact, and by means contrary to the ordinary course of judicial proceedings, that will constitute a bill of attainder. The remarks of the Supreme Court of Kentucky, 1 Dana, 510, may be well quoted here: " Bills of attainder have generally designated their victims by name ; but they may do it also by classes, or by general description fitting a multitude of persons. Either mode is equally liable to moral and constitutional censure. They have generally been applied to punish offences already committed, or for criminal omissions thereafter incurring. A bill of attainder is not necessarily an *ex post facto* law. A British act of Parliament might declare that if certain individuals, or a class of individuals, failed to do a given act by a named day, they should be deemed and treated as convicted felons and traitors. Such an act comes precisely within the definition of a bill of attainder, and the English courts would enforce it without indictment or trial by jury."

According to the Supreme Court of Kentucky, if the Legislature should pass a law declaring that all that class of persons who by a day named had failed to file an affidavit that they had kept the Sabbath laws, or the revenue laws, should be deprived of suffrage, this would be a bill of attainder. The bill would wear the form of a general law, but would be in fact a special act applying only to those who could not take the oath. It would no more be a general law than an act which should declare that every person who by a day named has not filed an affidavit that he never answered to the name of John Smith, shall suffer death as a traitor. Such an act would apply only to John Smith, notwithstanding its form. It would be a special act inflicting death on John Smith ; that is, it would be a legislative judgment, and nothing else.

In Fletcher v. Peck, 6 Cranch, 87, Marshall held an act repealing a law granting a title was an attainder and *ex post facto* law, forfeiting estate without a crime.

Let us again consider the force of Story's definition :

" Bills of attainder are such special acts of the Legislature as inflict capital punishments upon persons supposed to be guilty of high offences, such as treason or felony, without any conviction in the ordinary course of judicial proceed-

ings. If it inflict a milder punishment than death, it is called a bill of pains and penalties."

In inquiring whether the sections above stated are literally and substantially within Story's definition of an attainder, three points only need be attended to.

I. Do they suppose the persons aimed at to have been guilty of any high offence, such as treason or felony?

II. Do they inflict punishment on these persons?

III. If so, do they inflict that punishment without any conviction in the ordinary course of judicial proceedings?

As to the *first point*:—The answer to this is written down in the plainest terms on the face of sec. 3: "At any election held by the people under this Constitution, &c., no person shall be deemed a qualified voter who has ever been in armed hostility to the United States, or to the lawful authorities thereof, or to the Government of this State," &c. There is the act of levying war—the very definition of treason. The person excluded from suffrage is excluded for this treason. Of course, he is supposed to be guilty of the treason.

As to the *second point*:—All who have attempted to maintain the constitutional validity of these sections, deny that they are penal. It becomes necessary, therefore, to enter upon argument to prove a proposition which a little candor would promptly concede. "Punishments are either corporal or not corporal; punishments not corporal are fines, forfeitures, suspension or deprivation of some political or civil right"—Bouv. Law Dic. 389. When the Convention inserted in the Constitution that no person should vote who had committed treason, it would seem to admit of no doubt that the liberty to vote was taken away because of the treason; and that the disfranchisement of the person was a penalty, forfeiture or disability, or shame and dishonor inflicted for that act of treason. If this is not so, one can scarcely imagine how a punishment could be inflicted for such an act.

Suppose the Constitution had said, no person shall be deemed a qualified property holder who has committed treason; or, no person shall be qualified to live in this State who has committed treason; or, that every such person shall be seized and put to death without any conviction in the ordinary course of judicial proceedings;—these objectors might as well contend the confiscation, the banishment, or the death, was no punishment inflicted on the act; for neither death nor banishment is a penalty so frequently inflicted on crime as disfranchisement. The objectors say it would be

absurd for the Convention to undertake to convict particular persons of crime by means of their own devising without a trial by jury, and so to punish them, and therefore the Convention have not done it. Again, it is insisted that the Convention nowhere say that they are punishing anybody, and therefore it must not be concluded that they did punish. It is impossible so large a distinction can be made to rest upon grounds so small. The whole of it consists in the use or omission of a few words. The omission of these, it is supposed, changes the nature of the whole case, and renders useless the constitutional prohibitions.

Let it be remarked that the 3d section says as much as any penal law needs to say. It declares positively that disfranchisement is annexed to the act. Penal statutes are sometimes so framed as to use the word "punish" or "punishment"; but this is not always the case, nor is it ever essential. Turn to R. C. Mo. 555, and read: "Every person who shall commit treason against this State by levying war against the same, or by adhering to the enemies thereof by giving them aid and comfort, shall, upon conviction, suffer death," &c. No one has ever imagined the word "punish" or "punishment" was necessary to make this a penal law. The language of sec. 3 is quite as plain. No one who has committed treason shall vote. Whoever has committed treason is for that cause deprived of the liberty of suffrage. But our objectors insist that, in order to make the provision penal, it should read thus: Whoever has committed treason, &c., is hereby punished by the loss of his suffrage.

Proceeding, however, to show that black is not white, I refer the court to several adjudications on this most important objection. A statute declared that any one who crossed the lake within three miles of a certain bridge should pay toll to the bridge company, and Savage, C. J., held it was in restraint of liberty and penal—2 Cow. 419. So statutes creating liabilities to forfeiture are penal—1 Paine, 32–3; 4 Mass. 473; 2 Sto. 203; 9 Shep. 541; 8 Porter, 563; 3 Hill, (S. C.) 96; 12 N. H. 255. An act requiring a party to stipulate on oath in relation to his past conduct, and the future state of his mind, was held highly penal—1 Munf. 482.— "That disqualification from office, or the pursuit of a lawful avocation, is a punishment, is too evident to require any illustration"—7 Porter, 366. H held an office during good behavior, and, by an act of Legislature, B was elected to the same office, the act virtually removing H, but without any

legal cause of ouster. The Supreme Court of North Caro-
lina annulled the act, and said, "to inflict punishment after
finding a default is to adjudge; but to do it without default
is still more indefensible. What more can a citizen suffer
than to be taken, imprisoned, disseized of his freehold, liber-
ties or privileges, exiled, destroyed, deprived of his property
or life, without a crime?" "Yet all these he may suffer if
an act of the Legislature denouncing these penalties on par-
ticular persons, or a particular class of persons, is a law of
the land"—4 Dev. 1. The Supreme Court of North Caro-
lina reasoned very soundly when they concluded that to in-
flict a penalty, forfeiture, or disfranchisement, upon a citi-
zen, without a crime and without intending to punish him,
was less defensible than if crime was pretended and the intent
to punish openly avowed. (In 6 Cranch, 87, Ch. J. Marshall
decided that a statute annulling a law under which a title
had vested was penal; that it punished for a crime not de-
clared by previous law, and it punished without a crime.)

The Legislature of Kentucky, in 1824, passed an act that
if certain persons did not improve their lands by a day named
in a certain mode, the lands would be forfeited to the State.
This law prescribed no punishment in terms, but took away
the right of the citizen for the act of omission. The statute
was held penal and declared to be a bill of pains and penal-
ties, and void—1 Dana, 209–10. Would this law have been
any more constitutional, or any less penal, had it declared
that all persons who had heretofore suffered their lands to
lie unimproved shall be disqualified to hold said lands, or to
vote at any election in the State of Kentucky?

The objection may be fairly stated thus: If the statute
had said, every person who does not file his affidavit in sixty
days from the passage of this law that he had theretofore
made certain improvements on his lands, is hereby punished
by deprivation of his liberty of suffrage, the provision would
have been a violation of the Constitution of the United States;
but if it says merely that in such case the person shall not
vote, the provision is not unconstitutional. It is a rule of
law that penal statutes must be strictly construed. The act
intended to be punished must be plainly defined, and the
punishment as plainly annexed to the act. That a given pen-
alty is annexed to the act must not be left in doubt. This is
all which the most strict construction demands for the enforce-
ment of any penal law. Smith (Com. 62) says, "It will be
at once concluded that no man should be stripped of a valu-

able property—perhaps his all—be disfranchised, or consigned to public ignominy and reproach, unless it be clear that such high penalties have been annexed to the act he has committed."

If your honors will look for a moment at the nature of the liberty of suffrage taken away by these sections, you will see that the disability imposed, the dishonor inflicted, could not well be greater. We value life, liberty, and property ; and all these are admitted to be secured by constitutional guarantees : but the greatest among our liberties is suffrage. It is suffrage which protects property and life and all our other liberties. Mr. Madison, in 1785, writing to John Brown of Kentucky, urged upon him that the Legislature should not be allowed to abridge the right of suffrage—1 Mad. Writings, 178. "It is that right [said Alex. Hamilton] by which we exist as a free people"—3 Hist. Repub. U. S. 24. How much of blood and treasure has not been sacrificed to obtain it? When will men who know and appreciate liberty cease to value it above fortune and even life ? The Supreme Court of Pennsylvania say : "The most important of all our franchises is the right of an elector and citizen. It is true that, in a confined sense, it cannot be called property—it is not assets to pay debts—nor does it descend to the heir or administrator ; but who does not feel its value ? And who would not turn pale if he thought he could be deprived of it, without a hearing or trial, by an act of Assembly?" The court speak of the right of an elector as a franchise ; but by all authorities, English and American, "liberty" and "franchise" are synonymous terms—4 Tom. Jac. Law Dic. 148 ; 2 Black. 21-37. The right of the people to elect officers is a franchise—2 Bouv. Dic. 593. In Mr. Webster's argument, Dartmouth College case (5 Webster's Works, 479-81), he said " liberties and franchises are the same."

\* \* \* \* \* \* \*

" It cannot be necessary to say much in refutation of the idea that there cannot be a legal interest or ownership in anything which does not yield a pecuniary benefit, as if the law regarded no rights but rights of money, and visible, tangible property. Of what nature are all rights of suffrage ? No elector has a particular personal interest ; but each has a legal right to be exercised at his own discretion, and it cannot be taken away from him. Consequences of the utmost magnitude may sometimes depend on the exercise of the right of suffrage by one or a few electors. Nobody was

ever yet heard to contend, however, that for that account the public may take away the right or impair it."

Mr. Madison held that the citizen had not only a right to his property, but a property in all his rights—4 Writings of Madison, 478–80. When, under the English common and statute law, one was made a citizen of London or other city, or free burgess of any town corporate, "he had a freehold in his freedom during life"—2 Tom. Jac. Law Dic. 378. Can it be possible, your honors, that in America the liberty of suffrage is less secure than it is under the rule of Lords and Kings? Is it true that while an acre of land or fifty dollars in money is protected by a jury trial, the liberty of suffrage is not?

The deprivation of the liberty to vote in Missouri is by special statute law (R. C. 1855, p. 645, § 39) a brand of infamy. The learned Beccaria, after conceding that infamy is a punishment frequently inflicted for the commission of crime, adds the following sensible remarks touching its employment: "The punishment of infamy should not be too frequent; for the power of opinion grows weaker by repetition. Nor should it be imposed on a number of persons; for the infamy of many is the infamy of none"—Becc. on Crimes, 86.

As to the *third point*:—Do the sections under consideration inflict the punishment of disfranchisement without any conviction in the ordinary course of judicial proceedings?

Judge Story has put the definition of a bill of pains and penalties even more forcibly when he says, "In such cases the Legislature assumes judicial magistracy, pronouncing upon the guilt of the party without any of the common forms and guards of a trial, satisfying itself with proofs when such proofs are within its reach, whether they are conformable to the rules of evidence or not." Brande (Encyc. 873) calls it a "species of process employed to inflict punishment on State offenders out of the ordinary course of justice." Wooddeson, in an able article (38 Law Lib. 371) has carefully noticed the points in which the bill of attainder or pains and penalties departs from the ordinary course of judicial proceedings. Nothing is more important to the case at bar than the consideration of these points.

Wooddeson, speaking generally of these bills, says:

1. That in all of them the Legislature assumes judicial magistracy, weighing the enormity of the charge, and deciding on the political necessity and moral fitness of the penal judgment.

2. That they are all of them adapted to exigencies unprovided for in the criminal code.

He then identifies them by classes in the following manner:—

1. Bills that make a material innovation on the crime.

2. Bills that make no innovation on the crime, but change the rules of evidence.

3. Bills passed against domestic rebels and enforced in a summary mode without indictment or trial by jury.

4. Bills which affect the punishment making some innovation or creating some forfeiture or disability not incurred in the ordinary course of law.

Now, may it please the court, a disregard of the ordinary course of justice in any of the above mentioned particulars is enough to stamp upon these sections the character of a bill of pains and penalties. I will show that they embrace them all. I will show that when from each form of attainder which has been enacted in England, the constituent element is extracted, that same element will be found in the case at bar.

*First.* These sections disregard the ordinary course of judicial proceedings in this: they assume "judicial magistracy." The Supreme Court of Ohio has laid down distinction between legislative and judicial power with great clearness (16 Ohio, 623). "The legislative power may enact laws, but the judiciary declares their meaning. The judiciary declares what has been law, and what is law. The courts act on the past and the present; the Legislature on the future. To say that a law may be passed making that criminal then which is lawful now, is unmitigated despotism." Now may it please the court, if this be a true definition, the Convention did assuredly assume judicial magistracy. They did most certainly act on the past, which power belongs to the judiciary. The Convention did more—they undertook to say what was law with respect to facts already past. They assumed to decide that certain disabilities legally attached on such persons as had previously committed certain acts or spoken certain words. Now this was declaring both what the law was at the time they made sec. 3, and what it had been before they made it. Not only did the Convention do this, but they so contrived it that no court was allowed to inquire what the law was at the time the acts were committed, or the words spoken, which they assumed to punish. The Convention decided that by such acts or words the parties

stricken at were disfranchised absolutely, and took away from the case of those persons so much as they, the Convention, deemed it expedient to decide. Let this be made plain. The question is whether the Convention assumed judicial magistracy; whether they finally and judicially decided any portion of the case of the persons stricken at by sec. 3. This will be answered by tracing the practical operation of the plan adopted by the Convention to execute their work. Let us suppose a Christian minister is arraigned for preaching the Gospel without taking the oath required by sec. 9, article 2. He admits the facts charged in the indictment, but relies on the defence that he and some friends did once submit themselves to the authority of the enemy, who made a night attack, but he is unable now conscientiously to swear his submission was under overpowering compulsion. He asks the court to decide that such submission was not then legal cause of disfranchisement. Can the court hear this defence and uphold the 3d and 9th sections? Certainly not. The court must tell the prisoner that the Convention adjudged that question of law, and decided it finally; that the court had been prohibited by the Convention from looking into it. The court is obliged to tell the preacher that the only part of his case untried and unadjudged by the Convention is, whether he preached without taking the oath. Suppose it is a teacher who is on trial. He admits that he taught a school of orphan children for charity and the love of God, and did not file any oath about it; but that it is all a mistake about his doing any wrong acts or speaking any bad words; that the child unborn is not more innocent than he is of every thing in sec. 3; and he calls for proof of his guilt according to the laws of the land in force at the time. The court cannot allow this defence without overturning the sections, because the Convention has decided that no affirmative proof of his guilt is necessary. The Convention has told the court to treat him as positively guilty of all the matters in sec. 3. The Convention have ordered him to prove his innocence by an oath and told the court not to allow any other proof, *pro* or *con*.

The voter appears before the judges of the election. He was in arms in 1861 as a Union soldier against the rebel Government of Missouri, and could not take the oath. He wishes to read the laws of the United States and satisfy the judges his act was patriotic and honorable. But the judges respond to this, they have no right to look at the nature of

the act then, nor at the laws in force then ; that the Convention have solemnly decided that his act was deserving of ignominious disfranchisement, and that the decree of the Convention is proof positive not only that he made war on the rebel Government, but likewise on the United States, and there is no need for any evidence against him.

. It appears then that the act of the Convention is nothing less than a mandate to all officers commanding them to hold, in every case that arises, that sec. 3 is conclusive evidence of the disfranchisement of all such persons as fail to prove their innocence, no matter when the acts or words transpired, nor what the law was at the time. But such questions as these belong to the judiciary. But the Convention assumed to decide, and did decide them all. Therefore the Convention then assumed judicial magistracy. The Convention then adjudged an important part of the law of the case of every person who is stricken at by section 3. A case is composed of questions of law and fact. If a Convention could adjudge any of the questions of law belonging to a case, it might adjudge them all. There is no more reason why it should assume to adjudge questions of law than questions of fact. It might as well have adjudged all the facts. And experience has fully shown that such bodies, when they assume to decide one will decide the other, and decide all that are expedient. And it is in the assumption of such abitrary powers that legislative assemblies have not a few times gone the length of deciding that certain persons by name had committed specified acts when they had not, and that such acts were punishable with death when they were not, and that these special acts or legislative judgments, or bills of attainder, have been sometimes carried out by pusillanimous courts, and sometimes by machinery contrived specially for such cases.

The assumption of judicial magistracy is not allowed to legislative bodies even in civil cases.

In 1835 the Pennsylvania Legislature passed an act to the effect that " every last will and testament theretofore made or thereafter to be made, except such as had been finally adjudged, to which the testator's name had been subscribed by his direction, or to which he had made his mark or cross, should be deemed and taken to be valid." This was held to be a special act or legislative adjudgment made in the assumption of judicial magistracy, and void—11 Pa. 494.

In 1843 the same Legislature enacted that a certain sheriff's deed should be considered valid ; the same ruling was made as in the last case ( 33 Pa. 406), and the court remarked that "the law which gives character to a case, and by which it is to be decided, is the law that is inherent in the case and constituted part of it, when it arose as a complete transaction." * * * "If this law be changed or annulled, the case is changed and justice denied, and the due course of law violated." * * * "In the very nature of things, a law that is enacted after a case has arisen can be no part of that case. Such a law must produce an untrue decision—a decision not of a case arising between the parties as it ought to be, but a case partly created by the Legislature." And such also was the ruling upon an act which authorized a guardian to sell a minor's lands and pay the ancestor's debt (10 Yerg. 59) ; an act authorizing a person to sue without letters of administration (5 Yerg. 320) ; an act creating a special court to try certain causes in a certain way, directed by the act (2 Yerg. 599) ; an act dismissing certain suits (id. 554) ; an act empowering one to revive a judgment as if he was executor (4 Yerg. 202) ; an act directing a deposition to be read on a trial (1 Chip. 237) ; an act prohibiting an injunction (5 Cal. 74) ; an act removing an officer without cause (1 Dev. 1) ; an act granting leave to answer after default (4 R. I. 324) ; an act declaring the meaning of a law (5 Humph. 165) ; an act taking away an appeal (5 Ark. 358) ; an act granting a new trial (1 N. H. 199). All these cases were decided with reference to questions of property. Will a less stringent rule apply where the unauthorized assumption of judicial magistracy involves the infliction of disabilities approaching personal infamy?

The Kentucky Legislature passed an act that whenever any white man stated on oath to a justice of the peace a negro had lifted his hand against him, the justice should, without further investigation, order thirty-nine lashes to the negro. The Supreme Court of Kentucky annulled the law, it being a legislative judgment or assumption of judicial magistracy— 3 A. K. Marsh, 73. Apply these authorities to the case at the bar. The Convention has directed the judges of election to disfranchise the citizen on sundry charges of treason and *ex post facto* offences, and suffer no one to demand accusation, or notice, or proofs, but to require an oath of innocence. May it please the court, at no time in Missouri since

the existence of the State Government, has any department save the judicial exercised the powers employed by the Convention in these sections.

A few words only remain to be added under this head. That these sections were made in conformity to what their authors deemed political necessity is universally avowed; that they make no legal claims to favor, but rest alone on what is asserted to be a moral fitness, is quite as manifest.

*Second.* These sections disregard the ordinary course of judicial proceedings in this, that they are adapted to exigencies unprovided for in the criminal code. The disfranchisement of a large number of citizens for treason was an object in view. But under the criminal code that could not be effected soon enough to meet the views of the Convention. The criminal code provided for indictments, trials, and convictions. It also permitted pardons from the executive departments, State and Federal, and both these principles of that code were offensive to the Convention, and hence these sections.

The disfranchisement of a still larger number of citizens, who had violated no law, but had displeased the Convention, was an object in view. This class could not be disfranchised by any requirement to file an oath of innocence of crime. The Convention was compelled consequently to describe this class by other designations, which could not be denied under oath, and hence these sections.

A great deal was supposed to be gained by giving to sec. 3 the form of a general provision, while retaining all the force of a special act of condemnation, and hence the form of these sections. It would have been unconstitutional to say that A, B and C are hereby disfranchised for this or that act, for that would be a special law or legislative judgment made for the case of A, B and C. But to declare that all persons are disfranchised who did certain particular acts, only committed by A, B and C, would be a general law. To declare that John Smith is disfranchised for any named cause would be a special act for his case, a mere judgment against John Smith; but to provide that all persons who have ever answered to the name of John Smith within the State are disfranchised for such crime, would be a general law of the land, a rule of action for the people. So the Convention thought, or pretended to think. And this is the mode in which they met the political exigencies not provided for in the criminal code. Had they disfranchised every person who could not swear that he had

been a member of the Convention, it must have been all right, for the assembled Gods of Olympus never swelled higher nor laid claim to more transcendent powers than those sixty delegates of the people of Missouri.

*Third.* These sections disregard the ordinary course of judicial proceedings in this, they make a material innovation on the crime.

An examination of the analysis of sec. 3 will disclose the fact that among the offences therein mentioned as cause of disfranchisement, not less than thirty-five are offences after the fact created by that section ; further, that the penalty of disfranchisement never did attach on any of these acts before its enactment. This species of pains and penalties Mr. Wooddeson has detected in the case of Lord Clarendon, who was disfranchised and banished because he left England while under prosecution, no such act being penal under any law of the realm. It will further appear by sec. 6, art. 5, of the new Constitution, that the power of pardon is taken away from all persons mentioned in sec. 3.

*Fourth.* These sections disregard the ordinary course of judicial proceedings in this, they change the rules of evidence.

1. The law in force at the time all the acts of treason mentioned in sec. 3 are supposed to have been committed, was in these words : " No person can be convicted of treason unless on the testimony of two witnesses to the same overt act "— Cons. R. C. 1855, p. 84, § 15. This clause is omitted in the new Constitution purposely to allow other evidence.

2. The Convention having gotten rid of the two witnesses, decreed the guilt of all persons who would not or could not swear to their innocence.

3. They exclude all evidence, save only the filed affidavit, although such affidavit was no evidence when the supposed treason was committed.

Nothing is plainer than that the ordinary course of judicial proceedings in Missouri, at the time when the offences before or after the fact mentioned in sec. 3 were committed, forbade any person to be put upon his oath as to whether he had committed an offence or not. Prior to the new Constitution criminal justice here was accusatorial in every feature. It had never been otherwise in any State of the Union. But the American jurist, on scanning the short and forcible device for executing the judgment of the 3d section, is shocked to discover a total absence of the accusatorial method, so

well understood and so much loved by free nations, and the substitution of the hated inquisitorial in lieu thereof. Dr. Francis Lieber once was a lawyer and a statesman. In his Civil Liberty, vol. 1, p. 87, he says: " Another guarantee of the last importance is the well-secured penal trial, &ast; &ast; &ast; a distinct indictment charging a distinct act, the duty of proving this act on the part of the Government, and not the duty of proving the innocence on the part of the prisoner, &ast; &ast; &ast; the accusatorial and not the inquisitorial process." This is what Dr. Lieber declares to be the right of every person charged with a crime under a free government. The intelligent reader, whether of law or history, will recognize the truth of his declaration. But what securities are provided by these sections? A citizen, whose liberty to vote has been heretofore unquestioned, goes forward on election day and tenders his ballot to the judges; he is informed that there is a question about his liberty of suffrage; that he stands charged with treason and other offences, eighty-six in number. He calls for an indictment, according to the ordinary and long settled course of judicial proceedings in Missouri, and offers to meet it promptly. But he is informed that he has no longer any right to an indictment; that the Convention has rendered it unnecessary. He demands specifications of the charge, with time, place, manner, &c.; but he is told that the Convention has relieved them from the burden of furnishing any. He asks for the proof on which these grave and manifold charges are preferred; but he is given to understand the Convention has done away with all that. He wishes to know who makes these charges; he can obtain no answer. He inquires which one of the eighty-six acts he is supposed to be guilty of. He is then told that there is no accuser, and no need of any; but that the Convention has passed a law which proves that he is guilty of all the specifications in sec. 3, and until he makes and files an affidavit of innocence, touching all acts therein, his case cannot be even considered! Perhaps the citizen, after examining the section, declares he is ready to respond to the inquisition as touching all crimes or breaches of any law; that he is guilty of none, but that he did commit some acts mentioned, innocent at the time, and he wishes to produce the statutes and prove that said acts were not penal at all, or not grounds of disfranchisement. But he is told that all this would be of no use, as the Convention has decided that the acts, however innocent then, are criminal

now, and that he stands disfranchised by the Convention without the breach of any law ! Perhaps the citizen discovers nothing in sec. 3 of which he cannot truly acquit himself under oath, and promptly takes and files the oath and again offers his ballot. But is he now entitled to a vote ? Not at all. For the judges inform him that Mr. Scallewag has just testified that some portion of his affidavit is untrue, and his vote is rejected. Here the citizen boldly asserts that Scallewag is a reckless knave, and that he can prove by hosts of witnesses not only that his own affidavit is true, but that Scallewag is unworthy of credit. At this point the judges are compelled to admit that they cannot summon any witnesses—they have no power—that no one has such power —the Convention did not think it necessary !

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

It has been asserted by the friends of the Missouri test oath that it has long been in use, and proved itself a deserving instrument of the State for the promotion of criminal justice. I cannot assent to this declaration. That the Spanish Inquisition may have used an oath in something like the manner in which it has been used in Missouri may be true. I will not assert that this is so ; for I do not wish to do any injustice to the Spanish Inquisition. That the Protestant ecclesiastics may have acted quite as badly as the Spanish priests is not denied. But I will affirm that Queen Elizabeth's inquisition never went so far as the Missouri Convention. I will affirm, after some research, I have found nothing in the laws of England or America to justify the assertion that such a device ever entered before into the mind of any English or American law-giver. Oaths have been common in all that history ; oaths of pledge or promise to abjure or support sovereignties, reigning families of princes, religious or political dogmas, to observe or perform official duties, &c. But a test oath to ascertain if a party had been guilty of crimes made before or after the fact, some eighty-six in number, is what, I affirm, I have seen no mention of in English or American law. Nowhere has there been discovered any such device as that by which citizens are denied their common liberties as such, and even the common liberties of men, unless they could forswear their innocent lives in whole or in part.

One of the plainest principles of the English common law was that no man could be compelled to criminate himself, nor could any one be subjected to a penalty or deprived of a

liberty because he would not swear that he had never committed a crime or done any infamous thing. But this test oath does provide that unless the persons at whom it is aimed will swear to their innocence of a long list of treasons, as well as a longer list of offences, made after the fact, their silence shall be punished as if they had been convicted of actual guilt. That this is contrary to the ordinary course of justice, see 3 Yerg. 429; 1 Green. Ev. 587; 6 Cow. 254; 1 Burr's Trial, 244; 8 Wend. 595; 4 Wend. 215; 4 Taunt. 424; 2 Swanst. 295; 16 Ohio, 623; 1 Speers, 128; 3 Hill, 395; 3 Denio, 593; 1 Curtis, 332; Pitman's opinion, 335. The same rule laid down by the authorities just quoted prevails in Missouri to-day in respect to all other cases and all other persons, and the sections in question, providing that silence is guilt, are only a special law aimed at a class of persons, a legislative judgment against those persons.

*Fifth.* The sections in question disregard the ordinary course of judicial proceedings in this : they have been enacted against domestic rebels and enforced in a summary manner, without indictment or trial by jury.

It is remarkable that scarcely any person undertakes to defend these sections without insisting that domestic rebels have no rights under the laws or Constitution ; that the crime of rebellion is such that it has worked a forfeiture of even those rights which peculiarly belong to criminals. It is remarkable that these sections should have been carefully made to carry out this pet idea of their authors, and that this very idea should emphatically fix on their work the definition of a bill of pains and penalties. Rebels are nothing more than criminals. They are nothing worse than criminals. As such they are entitled to the benefit of all laws made for criminals. If not so, may it please the court, who is entitled to the benefit of the criminal laws ? The innocent have no use for them ; and if the guilty have no claims on the rights conferred by these laws, then they are mere nullities. . Wooddeson says that a British statute passed against domestic rebels, to be enforced in a summary manner, without indictment, that is, without the privilege of such trial as an indictment confers, is a bill of attainder, because a departure from the ordinary course of judicial proceedings in England. It cannot be less so here. The Constitution of Missouri since 1820 has contained the following provisions directing the ordinary course of criminal justice : " That no person can for an indictable offence be proceeded against

criminally by information, except in cases arising in the land
and naval forces, or in the militia, in actual service in the
time of war or public danger, or by leave of court, for op-
pression or misdemeanor in office"—see art. 1, § 24, new
Cons. Mo. " That in all criminal prosecutions the accused
has the right to be heard by himself and counsel, to demand
the nature and cause of accusation, to have compulsory pro-
cess for witnesses in his favor, to meet the witnesses against
him face to face ; and in prosecutions, on presentment or ·
indictment, to a speedy trial by an impartial jury of the
vicinage ; that the accused cannot be compelled to give evi-
dence against himself nor be deprived of life, liberty or prop-
erty, but by the judgment of his peers or the law of the
land"—art. 1, § 18, new Cons. Mo. These important provis-
ions of constitutional law have been substantially gathered
from British statutes.

The language of Magna Charta is as follows : " No free
man shall be taken or imprisoned, or disseized of his free-
hold or his liberties, or his free customs, nor be outlawed or
exiled, nor in any manner destroyed, nor will we pass upon
him or condemn him, unless by the legal judgment of his
peers or the law of the land"—3 Sto. Cons. 661.

By an act of 25 Edward, § 5, ch. 4, it was declared : " None
shall be taken by petition or suggestion made to the King or
his council, unless it be by indictment of lawful people of
his neighborhood, or by process made by writ original at the
common law. And none shall be put out of his franchise or
freehold unless he be duly brought to answer, and forejudged
by course of law ; and if anything be done to the contrary,
it shall be redressed and holden for none." The statute (42
Edward 3, ch. 3) declares " no man shall be put to answer
without presentment before justice, or matter of record of
due process, or writ original according to the ancient law of
the land."

These statutes, and many others reasserting and confirm-
ing them, were, by the Bill of Rights, assented to by William
of Orange, and enacted by Parliament—William and Mary,
ch. 2, stat. 2—proclaimed to be, and to have always been,
the ancient common law—4 Tom. Jacobs' Law Dic. 148–57.
It is scarcely necessary to say, may it please the court, it was
never intended to abate on the part of the American people
any portion of the substantial liberties of Englishmen. The
war of 1776 grew out of a claim made by America to these
liberties, and the battles of the revolution were fought to

make good that claim. They made it good ; and the people preserved it in constitutional guarantees, among which the clauses above quoted are worthy to be considered. These clauses secure every citizen against annoyance from criminal charges and harassments for capital or infamous crimes, unless by indictment or presentation on oath by lawful men. They provide that no man shall be put out of his property or franchises on mere information or suggestion. They require that before a citizen shall be brought to answer, the charge against him shall be made of record, and due process issue according to the " ancient law of the land." The elder Adams (see 3 vol. Works, p. 481) speaking of common law trial by jury, says, " In this manner the subject is guarded in the execution of the laws. The people choose a grand jury to make inquiry and presentment of crimes. Twelve of these must agree in finding a bill. And the petit jury must try the same fact over again, and find the person guilty before he can be punished. Innocence, therefore, is so well protected under this wise Constitution ( the British) that no man can be punished till twenty-four of his neighbors have said upon oath that he is guilty." If there be any value in the constitutional guarantees I have quoted, they secure to the citizen, in all cases where he is charged with an indictable offence, the right to be indicted and tried. They virtually declare that a charge shall be preferred in no other manner—Rawle on the Cons. p. 128. These constitutional guarantees contemplate that before any citizen can be deprived of life or liberty, or property, he shall be legally prosecuted, heard, tried and condemned. Information or suggestion of guilt may be ground for prosecutions in the army or navy, but nowhere else ; and even there the party has an absolute right to a trial. The process adopted by the new Constitution to disfranchise persons, is by mere suggestion or information. The Constitution or the election judges suggest the guilt and set the prosecutions on foot, and thus the disfranchisement is effected without any indictment or trial. The answer usually made to the argument founded on these constitutional provisions is, that there is no information filed against any one—no criminal proceeding begun —no prosecution of any sort ; no witnesses called against anybody, and therefore the constitutional provisions do not apply to the case ; the meaning of which is simply that a citizen can be disfranchised or his property confiscated for treason, without any charge or trial for treason ! The pur-

pose of the Constitution was to protect the citizen against loss of life, liberty or property in consequence of any crime alleged against him, until a legal charge of that crime is preferred and he is allowed to make his defence. Those who seek to oppress him and take away his rights, are aware that if they make a charge he is entitled to an indictment and a trial by jury, and therefore they proceed to rob and disfranchise him without any formal charge ; and claim they may rightfully do it, because they have made no charge.

But treason is an indictable offence. It cannot be proceeded against criminally on information. There must be an indictment—24 Ala. 692 ; 2 Parker, Cr. R., 320—and every indictment is triable by jury, and no person can be deprived of life, liberty or property but by the judgment of his peers or the law of the land. When a penalty is imposed and actually inflicted on a person for a crime committed by that person, it is not only absurd, but it is dishonest, to pretend that the person is not, in such case, criminally prosecuted. Why gravely provide by constitutional enactments in what manner criminal prosecutions shall be conducted, if a citizen may be punished without any prosecution ? The common sense of the matter is that in all such cases the accused has the right to trial by jury—3 Cow. 706 ; 6 Mon. 643 ; 17 Texas, 415 ; 2 Hilton, 415 ; 37 Maine, 165. "It must be judicially ascertained that the citizen has forfeited his privileges, or some one else has a superior title to the property he possesses, before either can be taken from him" —4 Hill, 146 ; 3 R. I., 64 ; 1 Mo. 244. No man should be punished for an offence until he has had a trial and been found guilty, and a law which prohibits a trial punishes the innocent as well as the guilty. There being no accusation does not help the matter. When the Constitution requires the accused to be notified of the accusation, it means there must be an accusation ; the accused has an absolute right to it. The accused has the absolute right to trial by jury. He has also the right to be so charged, that when the trial takes place, the jury shall pass on the whole charge— 1 Curtis, 331. Story (3 Cons. 658) says that the provision concerning indictments is a security against prosecutions in any other mode—3 Black, 379.

Will the court consider for a moment the consequence of holding that, provided no charge is made, the accused is by that fact deprived of the right of trial touching the cause alleged for taking away his life, liberty or property ? Should

Blair v. Ridgely et al.

a law be passed to the effect that no citizen shall be allowed by the clerk of any court to sue out a writ; or by the recorder of any county to file a deed for record ; or by any butcher, to purchase from him a piece of meat, unless he has previously filed an oath that he has neither committed treason nor experienced a sense of disaffection towards the Government of the United States in the late disturbances ; what objection could be raised to its validity, provided the sections under consideration are deemed valid, because they make no charge and set on foot no prosecution ?   Another answer to the constitutional provisions has been founded upon an erroneous interpretation of the words " or the law of the land."   This answer asserts that a party accused of treason, or other crime, has no absolute right to trial by jury, but has a right to trial by jury, " or the law of the land ;" one or the other, but not both.   It further insists that the 3d section of the 2d article of the new Constitution is that law of the land to which the citizen is entitled in lieu of the bill of indictment and trial by jury.   Never was there a greater error.   The suggestion can only spring from an utter ignorance of the whole subject.   These words, " law of the land," mean not a special law, made for the case of any particular person or persons, but the general law of the land operating prospectively against all persons.   They embrace the law in force at the time any act is committed, and they affirm in addition the right of the accused to prosecution by indictment and to trial by jury.   Lord Coke asserts that the meaning universally attributed to these words at the time of Magna Charta, and since, was " Due process of law, and that is presentment or indictment of good and lawful men, and being brought to answer thereto by due process of law"— 2 Kent Com:, p. — ; 3 Sto. Cons. 661—so that the words affirm the right of trial according to the process and proceedings of the common law.   These words, " the law of the land," do not mean an act of the Legislature, * * * * " for if so this branch of the government could at any time take away life, liberty, property and privilege without a trial"— 37 Maine, 165.   " They do not mean that no man shall be disfranchised or deprived of the rights of a citizen unless you pass an act for that purpose ;" but they do mean that it " shall be judicially ascertained that the citizen has forfeited his privileges, or some person has a better title to the property he possesses, before either can be taken from him"—4 Hill, 146.   The same measure of protection is extended to life,

liberty and property. If one may be taken without a forensic trial, there is no security for the others—Id. 147. When an offence is either capital or infamous, the Legislature cannot proceed in any other manner than by indictment or presentment—3 Mo. 77, Ledford's case. In the Dartmouth College case, Mr. Webster, speaking of the statute of New Hampshire, which took away the right of certain directors of the board, said: "Are these acts of the Legislature which affect only particular persons, and their particular privileges, laws of the land? Let this question be answered by the text of Blackstone, and first: It (the law) is a rule, not a transient sudden order from a superior to or concerning a particular person, but something permanent, uniform and universal; therefore, a particular act of the Legislature to confiscate the goods of Titius or to attaint him of high treason, does not enter into the idea of a municipal law, for the operation of this act is spent upon Titius only, and has no relation to the community in general. It is rather a sentence than a law. * * * By the law of the land is most clearly intended the general law—a law which hears before it condemns, which proceeds upon inquiry and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not therefore to be considered the law of the land. If this was so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees and forfeitures in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance inoperative and void. It would tend to establish the union of all powers in the Legislature. There would be no general permanent law for courts to administer or men to live under. The administration of justice would be an empty form, an idle ceremony; judges would sit to execute legislative judgments and decrees, not to declare the law, or to administer the justice of the country."—5 Webster's Works, 487; 11 Pa. 494; 33 Pa. 496; 10 Yer. 59; 5 Yer. 320; 2 Yer. 599; 4 Yer. 202; 1 Chip. 237; 5 Cal. 73; 1 Del. 1; 4 R. I. 324; 5 Humph. 165; 5 Ark. 358; 1 N. H. 199; 6 Pa. 91; 3 A. K. Marsh, 73; 3 Humph. 483; 6 Cranch, 87.

*Sixth.* The sections in question disregard the ordinary

course of judicial proceedings in this—they affect the punishment by creating a disability not incurred in the ordinary course of law.

Professor Wooddeson says he means by this such acts of Parliament as fix on a person a disability which the courts of justice could not, under the law at the time of the act, have adjudged against him. That this class of matter is found in the 3d section, and upon almost every line of it, needs no illustration.

May it please your honors, let us now review the course of the argument. Its aim has been to show these sections of the new Constitution within Wooddeson's and Story's definition of a bill of pains and penalties; and this has been done by establishing the following propositions : That these sections are adapted to political exigencies not provided for in the criminal code; that they are penal—taking away for treason committed, as they suppose, the most valuable of all the liberties of the citizen; that they assume judicial magistracy, deciding questions of law, and innovating on the crime—also on the rules of evidence, doing away with accusation, indictment, or presentment, proofs and trial; instituting inquisitions; authorizing a summary method of punishing domestic rebels ; not allowing to those criminals the benefit of criminal laws ; and, finally, designating a large class of citizens by certain innocent acts done by them heretofore, and then punishing them by a disability not incurred in the ordinary course of law, since no court was authorized to impose it, merely because they answer to such description ; and that they are not rules of action at all, but apply to matters past when made ; that they are not general, but particular laws—that is, legislative sentences or judgments. If the definitions are correct, the argument seems to be sufficient.

Allow me, if you please, now to invite your attention to several genuine bills of pains and penalties enacted in Parliament. In 6 How. State Trials, 391, is found the following:

"*An act for banishing and disenabling the Earl of Clarendon.*

" Whereas Edward, Earl of Clarendon, having been impeached, by the Commons assembled in Parliament, of treason and other misdemeanors, hath knowingly withdrawn himself, and is fled, whereby justice cannot be done upon him according to his demerits, be it enacted by the King's most excellent majesty, by and with the advice and consent of the Lords, spiritual and temporal, and Commons, in Par-

liament assembled, and by authority of the same, that the said Edward, Earl of Clarendon, shall and do suffer perpetual exile, and be forever banished this realm, and all other his majesty's dominions, and shall be forever disabled from having, holding or enjoying any office or place of public trust, or any other employment whatsoever.

" And be it further enacted by the authority aforesaid, that it shall be, and be taken to be treason for the said Earl at any time to return into, or be found in England, or any other his majesty's dominions, after the 1st day of February, according to the account of England, 1667 ; and that in case the said Earl shall at any time return into, or be found in England, or any other his majesty's dominions, after the said 1st day of February, that the said Earl shall suffer the pains and penalties of treason, and be made incapable of any pardon from the King's majesty, his heirs and successors, but by act of Parliament; and that all correspondency with the said Earl, except it be of his children, or such persons as shall be licensed by the King in council, concerning his estate and domestic affairs only, after the said 1st day of February, shall be, and shall be taken to be, of the same nature as correspondency with a traitor, and the offender shall suffer such pains and penalties as by the laws of this realm are to be inflicted upon such persons as keep correspondence with traitors; and that all letters sent to the said Earl be showed to one of the principal Secretaries of State before they be sent ; and that all letters which shall be received from the said Earl be likewise showed to one of the principal Secretaries within ten days after each receipt, under the penalties aforesaid.

" Provided, always, that if said Earl of Clarendon, on or before the 1st day of February next, render himself unto one of his majesty's principal Secretaries of State, or to the Lieutenant of the Tower of London for the time being, in order to his trial, which shall be in Parliament, that then and in such case all and every the penalties and disabilities by this act imposed upon the said Earl of Clarendon shall be utterly void and of no effect, anything herein mentioned to the contrary notwithstanding."

I will now show your honors another specimen ( see 15 Brit. Stat. at Large, 68) ; it is in these words:

*"An act to inflict pains and penalties on Francis, Lord Bishop of Rochester.*

" Whereas in the years one thousand seven hundred and twenty-one, and one thousand seven hundred and twenty-

two, a detestable and horrid conspiracy was formed and carried on by divers traitors for invading your majesty's kingdoms with foreign forces, for raising an insurrection and rebellion against your majesty, for seizing the Tower and city of London, and for laying violent hands upon your majesty's most sacred person, and upon his royal highness the Prince of Wales, in order to subvert our present happy establishment in church and state, by placing a popish pretender on your throne; and

" Whereas, for the better concealing and effecting the said conspiracy, divers treasonable correspondencies were, within the time aforesaid, carried on by letters written in cyphers, cant words, and fictitious names, which conspiracy, had it not been disappointed by the goodness of Almighty God, would have deprived your majesty's kingdoms of the enjoyment of their religion, laws and liberties, involved them in blood and ruin, and subjected your people to the bondage and oppression of Romish superstition and arbitrary power, for which execrable treason Christopher Layer has been indicted, tried, convicted, and attainted; and

" Whereas Francis, Lord Bishop of Rochester, notwithstanding the many solemn assurances by him given of his faith and allegiance to your majesty by taking the oaths by law appointed to be taken instead of the oaths of allegiance and supremacy, which oaths he had likewise taken at sundry times during the respective reigns of their late majesties King William and Queen Mary, and of her late majesty Queen Anne, and, notwithstanding he had frequently abjured the pretender, hath, in direct violation of his said repeated oaths and obligations, and to the great scandal of religion and his holy function, been deeply concerned in forming, directing and carrying on the said wicked and detestable conspiracy, and has been a principal actor therein by traitorously consulting and corresponding with divers persons to raise an insurrection and rebellion against your majesty within this kingdom, and to procure a foreign force to invade the same in order to depose your majesty and place the pretender on your throne; and by traitorously corresponding with the said pretender, and persons employed by him, knowing them to be so employed;—therefore, to manifest our just abhorrence of so wicked and abominable a conspiracy, and our zeal and tender regard for the preservation of your majesty's person and government, and of the Protestant succession in your majesty's royal family, the solid

foundation of our present happiness and future hopes, and to the end that no conspirator may, by any subtle contrivance or practice whatsoever, escape punishment, and that all others may, by the justice of Parliament, be forever hereafter deterred from engaging in any traitorous conspiracies or attempts, we, your majesty's most dutiful and loyal subjects, the Lords, spiritual and temporal, and Commons, in Parliament assembled, do humbly beseech your majesty, that it may be enacted, and be it enacted by the King's most excellent majesty, by and with the advice and consent of the Lords, spiritual and temporal, and Commons, in Parliament assembled, and by the authority of the same, that the said Francis, Lord Bishop of Rochester, from and after the first day of June, in the year of our Lord one thousand seven hundred and twenty-three, shall be and is hereby, to all intents and purposes, deprived of all and singular his offices, dignities, promotions and benefices ecclesiastical whatsoever, and that the same, and every of them, shall from thenceforth be actually void, as if he were naturally dead ; and that the said Francis, Lord Bishop of Rochester, shall from thenceforth forever be disabled, and be incapable of and from taking, holding or enjoying any office, dignity, promotion, benefice or employment within this realm, or any other his majesty's dominions, and also of and from using or exercising any office, function, authority or power, ecclesiastical or spiritual, whatsoever, and shall and do suffer perpetual exile, and be forever banished this realm and all other his majesty's dominions, and shall depart out of the same on or before the five and twentieth day of June, in the year of our Lord one thousand seven hundred and twenty-three ; and that if the said Francis, Lord Bishop of Rochester, shall return into or be found in this realm, or any other his majesty's dominions, at any time after the said five and twentieth day of June, in the year of our Lord one thousand seven hundred and twenty-three, he, the said Francis, Lord Bishop of Rochester, being thereof lawfully convicted, shall be adjudged guilty of felony, and shall suffer and forfeit as in cases of felony without benefit of clergy, and shall be utterly incapable of any pardon from his majesty, his heirs or successors."

May it please the court, what is the difference, in principle, between the 3d section and the bills of pains and penalties just read ? The latter enact that Clarendon and Rochester have committed certain acts not subject to the penalties inflicted by any laws of the realm when committed. The

former recite the commission of acts not subject to these penalties by any law of Missouri or of Congress. The bill against Clarendon provides to annul the penalties if he will return and be tried by men who have prejudged his case. Our bill provides to allow it to be released on filing an oath, provided the judges of election believe the oath. The bills against Rochester and Clarendon deprive their victims of all their offices and functions, public and private, and all employments. Ours deprives its victims of all liberty, 1. To vote; 2. To hold office or be a candidate; 3. To sit as a juror; 4. To practice law; 5. To be an officer of a corporation; 6. To be a professor or teacher in any school; 7. To hold any property in trust for religious purposes; 8. To act as a bishop, priest, deacon, minister, elder or clergyman of a religious denomination; 9. To preach or teach as such, or solemnize marriages.

All of them proceed in disregard of the ordinary course of judicial proceedings.

I will now show the Court a sample of another production. See 15 Brit. Stat. at Large, p. 65, and read as follows:

*"An act to inflict pains and penalties on John Plunket.*

" Whereas, in the years one thousand seven hundred and twenty-one, and one thousand seven hundred and twenty-two, a detestable and horrid conspiracy was formed and carried on by divers traitors, for invading your majesty's kingdom with foreign forces, for raising an insurrection and rebellion against your majesty, for seizing the Tower of and City of London, and for laying violent hands upon your majesty's most sacred person, and upon his royal highness the Prince of Wales, in order to subvert our present happy establishment in church and state, and to place a popish pretender on your throne; and, whereas, for the better concealing and effecting the said conspiracy, divers treasonable correspondencies were, within the time aforesaid, carried on by letters written in cyphers, cant words, and fictitious names; which conspiracy, had not Almighty God in his great mercy disappointed the same, would have deprived your majesty's kingdoms of the enjoyment of their religion, laws and liberties, involved them in blood and ruin, and subjected your people to the bondage and oppression of Romish superstition and arbitrary power, for which execrable treason Christopher Layer hath been indicted, tried, convicted and attainted; and whereas John Plunket hath been a principal actor in the said horrible and detestable conspiracy, by traitorously

consulting and corresponding with divers persons to raise an insurrection and rebellion within your majesty's kingdom, and to procure a foreign force to invade the same, with a design to depose your majesty, and to place the pretender on your throne, by traitorously corresponding with the said pretender, and by engaging in a most execrable and villainous design of laying violent hands upon the sacred person of your majesty (whom God long preserve): therefore, to manifest our just abhorrence of so wicked a conspiracy, and our zeal and tender regard for the preservation of your majesty's person and government, and for the Protestant succession in your majesty's royal family, the solid foundation of our present happiness and future hopes; and to the end that no conspirator may, by any contrivance or practice whatsoever, escape punishment, and that all persons may be by the justice of Parliament forever hereafter deterred from engaging in any traitorous conspiracies or attempts, we, your majesty's most dutiful and loyal subjects, the Lords, spiritual and temporal, and Commons, in Parliament assembled, do humbly beseech your majesty that it may be enacted, and *be it enacted* by the King's most excellent majesty, by and with the advice and consent of the Lords, spiritual and temporal, and Commons, in Parliament assembled, and by the authority of the same, that the said John Plunket shall be detained and kept in close and safe custody, without bail or mainprize, during the pleasure of his majesty, his heirs and successors, in any gaol or prison within the kingdom of Great Britain; to the custody of the gaoler or keeper whereof the said John Plunket shall from time to time be committed, in pursuance of this act, by warrant under the hand and seal of any Secretary of State of his majesty, his heirs or successors, which warrant or warrants any Secretary of State for the time being is hereby authorized and empowered to make; and that the said John Plunket shall forfeit to his majesty all his lands, tenements, hereditaments, goods and chattels whatsoever.

"II. And for the more sure detaining of said John Plunket in safe custody, be it further enacted by the authority aforesaid, that if the said John Plunket shall break such gaol or prison to which he shall be so committed, or shall escape out of the custody of the person in whose custody he shall be by virtue of such commitment, that then the said John Plunket, and all and every person and persons whatsoever who shall be aiding or assisting the said John Plunket

in breaking such goal or prison, or in making such escape as aforesaid, or who shall by force take or rescue the said John Plunket out of such custody, gaol or prison, during the continuance of his imprisonment by virtue of this act, being thereof lawfully convicted, shall be adjudged guilty of felony, and shall suffer death, as in case of felony, without benefit of clergy."

The several provisions of this bill against Plunket are worthy of a careful reading.

Before laying down these old records, I will present the court with still another relic of a species of legislation, which it was intended by the founders of our institutions should never obtain here. In 29 British Stat. at Large, 241, you have a bill in this form—it is a bill to take away the right of suffrage for crime:

"*An act to incapacitate* John Burnett, Charles Hannington, Thomas Haselgrove, Ralph Moor, Thomas Parsons, Thomas Snook, Jr., Thomas Hannington, John Robinson, William Cheesman, George Brown, John Parsons, John Curl, Frederick Dean, William Dean, Samuel Tuppen, John Sawyers, Thomas Crowter, Thomas Pockney, Joseph Dedman, John Dean, John Whiting, William Stevens, John Bawcomb, Robert Parker, John Hogsflesh, John Purse, John Dean, Thomas Jennings, John Snook, Jr., Richard Tilstone, William Turner, Walter Sawyers, Charles Mitchell, John Jarmand, John Wood, Friend Daniel, William Gratwick, Nathaniel Hillman, Thomas Roberts, John Ashman, William Cooter, Thomas Frost, Michael Smith, Richard Carver, Michael Durrant, Emery Churcher, Walter Broad, Richard Stoneham, James Bennett, Clement Freeman, William Jupp, Thomas Crowter, John Barnard, James Mitchell, James Millar (otherwise Miller), William Newnham, Jeffrey Carver, Randall Button, James Carver, John Martin, John Dedman, Sr., William Jennings, William Hards, Thomas Gear, William Rushbridge, Henry Robinson and Henry Hannington, from voting at election of members to serve in Parliament, and for the preventing bribery and corruption in the election of members to serve in Parliament for the borough of New Shoreham, in the county of Sussex.

" Whereas a weak and corrupt society, calling itself the Christian Society, hath, for several years, subsisted in the borough of New Shoreham, in the county of Sussex, and con-

7—VOL. XLI.

sisted of a great majority of persons having a right to vote at elections of members to serve in Parliament for the said borough ; and whereas it appears that the chief end of the institution of the said society was for the purpose of selling, from time to time, the seat or seats in Parliament for the said borough ; and whereas said persons were members of the said society ; in order, therefore, to prevent such unlawful practices for the future, and that the said borough from henceforth be duly represented in Parliament, be it enacted by the King's most excellent majesty, by and with the advice and consent of the Lords, spiritual and temporal, and Commons, in this present Parliament assembled, and by the authority of the same, that the said persons shall be, and by the virtue of this act are, from henceforth, incapacitated and disabled from giving any vote at any election for the choosing a member or members to serve in Parliament."

See further 8 Brit. Stat. at Large, 444 ; 13 id. 306 ; 10 id. 397 ; 3 How. St. Trials, 158 ; 13 Brit. Stat. at Large, 286 ; 8 id. 44 ; 10 id. 6 ; 13 id. 213 ; 18 id. 455 ; 15 id. 66.

These instruments, upon all whose parts are stamped the *worst features of factious malignity and tyranny,* call for no further criticism. As illustrations of the principles of such bills as defined by the text writers, they are perfect; as monuments of the wisdom of our fathers in declaring that never, never should any such find place in our legislation, it is hoped they may prove more lasting than marble or brass.

The plaintiff insists that sec. 3, art. 2, is an *ex post facto* law in the meaning of the Constitution of the United States; and being void for that reason, the other sections in aid must fall with it.

There is no argument and no authority which would overthrow a bill of attainder, that would not at the same time destroy the constitutional validity of an *ex post facto* enactment. An *ex post facto* law is one which punishes an act committed before it was made, in a manner it was not punished when committed ; and this punishment may be capital, or it may consist in a mere forfeiture or disability. It may consist merely in such a change of the rules of evidence as makes it easier to convict the accused—3 Dallas, 386 ; 6 Cranch, 87 ; 3 Murphy, 234, 327 ; 1 Kent's Com. 408 ; 1 Black, 193 ; 2 Gallison, 193 ; 2 McLean, 212 ; 22 N. Y. 139 ; J. R. 1 ; 4 N. H. 287. When a law declares that if a citizen shall do any act manifesting disaffection towards the govern-

ment, or any officer thereof, he shall be disfranchised, that is the creation of an offence before the fact; but when a law declares that he who has heretofore done any act manifesting disaffection towards the government shall be disfranchised, that is the creation and punishment of the offence after the fact; that is an *ex post facto* law, and falls within the constitutional prohibition.    There can be no liberty in any State where the legislative power is competent to make such enactments.    Walker (Amer. Law, 423) reviews the constitutional guarantees of liberty in |this country, and adds, with something of patriotic enthusiasm : " The result is that we enjoy the glorious privilege of knowing that the past is secure so far as punishment is concerned.    Under no state of excitement can a vindictive Legislature animadvert upon past transactions.    If we take care to escape existing penalties, we need be under no apprehensions as to retrospective ones."

3. The plaintiff insists that sec. 3 of art. 2 is void because it assumes, on the part of the State, power and jurisdiction to punish offences against the United States, and to punish such offences regardless of the power of 'pardon and amnesty lodged in the President, and in defiance of the wishes and policy of the Government of the United States.

Two propositions have been strenuously insisted on by the friends of these sections.    1. It is said that they inflict no punishment for any offence either before or after the fact ; but that they are mere qualifications of persons to vote, preach, practise law, &c. ; that the State has the unquestioned authority to regulate suffrage and other privileges of the citizen, and is by said sections only regulating these important matters.    It is not denied that the State possesses the power to declare what qualifications shall attend the right of suffrage; nor can it be denied that the State possesses the power to punish crime.    The two powers must not be confounded with each other.    If they are kept carefully separated in the mind, the rights and duties which belong to them will be also separated, and all difficulties in comprehending the proper range and scope of either power will vanish.

A declaration by constitutional authority that all persons of a certain age, or sex, or degree of intelligence, shall enjoy the liberty of suffrage, would be a legitimate exercise of the power of the State to regulate suffrage ; but a declaration that certain persons, already citizens of the State, are deprived of the liberty of suffrage, which they possess, because they have committed treason, is an exercise of the power to

punish crime, and has no binding force, because it is in conflict with constitutional provisions which limit and control that power.

There is no doubt that the power to punish crime may, under certain restrictions, be employed to interfere with the liberty of suffrage and every other liberty of the citizen. This fact has always had recognition in the Constitution as well as in our statute law. In 1820 the Constitution of Missouri provided the General Assembly should have power to exclude from every office of honor, trust or profit within this State, and from suffrage, all persons convicted of bribery, perjury or other infamous crimes, and this provision has never been changed. The statutes already quoted in these remarks abundantly show how willing the Legislature has been to exclude from our elections the ballots of all convicted felons. The people of Missouri have never objected to the employment of this power. No good citizen, no man who really values the liberty of suffrage and the transcendent importance of the purity of elections, would object to it. On the other hand, no Missouri Legislature has ever dared to assume the power of convicting any man of a crime, or of depriving him of suffrage, or of any portion of his liberty, without a judicial trial. Nor did any Convention, until the present unhappy troubles, ever exercise or claim the power so to do.

While it is not denied that the Convention had power to provide for the punishment of crimes, it is insisted that it could not do so by any bill of attainder or pains and penalties. It could not disfranchise without judicial investigation. It could not enact that any rebel had forfeited the right to a legal trial by indictment and jury, or proofs of his guilt, or any other benefit of those criminal laws which were made for the benefit of alleged criminals. It could not impute treason to any person and then quote its own statement as proof of such person's guilt, or infer the guilt from the silence of any person to respond to an inquisitorial oath.

If, therefore, the Convention had power to regulate suffrage in Missouri, which is not denied, they had no power to inflict disfranchisement for the crime of treason in the manner they did.

The State has the power to regulate contracts, and prescribe what evidence shall establish their existence; the State has power to regulate marriage and prescribe the age of the parties, and the ceremonies by which they shall be made husband and wife. The State has the power to pro-

tect a citizen in the enjoyment of his religion, and provide the means of such protection; but what would be thought of a law which declared that no man should accept a deed for land unless he would first swear he had never been intoxicated; that no man should marry a wife unless he should first swear he had never promised to marry another woman, and no man should preach unless he would swear first he did not believe in the Holy Trinity.

Does not every one see at once that these laws, so called, would be mere cheats—that there is no regulation of contracts or marriage, and no protection of religion in such enactments; that, in fact, the operation is to punish the act of intoxication, the prior contract of marriage, and the belief in the Holy Trinity, wherever found, and to specially inflict penalties on the class of persons described by such language. It is worthy to be noticed that while the intention to punish is so strenuously disclaimed, the same persons who are disfranchised by sec. 3 are pursued with the most vindictive persecution through all the other proscriptive clauses of the Constitution.

The other proposition urged in favor of these sections is, that the State must have power to protect itself. That self-protection is the great first law, and, therefore, the Convention had power to exclude from all participation in the Government the enemies of the Government.

But none of those who use this argument will give any intelligible definition of what they mean by "the State." They assert that the State has power to protect itself—that self-protection is the first law—and that the State may use any power that is necessary for this purpose. But what is the State in the meaning of these persons? Is it the militia? Is it the Governor? or the Legislature? Is it the Union party? Is it the Radical party? Can a political majority, which happens to dominate for the time, arrogate the title and powers of the State, and arbitrarily set forth its notions as the perfection of reason and ultimate standard by which the public good and the public ill, and the friends and enemies of the State are to be ascertained and dealt with? Is this the light in which we are to view the powers of the Convention. If so we can understand that the Convention, as the representatives of the political party, claimed omnipotent powers, and held themselves emancipated of all restraints. If this is the scope of the argument, I do not hesitate to denounce it as breathing the worst spirit of the worst men

in the worst times. Such has been the tyrant's plea from the beginning of the world. An Athenian Assembly or a Roman Senate never set up larger pretension, nor did either ever announce a more unqualified tyranny.

I shall now ask leave to present my own idea of the State, and proceed to examine the nature of its powers of self-preservation. This question, "What is the State?" ought not to be difficult for any American. If our political history has had any significance, its whole purpose has been to answer this very question. The State of Missouri is a political organization based upon specific principles. Russia is a despotic State, based on one principle, viz.: that the Czar is an absolute ruler, whose will is law. The State of Missouri is a free State, based upon the principles of liberty. These principles are defined by its organic laws. Whoever or whatever protects these principles, protects the State; whoever or whatever makes war on these, makes war on the State. Among these principles of liberty are the following: The rights of conscience are sacred; speech is free; the press is free; involuntary servitude, save for the punishment of crime, whereof the party shall have been duly convicted, shall not exist; justice shall not be sold, denied nor delayed, nor private property taken without compensation; trial by jury remains inviolate; no man shall be deprived of life, liberty or property except by the judgment of his peers or the law of the land; no *ex post facto* laws or bills of attainder; the powers of the Government to be divided among the separate departments; all political power is invested in and derived from the people; all government is derived from them, and is instituted solely for their good. Now, it will be observed that one of the foundation stones of the State is the doctrine that it is a popular government, emanating from the will of the people, governed by the people—solely instituted, carried on, administered for their good. Nowhere is it hinted that the people are made for the good of the State, nor that the State is above the people; but everywhere that the State is a mere instrument for promoting the popular well-being. All government, says the State of Missouri, "originates from the people and is founded on their will only." Observe, it is not said from the virtuous people, nor the people who have never rebelled, nor the people who obey the laws.

It proclaims merely that the authority of the people—such as they are—with all their weaknesses and all their faults,

and it trusts to and depends upon them. The State of Missouri, thus defined, stands before the world emphatically a popular government, limited and controlled only by the checks and balances of its Constitution. The Government of Great Britian, from which we separated in 1776, was not a government of the people. It was based on the opposite idea—that is, that the people cannot be trusted, are unfit to manage, and must have masters; one of these masters they called King. To him the people owed allegiance. On his death the right to govern passed to another by descent, like a tract of land. Besides Kings, they had many other hereditary rulers, called noblemen — lords, temporal and spiritual — deriving their right to rule by inheritance or special grant of power from the throne, and without the consent of the people. These claim to be a purer procelain of earth, and a better blood than falls to the lot of common men. This is the sort of government which, under several modifications, prevails now in almost every portion of Europe. About these governments there is no mystery. The source from which they sprung was popular disfranchisement.

Go and examine the title to power of the aristocrats of Europe, and you will find that a stronger party of armed men conquered and bore down a weaker party, and followed this conquest by laws which perpetuated their power. Perhaps the weaker party had been guilty of flagrant crimes. Perhaps their crime was simply being in the minority. But was it right to set up over either the guilty or innocent the iron rule of abitrary government? Is there any justification for taking away the liberties of any people? Is popular government right or is it wrong? Is it the theory of our government that when a portion of the people constituting and governing the State levy demestic war they shall be attainted, disfranchised, and cast out of its pale, by an act of the majority? And when, among those who remain, another feud shall arise, shall the minority be again cast out until nothing is left but a few aristocrats, whose power has been cemented by blood and terror? I say that this is not the government of the State of Missouri! Defined as I have expressed it, the State is a noble institution, proclaiming and guarding liberty. With any other definition, it is anything that tyrants make it. Russia is a State, and doubtless exerts the power of self-preservation over the liberties of the people. There is no such maxim of American liberty as safety of the

State.   But our motto is, on the contrary, *salus populi suprema lex*—the safety of the people is the supreme law—and no State is worth preservation, even for a moment, which does not cherish this motto.   I say that disfranchisement by legislative act of the majority is at war with the avowed principles of the State.   I say this on the faith of our Bill of Rights and of the Constitution of the United States, which is part of its organic law.   I say, may it please your honors, whoever maintains the contrary, is not protecting the State, but making war upon it; and he who shall succeed in introducing this wretched principle of revenge and anarchy into practice, will have ruined his country.

In so far, may it please the court, these provisions of the new Constitution have been considered almost entirely as legal questions.   The effort has been to show what are the interpretations placed upon the language of the Constitution of the United States, and what the scope and bearing of these guarantees of liberty; and how, as long as they are sacredly maintained, life and liberty and property will be reasonably secure from the violence of faction, exerting its influence by means ef *ex post facto* laws and attainders.   To one who is unacquainted with the history of man, it would seem needless to raise a barrier against injustice so palpable.   In one who knows what that history is, it would be criminal not to provide every guard which the profoundest wisdom may suggest. In all the ages of the world, in all the phases of its history, under every relation in which the individual has been called to act—amid all the combinations, social, political, religious, into which men have entered—the worst enemy of man or his race has been man.   The peace of the first family was broken by a display of his infuriate and terrible revenge. Alas! that this ungenerous passion should still rage in his bosom with unabating fires.   If we look back over the pathway where he has been moving for the thousands of years during which we have any authentic records, we behold the melancholy ruins of his best works, erected and sustained long enough to give life to hopes and then miserably destroyed by his own hands.   His history has been one unceasing struggle for political rights.   To secure his political rights his schemes and inventions have been endless, and his blood has been freely shed.   But where are the republics which he has so repeatedly and so boastfully proclaimed?   Buried in untimely graves which he himself has digged.   A divine religion, vouchsafed to him by infinite mercy and justice, which

was foreshadowed by inspired prophets, ushered upon him with bursts of heavenly harmony which angel tongues came down to teach him, breathed nothing but accents of love, and peace on earth and good will to man. But it is this very religion in which he has found the warrant for every species of persecution and cruelty. Man claiming for himself an individual right to liberty of conscience, has been swift to deny the same right to his brother. Exulting in the freedom of his own intellect, and pertinaciously resisting every effort to enslave his own thoughts, he has constantly endeavored to destroy the happiness and crush the right to this liberty in others. It is in such contests that the earth has been filled with misery, and the very altars of the Church bathed in the blood of contending factions.

Our fathers were wise men, and they labored in their day for the good of their race. They enjoyed peculiar advantages for the work which fell to their lot. They had been tried in the school of adversity. They had felt the rod of a tyrant, and knew what oppression was. It was their mission to protect their people, who were few and weak, against the many and the strong, and establish the fitting guards for liberty under all circumstances. Our mission to-day is very different. We are to restrain the excessive indulgence of our own power. We are to hold back the revengeful career of a victorious party, and resist the tempting occasion of becoming tyrants ourselves. We are to be generous to the fallen, and just to liberty and to mankind. We have no bulwarks to erect for freedom. We need only preserve and defend such as we have. But to do this we should fully comprehend and fully appreciate the nature and purpose of our constitutional heritage. Never was any constitution of government laid out with a more thorough knowledge of the nature of man. The founders of American liberty knew that parties and violent party excitements would belong to the government they established—that that was a consequence of liberty. But they knew when men are dispassionate they are rarely cruel; that when they are disinterested they are generally just. Their care was to provide such checks and balances as would give passion time to cool, avoid hasty action, invite reflection, secure deliberation and intelligence in the enactment of the laws, and prevent, by separation of powers those extensive combinations by which alone the administration can be rendered subservient to the will of a mere popular faction—the most deplorable of all the evils which can possibly befall a

free State. They believed that "there can be no liberty where the legislative and executive powers are united in the same person or body of magistrates, or if the powers of judging be not separated from the legislative and executive powers"—Federalist, No. 57, p. 224. Impressed with these views, they provided that every law should have the assent of one legislative body; that it should then be presented to and be considered and approved by another legislative body; that it should then undergo the scrutiny of another independent department before it took the name of law; that no legislative judgments, attainders, or *ex post facto* laws, should be passed; that criminal prosecutions should begin by indictment; that judicial powers should belong only to the courts of law; and that trial by jury should remain inviolate.

The question now arises, after all they have done, whether they succeeded in their purpose—whether the late Missouri Convention was an irresponsible body wielding omnipotent powers, or whether it was a body of limited powers? Mr. John Quincy Adams, in 1831, denied the whole doctrine of absolute political power, and proclaimed the inalienable rights of man—1 Sto. Cons. 195, note.

It is certain that this Convention intended to devise and execute with their own hands a stupendous scheme of political proscription. It is certain they set up a claim to absolute powers, and swept out of their way whatever stood between them and the accomplishment of their purpose—they removed all important officers in the State without any charge or cause assigned, and filled their places with such as were supposed to be their partisans, and brought the entire State government to the feet of a faction. This preparation being made, they assumed administrative and judicial functions, disfranchised the whole Secession party, and thousands and thousands of others who never violated any law; they provided that none of their victims should have any hearing or trial; they refused them justice and denied all remedy; they issued their mandate to the courts, degrading the judges from their proper functions—virtually making them inquisitors, common informers, and leaving them nothing to investigate but the arbitrary will of the Convention.

Let us concede to the Convention that it is an unchecked body, possessing all the powers which it claimed; that it has violated no law, and there is no redress by constitutional restriction. The effect of all this cannot possibly be mistaken. Revenge and cruelty, and oppression, are trees that bear bit-

ter fruits. The new Constitution party may possibly lose power. There was never yet a party under an elective system that did not lose power. The vices or errors, and sometimes the virtues of a party, will destroy it. That whimsical and capricious thing, the popular favor, vibrates like a pendulum. Let us suppose that the party which made this proscriptive Constitution shall become odious, and that the victims of the present moment hold in their hands the fortunes of their oppressors. We may reasonably expect then another Convention. In such an event, who will say that the spirit of revenge will be less fierce than that which reigned in the late Convention? I say, not that it would be right, but that such a thing would not be unnatural.

*    *    *    *    *    *    *

There are yet other forms in which the tyranny of unchecked legislation has manifested itself. I allude to the systems of express class legislation. I should more properly say class attainders. Of this nature were all those laws by which Jews were required, under pains and penalties, to wear a peculiar dress; to abide in a designated place; prohibited from marrying a Christian, or eating with one, or using the same bath, or entering into certain contracts: by which Catholics have been prohibited from acquiring property, or educating their children, or marrying a Protestant, or appearing at court, or living in London or within ten miles of it, or removing more than five miles without a special license, or practising medicine, surgery or law, or acting as judge or clerk or officer of any corporation; and by which no one could employ a Catholic servant without paying a forfeiture of £10 a month for so great a crime. Days might be employed in reciting the history of such monstrous legislation and yet not exhaust the painful theme. It was in contemplation of this history and the frightful working of that spirit of vengeance which marks the course of unbalanced parties that Mr. Adams was led to exclaim, " Of all the spirits that we read of out of hell this is the last that any enlightened friend of liberty would wish to inculcate." One would think the facts we gather from the ancients were quite sufficient to justify this expression of horror. But modern times have produced another specimen yet more terrible. "The law of the suspected," passed by the commune of the city of Paris in 1793, was a volcano of human ferocity before which every other proscription fades into insignificance —it was a demon at whose throne the congregated fiends and

devils should bow with reverence. It ordered the seizure and imprisonment as public enemies of all those persons—

"1. Who, in the assemblies of the people, check their energy by crafty addresses, turbulent cries and threats. 2. All those who, more prudent, talk mysteriously of the disasters of the Republic, deplore the lot of the people, and are always ready to propagate bad news with affected grief. 3. All those who have changed their language and conduct according to events; who, silent with respect to the crimes of the Royalists and the Federalists, disclaim with emphasis against the slight faults of the patriots, and, in order to appear Republicans, affect a studied austerity and severity, and who are all indulgence in whatever concerns a moderate or an aristocrat. 4. All those who pity the farmers and greedy shop-keepers against whom the law is obliged to take measures. 5. All those who, though they have the words *liberty*, *republic*, and *country*, continually in their mouths, associate with ci-devant nobles, priests, counter-revolutionists, feuillons and moderates, and take an interest in their fate. 6. All those who have not taken an active party in anything connected with the revolution, and who, to excuse themselves from doing so, plead the payment of their contributions, their patriotic donations, their services in the national guard by substitute or otherwise. 7. All those who received the Republican Constitution with indifference, and expressed false fears concerning its establishment and duration. 8. All those who, though they have done nothing against liberty, have done nothing for it. 9. All those who do not attend their sections and allege as excuse that they are no speakers, or that they are prevented by business. 10. All those who speak contemptuously of the constituted authorities, of the signs of the law, of the popular societies, and the defenders of liberty. 11. All those who signed counter-revolution petitions, or frequented ante-civil societies and clubs. 12. All those who are known to have been insincere partisans of Lafayette and of those who marched to the charge in the Champ de Mars."

Under such a law, of course, the prisons of Paris were filled with victims. Political hate and personal and private malice did their work. Under such accusations fell the whole noble party of the Girondists. The only showing of offence which the Girondists appear to have exhibited, was their unshaken sense of justice; the only crime they committed, their indomitable courage in resisting and defying aggression. On

such charges they were condemned, not punished, but *disqualified* to live and *regulated* out of existence.

I ask, in the language of Mr. Adams, "In the name of human and Divine benevolence, is this the Government under which we live? Are there no constitutional restraints that may be legally invoked against such enactments? Is it possible that our Legislatures are prohibited from passing such laws, but that a party, having a majority of votes for the moment, may call a Convention, and that this Convention is an unchecked body with omnipotent powers? If so, then what is that liberty worth, which may be swept away by every passing breath of popular feeling? If, may it please your honors, our "Law of the suspected"—this notable section 3 of article 2—is a valid act of legislation—is neither an *ex post facto* law, nor a bill of attainder;—if a majority of the people may by such a proceeding disfranchise, outlaw or banish their political opponents for actual or fictitious crimes, without proofs and without trial, under our system of government, what more security is there for a citizen of Missouri than there was for a citizen of Athens, or Sparta, or Rome?

\*        \*        \*        \*        \*        \*        \*

May it please the court, this great question of war is settled. The Government is saved from armed foes. The Constitution is secure from insurrection and violence. And now a great question arises and demands a settlement: What is the Constitution? I may almost propound it in this way: Have we any Constitution? If we have, does it contain guarantees of liberty? Does it any longer secure a trial by jury, or an indictment according to the ordinary course of judicial proceedings? Has any one who is charged with crime a right to hearing and proofs of guilt as heretofore? Or is it now the fact that life and liberty and property are held only by the feeble tenure of popular passion and prejudice? Are we henceforth to be victimized by legislative judgments, *ex post facto* laws, bills of attainder, and inquisitorial processes, emanating from State Conventions, until, like so many other republics, we are sunk in the deep and bottomless abyss of anarchy and revolution?

This is the question presented to the country. The sections of the Constitution under consideration assume powers destructive of liberty. The solution is forced at last into this department. The judiciary is solemnly invoked to perform the duty for which it was created. The judiciary holds in its hands the liberties of the people. It remains to be seen

whether it will perform its office; or whether it will abandon the Constitution to a political faction who have assumed arbitrary powers, and the people to anarchy and bloodshed.

*T. T. Gantt*, for plaintiff in error.

\*     \*     \*     \*     \*     \*     \*

The clause of the new Constitution relied on by the demurrants is utterly inconsistent with the idea of limited constitutional government. Nor is that all. It violates the idea of limited constitutional government in two particulars which are prohibited by the Constitution of the United States. This I will attempt to demonstrate. No time will be wasted in commenting upon the general offence against humanity, justice, reason, of which this clause is guilty. It is admitted that it is impossible to create powers competent for doing good without giving them energy enough to inflict evil if abused by faithless depositaries, and that the abuse of given power by a Legislature is not the subject of animadversion by a court of justice. But it is contended that usurpation (the attempt to exercise a power that is forbidden by the supreme authority) is a proper subject of judicial action; that courts are established to rebuke such attempts, to pronounce them invalid, and to protect the citizen against them.

As this is the frame of the argument which we propose to submit to you, it is manifest to what little purpose the demurrant has employed himself in the superfluous task of demonstrating that the people are the source of all power in our system. No one ever thought of questioning this axiom, and surely the man must be blind who is serious in imputing such a design to the plaintiff. But though the people be the source of all power, the question remains, what portion of this power have they confided to those who have been deputed by them to effect certain governmental objects? A State of this Union possesses in that ultimate depository of all of its powers, the people of the State, rights, franchises, liberties and privileges which are almost without limit. So far as any limitations are imposed upon it by its own authority, it needs no argument to show that the limitation may be removed by the authority which imposed it. The provisions of its own Constitution, then, are to this extent never unalterable. Whenever the people of the State see fit to change these, there is no restriction upon the exercise of this discretion. But in these United States we have the advantage of some checks to disorder which are to be found beyond our

State governments. There is a grand central balance-wheel in our political machinery with which all its other mechanism must be brought into full harmony. This balance-wheel is the Constitution of the United States. By that instrument several well known limitations are imposed on the several States. When that Constitution was formed, it was well understood by its framers that popular, no less than monarchical or oligarchical, governments were subject to the temptation to abuse power and practise oppression. It was well known that to embody in a State Constitution a provision which the majority of the people of the State could sweep away in a moment of excitement, was a most imperfect guard against misgovernment. It was notorious that many of the States of the old confederation had exercised the odious power of passing bills of attainder and *ex post facto* laws. Other exercises of power conducing to disorder, and impairing the general welfare, had also been practised by the individual States. It was from an experience of the evils of which the preceding twelve years had given mournful examples, far more than from any speculative notion of what government in the abstract should be, that the sages of 1787 were led to embody in the Constitution the limitations it contains upon the powers of the States. By the adoption of that Constitution all of the thirteen States that acceded to it became on the instant shorn of the prohibited powers. In respect of all the States that have since been admitted into this Union, these obnoxious powers never had any existence. Any State at this day attempting to exercise any one of them is simply guilty of usurpation as plain as that which can be predicated of any individual tyrant. If we stood here to impeach the justice, the equity, or the expediency of this provision, we should of course be told decisively that for a court of justice to criticise the act of a State, or of persons claiming to represent the State, from such a point of view, would be a transcending of the functions of the judiciary. If we should argue that this provision is in conflict with the declaration of rights to be found in the Constitution of 1865, we should in all likelihood be told that it was a most questionable exercise of judicial discretion to condemn a positive provision of the Constitution because of its non-conformity with the abstract principles of government which were approved and proclaimed by its framers. But no such reply can be made to us when we designate a pointed prohibition, by an authority acknowledged to be paramount, to do what we say

this provision seeks to accomplish. We may be told to make out our case—to demonstrate clearly that section 3 of article 2 does effect, was and is forbidden by the Constitution of the United States.

*       *       *       *.       *       *       *

I say, then, that this section 3 of article 2 of the new Constitution of Missouri violates the 10th section of the 1st article of the Constitution of the United States in two particulars. 1st. It is a bill or act of attainder, passed by State authority; and the 10th sec. of the 1st art. of the Constitution of the United States declares that "no State shall *   * pass any bill of attainder." *   * 2d. It is an *ex post facto* law, and the same section says "no State shall pass *   * any *ex post facto* law." The establishment of either proposition will suffice. It is believed that both are capable of demonstration.

I will first examine into the nature of a bill of attainder, ascertain its properties and distinguishing characteristics, and see whether these are predicable of the clause in question. As the Constitution of the United States forbids, both to the General Government or to any of the States, the passage of any bill of attainder, we must look to the jurisprudence of other lands, or the history of ante-constitutional times in our own country, for examples of the forbidden thing.

The form of words employed implies a bill which attaints any individual, or number of individuals, or class of individuals—a bill which inflicts attainder upon any person, or any number of persons, or any class of persons.

In order to know the full import of these words, we must next ascertain the meaning of "attainder." It is that condition in which a man stands who has been sentenced to the pains and penalties of felony. Blackstone tells us: "When sentence of death is pronounced, the immediate, inseparable consequence, by the common law, is attainder. For when it is now clear, beyond all dispute, that the criminal is now no longer fit to live upon the earth, but is to be exterminated as a monster and a bane to human society, the law sets a note of infamy upon him. He is then called attaint, *attinctus*, stained or blackened. He is no longer of any credit or reputation. He cannot be a witness in any court, neither is he capable of performing the functions of another man. This is after judgment; for there is a great difference between a man convicted and attainted, though they are frequently through inaccuracy confounded together. Upon judgment,

therefore, of death, and not before, the attainder of a criminal commences"—4 Blacks. Comm. 380–1.

To this condition a culprit is brought when he stands condemned of felony and is sentenced to endure its penalties. The penalty of felony, for which alone, by the common law, a man could be judicially attainted, was disfranchisement, death, and forfeiture of goods. Of the more aggravated felony of treason, corruption of blood, which involved forfeiture of land, was part of the consequences. In this country, we do not, as our forefathers did, esteem the theft of twelve pence grand larceny, and hang a man for its commission; nor do we punish capitally any felonies below the grade of murder. We do, however, annex certain marks of infamy, and certain penalties, disfranchisements and disabilities, to a conviction for that class of felonies which we regard as stamped with peculiar turpitude. Of these may be enumerated treason, murder, perjury, forgery, and various other felonies, in the 1st, 2d, 3d, 4th, 5th and 6th articles of chapter 50, R. C. 1855, defining crimes and their punishment.

The law in force in 1865 prescribed, as part of the consequence of a judicial attainder for these crimes, a loss of civil rights—an incapacity to vote at any election, to hold any office of trust or profit in this State, or to perform the functions of a juror—§ 13, art. 1; § 46, art. 2; § 70, art. 3; § 36, art. —; § 47, art. 5; § 18, art. 6.

Such is the nature of attainder by judicial process. This description of attainder is familiar to us. It is the means of preserving the order of society with which no statesman and no lover of freedom ever found cause of quarrel. It is the punishment of crime judicially ascertained. The careful guards thrown around the accused by the humanity of the law need no recital here. When these fail him, it is only because every presumption of innocence vanishes, and he must suffer punishment in order that others may by his example be deterred from crime.

But the Constitution forbidding any State (as well as the United States) to pass any bill of attainder, what is meant by that prohibition? Clearly, that the States are forbidden to inflict death, or any other penalty or deprivation annexed to felony by any act of legislation, ordinary or extraordinary. They are forbidden to do by the instrumentality of a deliberative body what their courts of justice executing the criminal law can rightfully and lawfully do. They are forbidden to do by the vote of an assembly, not governed by the rules

laid down for the protection of the rights of all, even the guilty, what can only be safely entrusted to courts of justice and the due course of law. A State cannot, then, declare the guilt of any person or class, or inflict punishment, except through its courts of justice. It makes laws through its Legislature, defining crimes and affixing their punishment; and it declares that all who offend against these shall be punished. But no criminal law can ascertain and name a guilty party. Moreover, all criminal law must be prospective. It cannot say that all who have in times past done a particular act shall be punished, but only that all who thereafter shall do that act shall incur certain penalties on conviction. A criminal law forbids all persons to do an act under stated sanctions. An act of attainder declares that a particular person or class, for having already done a designated act, shall be subject to certain pains and penalties. It is this dangerous exercise of power which is forbidden to a State. The prohibition is directed against any machinery which ingenuity might see fit to employ. It is not merely said that no State Legislature shall pass such an act, but that no State shall do it; that is, the whole power of the State is under a disability to perpetrate, directly or indirectly, that act of tyrannous injustice which is known to the jurisprudence of England and America as a bill of attainder. The scope of this prohibition, then, is to deny to any State Convention, or State Legislature, or General Assembly, or general court (for the style of the body is indifferent), the power to sentence any person, or class of persons, to any of the pains and penalties which are among the consequences of an attainder for felony by judicial process.

Such being the meaning of the prohibition, does sec. 3 of art. 2 come within it? Without setting out the section at length, I may say that it enumerates eighty-six particular acts and manifestations of sentiment, and declares that no one who has at any past time done any of the acts or manifested any of the sentiments shall vote at any election in this State, hold any office of trust or profit in this State, or perform various other functions of citizenship. It does not say that whoever does any of these acts, or manifests any of these opinions hereafter, shall, on conviction, be disabled from exercising any of these franchises, liberties and rights; but inflicts this disfranchisement on all who have done the least of these things in times past. Some of the acts and sentiments thus treated were never crimes in Missouri before, and are

not now. Others were high crimes against the United States, while some are violations of our own criminal code, and under it amount to felony. Criminal law can only deal with what it forbids under penal sanctions : and whatever be the moral nature of many of the things enumerated in this 3d section, it is inconsistent with every principle of jurisprudence to treat and punish as a crime anything which, when done, was not known as such to the law. Moreover, the least of the things mentioned in it is sufficient to insure the full penalty ; and some of these things are not criminal at all. But the argument here does not depend on this distinction. It might be safely conceded that each one of the acts and sentiments mentioned involves some degree of criminality. It would still remain true that not even for the most clearly acknowledged offences can punishment be inflicted by a bill of attainder, or by legislation coming after the act done. And the question remains whether the intended and necessary operation of this 3d section is to inflict punishment upon any citizen, and particularly whether it inflicts it upon the plaintiff. If it does this, it imposes pains and penalties on him. This is what constitutes, in the view of the Supreme Court of the United States, a bill of attainder. If the section under examination does this, no artifice in the phraseology employed, no ingenuity in the contrivance by which the penalty is inflicted, can disguise the nature of the act, or save it from the consequences of the constitutional prohibition.

By reference to the criminal law of Missouri, already cited, we see that the disabilities, deprivations, and forfeitures, which are among the pains and penalties of a judicial attainder for felony, are the same with those which by the 3d section of article 2 of the new Constitution are inflicted summarily, without trial and without evidence, upon all who have ever done any of the acts or thought any of the thoughts enumerated in that section. This 3d section does not speak of those who hereafter may act or think in this obnoxious manner. If it did, it would be uncertain who would be included in the penalties of the section, the conduct in respect of which the penalties were denounced being future, and therefore contingent—something that might occur, or might not. But, referring as it does to all who have already done any of the acts mentioned in this section, it is clear that it provides the means of designating each member of an existing class. The section contemplates all the citizens of Missouri coming within a certain description, the terms of which

are definite, and pronounces a sentence of deprivation and forfeiture against every man in the class thus ascertained. The legal effect of this section, then, is precisely what it would be if, instead of furnishing the means of enumerating and naming every man in this class, it had actually enumerated and named each one of them—as if the name and addition of every person comprehended in the description of the class had been set forth in the bill. No one can doubt that it is practicable to make such a list. Indeed, secs. 4 and 5 of the same article do actually require such a list to be made. I ask attention to this feature of the section. It ascertains those citizens of Missouri who are the subjects of the sentence of forfeiture and deprivation which that 3d section declares. When I come to consider the only defence which I have yet heard for this atrocity, I shall have something to say respecting the difference between such a list and a list of those who, before this section was adopted, were by existing laws disqualified from voting. At present, I proceed to consider the meaning of the operation of this section in respect of the class with which it deals. I think I have demonstrated that we are at liberty to treat the section as if, instead of the one description of the parties disfranchised and so punished, another equivalent description had been used. If a deed, a will, or any legal instrument, defines a class with such certainty that the definition necessarily includes A, B, C, D and E, and excludes all other persons, it must receive the same construction precisely as if, instead of the definition adopted, it had by name enumerated the individuals A, B, C, D and E. It cannot be necessary to pause on this point. If the children of certain parents are mentioned in a deed or will as the donees of certain property, this description will have precisely the same construction as if the same provision had been made for them by their individual names. It is true we are not familiar with the designation of particular families as the selected victims of political rancor, clothed in legal forms. Let this section stand, and we may soon become mournfully conversant with every devilish contrivance which the malice of factions, alternately gaining the ascendant in the State, can in the hour of triumph inflict upon their defeated adversaries. History has warned us (can the warning be in vain?) against the atrocities which under such circumstances flow " not less from the bitterness of retaliation than from the merciless policy of fear."

This 3d section, then, is to be regarded by the court as if,

instead of discriminating against the class at which it is directed by the description adopted, it had designated by name every individual comprehended within that description. It can make no difference whether the number of such individuals be great or small. Undoubtedly, in this respect, this bill of attainder challenges attention. Prior to this production, the act of the Irish Parliament attainting between two and three thousand men, women and children, in 1689–90, was nearly or quite without a parallel. Many more than that number are disfranchised by this bill of pains and penalties. But the number is of no consequence; whether fifty thousand, or five thousand, or five hundred, or five, the number of the victims will not alter the character of the act. And whatever might have been said against it if it had designated a few persons by name, may be said against it now when it disfranchises by a definite description a large part of the loyal men of Missouri. It will not, I hope, be forgotten, that in May, 1861, the plaintiff was in armed hostility to the Government of Missouri, then administered by traitors; and for this act of eminent loyalty to the Union he now stands disfranchised by this "new Constitution."

The section may then be read thus : The following named persons, that is to say, Francis P. Blair, Jr., &c., shall not, nor shall any one of them be deemed a qualified voter at any election held by the people of this State, under this Constitution ; nor shall the said Francis P. Blair, Jr., &c., nor any of them, be capable at any time hereafter of holding in this State any office of trust or profit under its authority, &c. &c.

This is nothing but a legislative sentence, depriving certain enumerated individuals of certain rights, privileges, liberties, and franchises, which they enjoyed at the passage of the bill. This, however, is the very definition of a bill of pains and penalties, which, as the Supreme Court of the United States declared, is included in the more general prohibition of a bill of attainder; a bill of attainder being the general term embracing all legislative sentences which may be inflicted as the punishment of felony.

But we have heard from the demurrants, this day, a defence of this section, which declares that it is not a bill of attainder, nor a bill of pains and penalties, because it neither inflicts capital nor any other kind of punishment; that punishment is the recompense which the law awards to crime, and here there is no crime; punishment is the result of a conviction for crime, and here there is no conviction, not even a

trial; that the words "crime" and "punishment" are not to be found in the section under consideration, and therefore that the court is not at liberty to say that the minds of its framers had any idea corresponding to these terms; that the section is upon its face a definition of the qualification of voters in Missouri, and that the courts cannot take any view of it, nor give it any interpretation, inconsistent with the declared object.

If these positions are tenable, there is no possibility of defining by the most careful language any principle, right or liberty which may not be set aside the next moment by chicane. Arguments like these seem, to the counsel for plaintiff, to outdo all that a lively imagination ever imputed in works of fiction to the most impudent of prevaricators. The extravagance of a verbal jugglery imputed by Swift, in his "Tale of a Tub," to the three brothers, who sought to find in their father's will a warrant for the accomplishment of their unruly desires, are absolutely brought to shame by this example. The sharpness of the satire, directed in that instance against the perverse ingenuity and utter shamelessness of sectarian zeal, has been objected to, as violating all probability. But here we have in broad daylight, in the case of a legal argument on a question of the utmost gravity, a serious attempt to do no less violence to plain language, to criticism and common sense, than the caustic Dean, in his contempt for those who heat their tempers and befog their intellects in the conflict of theological controversy, imagined it to be possible for the human mind to be betrayed into perpetrating. It is necessary to remember all these circumstances; we are else in danger of supposing that the attempt is not—cannot be—seriously made.

Being convinced, however, that this is really the ground taken by the defendants, it is incumbent upon us to examine it, and to submit it to those tests which logic and authority may furnish. It is felt, indeed, that to state such an argument (?) is the best means of refuting it; and that little remains to be done, or is possible to be done by any elaboration of the subject, to add to the discredit of what is, almost in its very terms, an affront to the understanding of mankind. But it is permissible to consider in detail what the pretensions of the demurrants amount to, and what are the "qualifications for voting" fixed by the new Constitution of Missouri.

In the first place, parties named in this bill of attainder,

or described on it so accurately as to dispense with that particular description which is effected by giving the name of the individual, were at the time of the adoption of this Constitution in the enjoyment of the privilege, right, franchise and liberty of voting, of holding office and performing various other functions belonging to them as free citizens. Life and liberty are the chief of the rights, liberties and privileges which appertain to a citizen of a free State. His liberties, his franchises and rights as a citizen—his " place in the commonwealth "—these are what give grace to his existence and make his condition preferable to that of the subject of a despotism. Take away these, and you will reduce him to that degraded rank. To say that they are taken away by sec. 3 of Art. II. is merely to quote its provisions. It is not denied by the demurrants that it does effect this. But it is said that the things taken away are mere political rights which the State may give, withhold or reclaim at pleasure ; that a man can have no property in such things, and that for the abrogation of them he can have no remedy in a court of law. We say that to be deprived of these things or any of them is a heavy punishment. That not to have them is not to be free, and that when they are taken away from him who once possessed them, that person is degraded any punished by the deprivation ; that punishment is of two kinds, corporal and not corporal ; that of the latter kind are " fines, forfeitures, suspension or deprivation of some civil or political right." " They are (4 Blacks. Comm. 7) the evils or inconveniences consequent upon (conviction of) crimes and misdemeanors." The learned author is speaking of punishments as known to free and constitutional governments: the evils and inconveniences, the penalties, annexed to crime judicially ascertained. But the idea entertained by the demurrants seems really to be that, if a government abuses power to such a degree as to inflict pains and penalties for that which is no crime, and to do this without any judicial inquiry as to the existence of that in respect of which the pains and penalties are inflicted, then the pains and penalties cease to be a punishment. It is said that punishment is that which the law ordains, after trial and conviction, against one who has committed a crime, and the monstrous notion seems to prevail that, if the penalty is visited upon an individual with the forms, but in violation of the spirit of law ; or if it be imposed without trial ; or if it be done after an acquittal, in-

stead of after a conviction; or if it be inflicted not for the commission of a crime, but for the doing of something not criminal by law nor forbidden by morality—something which is neither *malum in se*, nor *malum prohibitum*—it is maintained, I say, by the counsel for the demurrants that all these hideous aggravations of the guilt of the usurpers of governmental powers may be pleaded by the offenders in bar of the accusation for the less grievous offence.

It is very difficult to treat this argument calmly. Are "political rights" something so shadowy and valueless as not to be worth the attention of courts of justice? Are they so minute and trifling as to be beneath its dignity? If they are, it is at any rate useful for us to be assured of the result; for such knowledge will, at lowest, lead to a correction of our estimate of American freedom, and to a reform in the language of panegyric we are accustomed to employ when speaking of our institutions.

The man who, six years ago, would have expressed a doubt of the reality of the rights, franchises and liberties of a citizen of this State would certainly have incurred the reproach of eccentricity. If he had suggested that these rights, franchises and liberties reposed on a foundation less secure than that of the freemen of England in the days of King John, he would have been regarded with a mixture of incredulity and derision—of derision, I say, for such extravagance could not at that day have moved any one to serious indignation. He would have been told that if ever there was on earth a government, the foundation and elementary principle of which was the sacredness and inviolability of popular rights and privileges, that country was the United States; that if there be one of these rights more important and more sacred than another, it was the right of every freeman to have a voice in the selection of the depositaries of the powers of government; that nearly equal to this in importance was the right of being himself such depositary, should a majority of the constituent body so will; that whoever and whatever invaded rights like these, was a far deadlier enemy to the common weal than he who encroached upon the rights of tangible, real and personal property; and that if we were not like children, cheated with the semblance of liberty, while deprived of its substance, we were either in the enjoyment of a form of government which gave effectual protection to such political rights, or we would instantly, without the de-

lay of a moment, upon being suspicious that our Government was defective in making this provision, betake ourselves to the reformation of it in this vital particular.

All this and more would have been said. The truth is that political rights are as much the property of the citizen as his house or his land, and equally under the protection of the law, and until very lately none thought of doubting this. It is only by very perverse industry that any confusion of ideas on this subject has been rendered possible.

It is obvious at a glance that no one in a commonwealth can be, as a citizen of that commonwealth, humiliated and degraded by the operation of a law which really presses equally on all alike. A sumptuary law may be very hurtful to the general prosperity, and may, in its application, be particularly inconvenient to certain individuals. It may be very unwise, but it can hardly be said to be degrading if all are subject to it equally. If, however, it be so framed as to discriminate against a portion only of the citizens of a commonwealth, then, although in its preamble it be declared to be of general application, it will be a degrading and humiliating law.

In like manner, it may be doubted hereafter as it has heretofore been doubted, whether it is wise to confer upon all citizens the fulness of participation in the government of the State. The age at which competency for the exercise of political rights accrues, is, beyond all doubt, to be fixed by the will of the State. The qualifications, intellectual and pecuniary, which a citizen must possess in order to have the enjoyment of full political franchises may also be established by the State and changed at its pleasure. Every one can see, that by reason of such regulations operating equally on all, and so being an injurious discrimination against none, here is a standard fixed, and every citizen is invited to bring himself up to its requirements. It is the essential of all such qualifications that they are, humanly speaking, within the reach of every man possessed of a sound mind.

When, instead of fixing a qualification to which all men may attain, a class is accurately defined, and every man of that class hopelessly disqualified, the oppressive tyranny of the proceeding is only aggravating when its victims are told that they do not suffer any punishment, for the sole and sufficient reason that the word "punishment" is not used in the sentence which consigns them to degradation and ruin. They are not killed, but simply disqualified to live; they are not

deprived of any property, but simply rendered incapable of acquiring or holding any property except in trust for the spoiler.

It has already been said that, when a law, fixing qualifications for the right of suffrage, or for holding office is made, it always fixes a standard, and to this standard all of the free male citizens of a State may attain. A certain age is generally required. All who live long enough will be sure to fill this condition. A property qualification may be annexed, and all who are thrifty enough to make the necessary accumulation are within this requirement. The list of those then, who are, by a law fixing the qualifications of voters, at any time excluded from the polls, is perpetually changing. Men who were too young to vote last week, are now of age ; those who had not then lived long enough in the State or county, have now completed the required period. No such changes occur, or can occur, in the list of those who are excluded by the 3d section of art. 2. By an inflexible sentence they are pronounced unworthy of the rights of free citizens ; and on the list of the proscribed they must remain until death relieves them of the degradation.

It is far from being a pleasant reflection that a citizen of the United States, defending himself against arbitrary power, is at this day driven to the great charter of the liberties of Englishmen, extorted from the King who ruled the mother country in the twelfth century, for a definition of his political and personal rights and an acknowledgment that they are indeed his property. But so it is, and there may be something salutary after all in the necessity. Lawyers know how destructive of sound law is the ignorance which knows nothing of the wisdom of the past, as well as the arrogance which, springing from this ignorance, disdains to profit by the thoughts and experience of those who have passed through trials not wholly unlike our own. If those who are placed in stations of trust and power in this country could be so far instructed as to become sensible of the disadvantage they sustain by their ignorance of the lessons of history, many outrages, many follies of a most costly nature, might be avoided. If, in examining into the tenure and qualities of the liberties of freemen, which we have so long claimed to hold by inheritance, and to have enlarged by our own struggles until there is no other nation the people of which enjoy them in so full a measure, we are led to the discovery that we have narrowed rather than extended that

inestimable possession, and are in danger of losing it alto-
gether, we may be quickened and prompted, while it is yet
time, to the performance of our duty—the reassertion of
our ancient birthright, and the casting off of a yoke to which
our necks are not yet accustomed.  If the discovery of our
danger teaches us a lesson of humility and imposes some re-
straint upon the vaunts with which we have so long wearied
all ears, of our monopoly of that, in respect of which we
prove to be so nigh utter destitution, it may be of·material
advantage to the national character, and may prepare us for
the recovery of our ancient birthright, which was not "un-
chartered freedom," but rational,.constitutional liberty, un-
der the sanctions of august and sacred law.

The language of the Great Charter is : " No freeman shall
be taken (arrested), or imprisoned, or be dissiezed of his
freehold, or liberties, or free customs, or be outlawed, or
exiled, or any otherwise destroyed ; nor will we pass upon
him, nor condemn him but by lawful judgment of his peers,
or by the law of the land.   We will sell to no man, we will
deny to no man, we will delay to no man either justice or
right."

Such was one chapter of the great charter.  Let no one
imagine that this was an enlargement of the ancient liberties
of Englishmen.  The profoundest antiquarians, the ablest
jurists of that country have declared that this charter con-
tained very few new grants, but was merely declaratory of
the fundamental laws, privileges and liberties of England ;
and Lord Coke especially says this of the paragraphs quoted.
This is one of the most pregnant passages of the whole of
that remarkable instrument, and a commentary upon it would
occupy more time than I can now bestow.  A glance at its
tenor is all that is permitted.

In the first place, it is noteworthy that the "liberties" and
" free customs" of every free man were put in the same rank
with his life and land.   In the second place, these " liber-
ties" and "free customs" were very different from personal
liberty ; for freedom from arrest and imprisonment had al-
ready been provided for before we come to the disseisin of
" his freehold," or " liberties," or " free customs."  And by
the word employed, the most emphatic possible sanction is
given to the idea, that in such privileges and liberties the
freeman had a property, his right to which was as indefeasi-
bly sacred as his title to his land.  In the third place, arbi-
trarily to inflict upon any free man any of these pains and

penalties was, in the energetic language of the charter, to destroy him. In the fourth place, these pains and penalties, which could not, without subverting the fundamental law, be inflicted arbitrarily on any man, may all be inflicted "by the legal judgment of his peers, or by the law of the land;" that is, by due process of law, annexing penalties to crime after regular conviction.

It is hard to believe that any one who has read this charter can doubt that all these things which are mentioned in it as inflictions not to be arbitrarily imposed, but only annexed as the penalty for crime, after regular conviction by due process of law, should be regarded as punishments in their own nature; and still more difficult is it to understand how such a one can suppose that, if the penalty be inflicted without trial, it is thereby deprived of its sting and bitterness, and becomes no punishment at all.

Such was not the opinion of Lord Coke. It is worth our while to listen to what he says of the scheme of proceedings which found favor with the late Convention of Missouri, of which the counsel for defendant was a member. After explaining the significance of the words, "the lawful judgment of his peers, or the law of the land," and particularly enforcing the view that by "the law of the land" is meant "the due course and process of law," he speaks of the infliction of punishments arbitrarily and without these sanctions. He speaks of these things as being the ear-marks of tyranny and despotism. It never seems to have occurred to him that the absence of trial and the innocence of the victim made punishment change its nature and lose its sting; but he speaks of it when thus inflicted as being the most hateful spectacle on earth—as meriting the execration of all mankind, and particularly all upright ministers of the law. I cannot forbear to quote one passage from p. 55 of the 2d Institute of Coke :

" The philosophical poet doth notably describe the damnable and damned proceedings of the Judge of Hell,

'Gnosius hic Radamanthus habet durissima regna ;
Castigatque, auditque dolos, subigitque fateri.'

And in another place :

' Leges fixit pretio, atque refixit.'

First, he punisheth ; then he heareth ; and lastly compelleth to confess ; and makes and mars laws at his pleasure ; like as the Centurion in the holy history did to St. Paul.

For the text saith : ' *Centurio apprehendi Paulum jussit, et se catenis ligari ; et tunc interrogabat quis fuisset et quid fecisset.*' [The centurion ordered Paul to be seized and loaded with chains, and then he inquired of him who he was and what he had done.] But good judges and justices abhor these courses."

In the case of Ashby v. White and others (Lord Raymond's Reps. 938), after verdict for the plaintiff, the judgment was arrested by the Court of Queen's Bench by Justices Gould, Powys and Powell. The action was brought against the returning officers (who fill the same place in England that judges of election fill in this State), for refusing to receive the vote of the plaintiff. The case is a most interesting one.

Gould, justice, was of opinion that the action was not maintainable ; 1st, because the returning officers were judges of the qualification of voters ; 2d, because the plaintiff's privilege of voting is not a matter of property or credit, so that the hindrance of it is merely *damnum absque injuria.* * * *

Justices Powell and Powys concurred, mainly on the third point. Lord Holt dissented. "It is not to be doubted," he said, " but that the Commons of England have a great and considerable share in the Government and a share in the Legislature, without whom no law passes ; but because of their vast numbers, this right is not exercisable by them in their proper persons ; and therefore by the Constitution of England it has been directed that it should be exercised by representatives chosen by and out of themselves ; and this representation is exercised in three different qualities, either as knights of shires, citizens of cities, or burgesses of boroughs ; and these are the persons entitled to represent all the commons of England. The election of knights belongs to the freeholders of the counties, and it is an original right vested in and inseparable from the freehold, and can no more be severed from the freehold than the freehold itself can be taken away." * * " The right of election is an original right incident to and inseparable from the freehold. As for citizens and burgesses, they depend on the same rights as the knights of shires, and differ only as to the tenure, but the right and the manner of their election is on the same foundation."

After examining the various tenures of the different cities and boroughs, he proceeds : " Hence it appears that any man that is to give his vote on the election of members to serve in Parliament, has a several and particular right in his pri-

vate capacity as a citizen or burgess ; and surely, it cannot be said that this is so inconsiderable a right as to apply that maxim to it, ' *de minimis non curat lex;*' a right that a man has to give his vote at the election of a person to represent him in Parliament, there to concur in the making of laws which are to bind his liberty and property, is a most transcendent thing and of an high nature, and the law takes notice of it as such in several statutes." * * " The right of voting at the election of burgesses is a thing of the highest importance, and so great a privilege that it is a great injury to deprive the plaintiff of it." * * " But my brother says we cannot judge of this matter because it is a Parliamentary thing. Oh ! by all means, be very tender of that !" * * " To allow this action will make public officers more careful to observe the constitution of cities and boroughs, and not to be so partial as they commonly are in all elections, which is indeed a great and growing mischief, and tends to the prejudice of the peace of the nation." * * " If it be a matter within our jurisdiction, we are bound by our oaths to judge of it. This is a matter of property determinable before us."

Such was the opinion of Lord Holt. He was overruled by the three Associate Judges, but most fortunately a writ of error was taken to the House of Lords, and the judgment of the Court of King's Bench was reversed by the vote of fifty Lords to sixteen. Trevor, Chief Justice of the Common Pleas, and Baron Price, of the Exchequer, were of opinion with the three Judges of the King's Bench. Ward, Chief Baron of the Exchequer, with his associates, Bury and Smith, agreed with the Lord Chief Justice Holt. Tracy, Justice, agreed with Holt on the main point, but differed on a point of pleading.

When this case was argued in the House of Lords, Holt, Chief Justice, said, addressing those in favor of affirming the judgment : " The plaintiff has a particular right vested in him to vote. Is it not then a wrong and an injury to that right to refuse to receive his vote ? * * This action is brought by the plaintiff for the infringement of his franchise. You would have nothing to be a damage but what is pecuniary." * * " Let all people come in and vote fairly. It is to support one or the other party to deny any man's vote. By my consent, if such an action comes to be tried before me, I will direct the jury to make him (the defendant) pay well for it. It is denying him his English right ; and if this action be not allowed, a man may be forever deprived of it.

It is a great privilege to choose such persons as are to bind a man's life and property by the laws they make."

This case is cited at length in order to combat the notion that the right of suffrage is of slight estimation in the eye of the law, and is not regarded as being of the sacredness that hedges and protects tangible, real and personal property. This was the opinion of Gould, Powell and Powys, Justices of the King's Bench (or rather of the Queen's Bench—for the cause was originally tried in the second year of Queen Anne). But the opinion of Holt to the contrary was supported by a majority of the judges of the three courts, and by more than three-fourths of the House of Lords.

Whoever is disposed to make light of this case as an authority for the only proposition in support of which it is cited, viz., that the right of suffrage is eminently a thing belonging to a free American man—that it is his property, something which is his own, the infringement of which debases and degrades him, and is a deprivation of that which makes the principal dignity of his condition—must be prepared to maintain these propositions also, viz. :

1. That the freedom of an American citizen rests on a less assured basis than that of an Englishman.

2. That popular rights are of less weight in a popular government than in an oligarchical.

3. That the right of suffrage, if possessed by a man in virtue of being a freeholder, or a member of a borough in England, is more inviolable than if it be held as an incident of free citizenship of such a State as Missouri.

If these things be true, the authority of the case just cited is unquestionably very much shaken. If they are not true, it is not perceived how it can be denied that a man's political franchises are as inviolable as his purse or person.

Let it not be imagined—let no one pretend to imagine— that the plaintiff denies the power of the people of Missouri to alter the qualifications for voters at pleasure. What is denied is the power of inflicting punishment on obnoxious individuals by bill—that is, without a trial and without a crime, under pretence of fixing such qualifications. If this is done—if this is both attempted and accomplished—it does not matter a straw under what specious disguises the offence seeks to hide its true character. If, while the general qualifications of voters remain the same, a certain obnoxious class of persons be singled out, stigmatized, deprived of the great privilege to choose such persons as are to bind a man's life

and property by the laws they make, and made incapable of becoming themselves the depositaries of any public trust ; and if courts of justice are to be told, and not only that, but are bound to believe against the evidence of their understanding that this is not a punishment because the word is not used throughout the section, though the thing is there in all its bitterness and all its infamy, then I can no otherwise express my sense of our political and social situation than by saying that we seem to be under the weight of a horrible nightmare ; a state in which, in view of the most menacing dangers, some miserable impotence prevents us moving a finger to save or uttering a cry to warn.

Disfranchisement, deprivation of all political rights, no punishment! To be made a Pariah no degradation! To be stripped of all which makes us the equal of our fellow-citizens no penalty !

It is this last named consideration that the counsel for the defendants seek industriously to keep out of view. He talks of the power of the State to fix the qualification of voters. We admit this power. General laws operating equally on all are the appointed means of fixing these qualifications ; and however such laws may restrict the suffrage, to however small a class they may confine this inestimable privilege, still, if general and equal in their operation, they escape the objection of being degrading to any individual. No person can say of any other that such a law was framed for his exclusion. He may be for the time excluded by it, but a change of circumstances may at any moment remove the exclusion by conferring on him the necessary qualification. For this change of circumstances he may labor and wait ; but if the individual person be disfranchised, all such labor and patience are hopeless. Indeed, the whole pending controversy is decided when we see that the third section is really a disfranchisement of individuals, and that the disqualification (if we must use that word) attaches to them as individual persons, and not to the circumstances in which they stand. If it be said that when a man is deprived of his political rights upon conviction for crime, the disqualification is personal in that case also, we reply that it is so undoubtedly, and for the very reason that it is then inflicted as a punishment. I am really afraid, your honors, that I am likely to neglect my duty here. The defendants' counsel says that certain pains and penalties, disqualifications, disfranchisements, &c., are no punishment at all—partly because the things taken away are merely

political rights and privileges, and partly because the word punishment is not used in the sentence of deprivation, and he argues as if he at least was entirely convinced of what he says, although he couples this debasement of popular rights with a claim of omnipotence of popular powers. For my part, the mere statement of the proposition is so revolting that any attempt to demonstrate its futility wears the appearance of an anti-climax; and the language I employ seems as weak as would be any ratiocination used to make plainer the proposition that two and two make four.

But I cannot forbear here a reference to a passage of history, which to my mind is of singular appositeness. In a question like the present, the political history of former ages may contain more instruction than will be yielded by the decision of courts of justice; and the decision pronounced by the historian upon the acts of men in times past, under circumstances similar to those of the present day, may enable us to anticipate the sentence which future ages may give upon events now passing into history.

It is known that in the reign of Charles II. proceedings were set on foot to forfeit the charters of most of the principal cities and towns of England. The privileges and immunities enjoyed by those who were freemen of a city or borough were a great obstacle to the designs entertained at that period by the Court party. It was felt that an immense advantage would be gained if the charters of the municipalities could be forfeited. With a view to this, the Crown, by virtue of the power then held by it of displacing any judge at pleasure and appointing his successor, purged the bench of every judge who from his learning and integrity was supposed not to be likely to prove a tool of arbitrary power; and then writs of *quo warranto* were issued against the several corporations. But in England, in the worst of times, there has been some reverence for law, and some hesitation to commit open outrages upon it. So soon as the actions were begun, the creatures of the Crown began to approach the municipal magistrates, and advise them to surrender their charters without a trial to the Crown, trusting to the clemency of the King to grant them new charters, not so favorable indeed as the old, but far better than could be looked for if formal judgment of ouster were passed against them. This was the form of the solicitation. Both the monarch and his supple instruments, the judges, had a wholesome dread of the possible consequences that might ensue to them both in case of

a popular reaction such as had led to the Long Parliament, and they had no such disposition to push matters to extremities if it was possible to avoid that necessity by a compromise. Most of the corporations were persuaded to surrender their charters for fear of encountering still worse evils. Of course there were on this subject in each borough two parties; one of them in favor of surrendering the charters (these were mostly friends of the prerogative, or Tories), and the others opposed to this policy, mainly composed of Whigs. These things were done between 1683 and 1686.

In 1688 occurred the revolution that drove the Stuart dynasty from the throne of Great Britain. The first Parliament which assembled under the new monarch betook itself to the task of redressing some of the heinous wrongs of the preceding reigns. In this Parliament the Whigs had a majority. In an evil hour some of that party bethought themselves of a scheme, the accomplishment of which would, they thought, secure to the Whigs a permanent tenure of political power. They resolved to seize the occasion of the corporation bill for effecting this object. I proceed to quote the narrative of the heated party strife of the 17th century with the comment of a writer of the present day. [Ext. from Macaulay's History of England, vol. 3, ch. 15, pp. 467–71, large 8vo ed.]

I have quoted at length this interesting passage, considering it as I do most apposite and most instructive to ourselves, unless we have reached that point at which the lessons of experience are thrown away on men doomed to destruction and disgrace. There are many things in this narrative to arrest our attention. We read the history of the Whig party of 1690, written in 1855 by a Whig partisan. Assuredly no one can suspect the historian of any tenderness for Tories. On the other hand, the thing which the Whigs of 1690 attempted to do is relieved of many features of aggravation which are branded indelibly on the whole work of the late Convention of Missouri. It was undoubtedly something which mitigated the blame we should otherwise attach to the intolerance of Sacheverell and Howard that these men stood in 1690 where they had stood in 1680. In the days when it was dangerous to oppose the Crown they had voted for the exclusion bill. We may imagine with what loathing and disgust such a motion as they made for the disfranchisement of the Tories would have been received by Whigs and Tories alike, had it come from any person whose hands were dripping with the blood of Russell and Sydney.

Again, the forfeiture which was attempted by the corporation bill in 1690 was by no means so sweeping as that which we are forced to contemplate at home in our own days. There is a wide difference between disability to hold any borough office for seven years, and a life-long disqualification to vote or hold any office of trust in the whole realm, or to pursue many paths to subsistence. There seemed to be some proportion in the corporation act of 1690 between offence and penalty. Those who had contributed to the surrender of the old charter were disabled for seven years from holding office under the charter which that act restored. This was all; but this was enough to call for language of the most just and unsparing severity from the mouth of a friendly commentator. I call attention to the terms in which this act is characterized by Macaulay, who certainly, when he used them, was not writing in the interest of the opponents of this new Constitution, unless every writer of sense and integrity, whether dead or alive, may be said to have been engaged in such a conspiracy. He says the bill, as amended by Sacheverell, "retrospectively inflicted a severe penalty"—that it was "a retrospective penal law"—that it proposed to "punish" those at whom it was aimed—and that it was an attempt "to inflict on all these men without exception a degrading punishment."

Are these terms properly applied? "Impossible! The bill was a mere ascertainment of the qualifications for holding office in the different boroughs; that was its declared object. It did not intend to punish any one; that is clear, because the word "punish" is not once used in the bill. As for crime and its punishment, there is no hint at either in the act; and any one who can, in the face of demonstration like this, imagine that he sees either, must be a rank Jacobite and an enemy to the principles of the Whig party—(the 'good cause,' as it was sometimes called). No trial is provided for in the bill. How can there be punishment except for crime? Whoever dares to say that there is any such thing in it as penalty or punishment—that it is a bill of pains and penalties—that it is an *ex post facto* law—or that it is, in short, anything but what it suits its advocates to admit it to be, is an enemy to the Protestant succession."

Now, I ask if this is an unfair application to the bill of 1690 of the defence which has been attempted of the 3d section of article 2? If it is available for the last of these, is it not doubly so for the first? And does not every one see

at the first glance that if such a defence of the act of 1690 had been attempted, it would have been impossible to persuade posterity that those who made the effort were themselves the dupes of such drivel. Let no one be deceived. Let no one doubt that before the earth shall twice have completed the circuit of the sun, there will be on the part of all an equal incapacity to understand, to believe, that those who now on this ground, and on this ground alone, dare to defend the test oath of the new Constitution, could have been at once sincere and in their senses.

Nothing can be clearer than that if the Corporation Bill, as amended by Sacheverell, was a " retrospective penal law," then sec. 3 of art. 2 of the new Constitution is a retrospective penal ordinance. If the first inflicts a " degrading punishment," then, because the whole is greater than a part, the latter inflicts a punishment still more grievous and still more degrading.

But, if the 3d section of the 2d article of the Constitution is a penal ordinance, it is a bill of pains and penalties ; if it is a retrospective penal ordinance, it is an *ex post facto* law ; and so it violates the 10th section of the first article of the Constitution of the United States in both the prohibited particulars. The mode of ascertaining whether any of the class proscribed by the Corporation Bill were within its provisions does not appear. But, whatever it was, of this we can be quite sure : it could not be more foreign and repugnant to the genius of English law and the spirit of liberty, than the inquisitorial process which was adopted and made a substitute for trial and conviction in section 3 of Art. II. of the new Constitution, by the astonishing body of men, which, sixty-four in number, assembled in Mercantile Library Hall, in St. Louis, in the month of January, 1865, and imagined themselves clothed with unlimited power to feed fat the grudges of political rancor which they bore to a large majority of the best citizens of Missouri.

Again I say I feel that I owe an apology to the court for dwelling on what is so plain, when I call its attention to the fact that, whatever evil thing was done by the Corporation Bill of 1690 is done in greater measure by the Missouri Constitution of 1865. The latter excludes a large class from the right of voting at any election, from the right of holding any office under the State, or any municipal corporation in it ; and from the right of pursuing certain callings by which men earn their living ; and it does these things and more,

not for seven years, but for all time—while the Corporation Bill only excluded its victims from a part, and a very small part of these privileges, and that only for seven years. If the Corporation Bill was penal, much more is the new Constitution penal.

It is important to look to the extent of the pretension made by the demurrants. It amounts to this or to nothing, viz. : That if a Convention (and by parity of reason a Legislature) does any act which it wishes to withdraw from judicial animadversion, and to screen from the objection of being violatory of some provision of the fundamental law of the land, all that is necessary is that the act should declare on its face, that its object and purpose are not to violate that fundamental law. If this declaration be made, no matter how impudently and how falsely, courts of justice are by means of it absolutely precluded from looking into the act itself in order to discern whether it really effects any of the things forbidden by the supreme law. All the mischiefs which the constitutional provision intended to prevent, can be effected by merely changing the phraseology of the act which works the mischief. If the act frankly declares its purpose—if it proclaims its intention to punish, by deprivation or otherwise, certain persons whom it ascertains by name or description, then beyond doubt it is a violation of the Constitution of the United States. But if it does not declare this purpose, and still more, if it denies this purpose, it may proceed to inflict the prohibited penal consequences ; but by reason of the language of the act courts of justice will be precluded from saying that it is penal at all.

This is the position taken by Mr. Drake. It amounts to this or to nothing.

I consider the employment, by the defendants, of such a substitute for an argument as an admission of the highest importance. It is inconceivable that any one would adopt this defence of a position which he evidently greatly desires to maintain, if he had anything better to offer. And to what does this defence amount? It is simply that the judiciary shall shut the eyes and close the ears of their understandings, and only see and hear what *one* of the parties litigant before them may desire them to see and hear. It is a demand that the judiciary shall abdicate its functions as interpreters of law, and submissively accept from either of the co-ordinate departments (or from any litigant sufficiently noisy and imperious) the name and definition of an act

which is called in question. It is an abrogation of every constitutional safeguard, and every law which is expressed in language; which includes all laws and all constitutions. For, if it is only necessary to change the name of a thing in order to preclude an inquiry into its nature—and this is simply what the defendants claim—not one of the prohibitions in the Constitution of the United States, or of any State, and not one of the statutes in either, is worth a farthing.

If the name is everything and the substance nothing in an act of the Legislature, or an ordinance of a Convention, we can with little difficulty evade the operation of any constitutional prohibition. It may not be easy to overthrow it by any attack in front, but nothing will be easier than to turn its flank. Having got rid of the old rule—"*Quod prohibetur per directum, prohibetur et per obliquum*"—and having, in effect, construed it to mean that "if there be any difficulty which is insuperable by direct means, you can easily dispose of it by indirect," the whole task is, as it were, ready done to our hands.

The Constitution of the United States forbids the infliction of capital or other punishment by bill; and it is, notwithstanding, desirable for some party or faction, having a temporary ascendant in the State, to prescribe and put to death a large class of its opponents. Clearly this cannot be done if death is called a punishment. But, if its name be changed, and it be called a reward, the constitutional prohibition will not be applicable to any wholesale murder which the Legislature may have at heart, and which it chooses thus to characterize. All difficulty disappears like magic. It would be competent for the Legislature (by the logic of the defendants) to make the change of names of their own pleasure and power. But, in this case, (*i. e.*, when death is in question,) they have actually good, or at least plausible authority in their favor. St. Paul said, "For me to die is gain;" and the same has been said of other Christians. Moreover, a heathen didactic poet has said, "That the wise man regards the close of life as among the rewards of nature." Pagan and Christian authority may then be quoted for calling death a reward. Furnished with this superfluous support of a power already without bounds (in the article of miscalling things), let the faction designate by some certain description the persons whose continued existence on this earth threatens the permanent tenure of office by the faction.

Let this class of persons, if mockery be considered a fit aggravation of their fate, be declared to have deserved well of the Republic. As a recompense for such conduct, let it be decreed that they shall receive a testimonial of the gratitude of the nation. Let it be the duty of some functionary (Jack Ketch, for example) to confer upon the persons named, or otherwise ascertained by description, in some public place, with appropriate ceremonies, that particular reward of which St. Paul and Juvenal spoke. Money has been called the root of all evil; property has been called a mere source of care. Nothing will be easier than by adopting these definitions, to perpetrate any act of spoliation, and call it a relief of the sufferer from pernicious evils. Even personal freedom has not always proved a blessing to its possessor; at any rate there have been men who have called it a curse. From personal freedom then, denominated as a curse, let certain political enemies, described as the favorites of the State, be delivered. Nothing can be simpler. Death, imprisonment and confiscation can be inflicted without stint, provided only those who frame the list of the proscribed are careful of the phraseology they employ. Let them beware of calling these things punishments, and let them be sedulous not to impute crime. Let them call spoliation, bounty; let them call death a reward, and imprisonment, a privilege. Courts of justice cannot (so runs the argument) look behind the professed intention of the act, and must be, dare not be otherwise, than blind as beetles and mute as fishes respecting its real nature.

No doubt, your honors, I seem to trifle with your time, and to make a dull jest of a solemn subject. I can give no excuse but what I have already given—I am replying to the only defence of this test oath which I have heard, and I have legitimately exposed the absurdities to which it leads.

I might proceed with the examination of almost every odious and oppressive law prompted by political hate or religious rancor, and show that the penal nature of them all may be denied with precisely the same propriety that the section 3 of Art. II. can be said to inflict no punishment. But I forbear such a trespass upon your time and my own powers of endurance.

If I do not mistake, I have made it plain, First, That the second article of the new Constitution of Missouri, under pretence of ascertaining the qualification of voters, actually promulges a sentence of severe and infamous punishment

against a large and innocent class of the citizens of this State, who are described in the article as plainly as if they had been designated in it by name.

Second, That this 2d article is not only a penal ordinance, but a retrospective penal ordinance.

Third, That in so far as it is a penal ordinance, it is a bill of pains and penalties, that is, a bill of attainder; and in so far as it is a retrospective penal ordinance, it is an *ex post facto* law—and so, by both titles, it is a violation of the Contitution of the United States, and void.

*C. D. Drake*, for defendants in error.

NOTE.— The following are the portions of Art. II. of the Constitution of Missouri involved in this argument:

" SEC. 3. At any election held by the people under this Constitution, or in pursuance of any law of this State, or under any ordinance or by-law of any municipal corporation, no person shall be deemed a qualified voter who has ever been in armed hostility to the United States, or to the lawful authorities thereof, or to the Government of this State; or has ever given aid, comfort, countenance or support to persons engaged in any such hostility ; or has ever, in any manner, adhered to the enemies, foreign or domestic, of the United States, either by contributing to them, or by unlawfully sending within their lines, money, goods, letters, or information; or has ever disloyally held communication with such enemies ; or has ever advised or aided any person to enter the service of such enemies; or has ever, by act or word, manifested his adherence to the cause of such enemies, or his desire for their triumph over the arms of the United States, or his sympathy with those engaged in exciting or carrying on rebellion against the United States ; or has ever, except under overpowering compulsion, submitted to the authority, or been in the service, of the so-called 'Confederate States of America'; or has ever left this State, and gone within the lines of the armies of the so-called 'Confederate States of America,' with the purpose of adhering to said States or armies; or has ever been a member of, or connected with, any order, society, or organization, inimical to the Government of the United States, or to the Government of this State ; or has ever been engaged in guerrilla warfare against loyal inhabitants of the United States, or in that description of marauding commonly known as 'bushwhacking'; or has ever knowingly and willingly harbored, aided, or countenanced any person so engaged ; or has ever come into or left this State for the purpose of avoiding enrolment for or draft into the military service of the United States ; or has ever, with a view to avoid enrolment in the militia of this State, or to escape the performance of duty therein, or for any other purpose, enrolled himself, or authorized himself to be enrolled, by or before any officer, as disloyal, or as a Southern sympathizer, or in any other terms indicating his disaffection to the Government of the United States in its contest with rebellion, or his sympathy with those engaged in such rebellion ; or, having ever voted at any election by the people in this State, or in any other of the United States, or in any of their Territories, or held office in this State, or in any other of the United States, or in any of their Territories, or under the United States, shall thereafter have sought or received, under claim of alienage, the protection of any foreign Government, through any consul or other officer thereof, in order to secure exemption from military duty in the militia of this State, or in the army of the United States."

" SEC. 5. Until such a system of registration shall have been established, every person shall, at the time of offering to vote, and before his vote shall be

received, take an oath in the terms prescribed in the next succeeding section. * * * * Any person declining to take said oath, shall not be allowed to vote.

"SEC. 6. The oath to be taken as aforesaid shall be known as the Oath of Loyalty, and shall be in the following terms :

"'I, A. B., do solemnly swear, that I am well acquainted with the terms of the third section of the second article of the Constitution of the State of Missouri, adopted in the year eighteen hundred and sixty-five, and have care-fully considered the same; that I have never, directly or indirectly, done any of the acts in said section specified; that I have always been truly and loy-ally on the side of the United States against all enemies thereof, foreign and domestic; that I will bear true faith and allegiance to the United States, and will support the Constitution and laws thereof as the supreme law of the land, any law or ordinance of any State to the contrary notwithstanding; that I will, to the best of my ability, protect and defend the Union of the United States, and not allow the same to be broken up and dissolved, or the Govern-ment thereof to be destroyed or overthrown, under any circumstances, if in my power to prevent it; that I will support the Constitution of the State of Missouri; and that I make this oath without any mental reservation or eva-sion, and hold it to be binding on me."

*       *       *       *       *       *       *

The question is simply whether the plaintiff was legally entitled to vote, at the election at which he offered to vote, when, by his own showing, he refused to take the Oath of Loyalty which the Constitution requires to be taken by ev-ery voter as a condition precedent to his exercising the right of suffrage. That is the formal question ; but within it lies another of vastly greater importance, viz.: Whether the Peo-ple of Missouri have the right to declare in their Constitu-tion who shall be voters, and who shall not.

May it please your honors, were I governed merely by my conviction of the necessity of an argument in support of the negative of the first, and the affirmative of the second of those questions, I would make none; for, to make it might seem to imply that the Constitution of Missouri needs judi-cial sanction to be the Constitution of Missouri; a proposi-tion which I do not for an instant admit. But when I find able counsel boldly assailing the Constitution adopted by the People of this State, and attempting to establish the propo-sition that its provisions in regard to the qualifications of voters "are no constitutional provisions at all ; that they are binding on nobody and affect nobody's rights ; and that they are in violation of the Constitution of the United States, and mere nullities," I cannot hesitate to meet the attack with such ability as I possess. I approach the discussion with no misgivings as to the right, or as to the result.

May it please the court, the plaintiff's case, and the argu-ment of his counsel, proceed upon a wholly baseless assump-tion as to the legitimate province of this court. Says Mr.

Glover, " the judiciary holds in its hands the liberties of the people"; and he " solemnly invokes the judiciary to perform the duty for which it was created." This is the final invocation of his argument; and its closing words broadly intimate, that if the court fails to perform the duty of adjudging the sections of the Constitution under consideration to be nullities, "anarchy and bloodshed" may be the dread alternative. May it please your honors, we need not waste words just now upon the " anarchy and bloodshed" matter. Time enough to attend to that when it comes; when, no doubt, it will be attended to promptly, decidedly, and efficiently. What I am after just now is the position assumed by the gentleman, that " the judiciary holds in its hands the liberties of the people"; a position which I wholly repudiate. It is in no sense true, nor was it ever true, that in this or any other State of the American Union " the judiciary holds in its hands the liberties of the people." That it possesses the power to protect the liberty of the individual citizen, when illegally restrained, is most true; but by no inherent faculty, by no granted right, by no constitutional or statutory authority, express or implied, is it the custodian of the liberties of the people. They are the keepers and the defenders of their own liberties—which they define and guard in and by a Constitution adopted by themselves. As a necessary part of the machinery of government under that Constitution the Judiciary is organized, in part, to administer the fundamental law therein contained—not to set aside, abrogate, or annul it. Denying utterly any semblance of authority in this court, by its judgment, to cut out the very vitals of the Constitution to which it owes its existence—which is just what the plaintiff demands and his counsel urges—I am yet constrained to answer the elaborate argument of the latter.

In that argument all ages, all quarters of the globe, and all systems of government and laws are laid under contribution for material upon which to build the startling proposition, that the people of Missouri have no right to say, in their Constitution, who shall and who shall not vote ; and that it is for this court, or the Supreme Court of this State, or that of the United States, to prescribe different qualifications for voters from those which the People of the State have themselves ordained. While I shall endeavor to meet that argument, it is not my purpose implicitly to follow its course. To do so, would not verify the old saying, that "the longest way round is the shortest way home." I shall take a shorter way to my con-

clusions; and shall endeavor, in reaching them, to walk in the light of this age and this country, not in the twilight of old Greece and Rome, or the darkness of mediæval Europe, or the gloom of Westminster Hall in its days of attainders, pains, and penalties. America sheds light enough upon her own institutions; and no other country's history or laws can much increase that light, in the grand realm where her people are working out the sublime problem of self-government, as never it was worked out before.

While I cannot but suppose it a work of supererogation to defend this demurrer, I am gratified that it devolves upon me to do so; for it presents the first opportunity I have ever known in a court of justice, to examine, down to the very corner-stone, the foundations of our system of popular government by masses of people organized into States; and to set forth the fundamental principles upon which the government of this State rests, and which seem not to have come within the range of Mr. Glover's vision, in his wide excursion through the realms of history, philosophy, politics, law, and rhetoric. There are such principles, and they are so plainly written down—make so clear and marked a way, that " wayfaring men, though fools, shall not err therein." I propose to bring them forth, and apply them to the case in hand, with undoubting confidence that they will vindicate the right of the people in this great matter.

It so happened that, in the course of his argument, Mr. Glover did—perhaps by accident—knock at the door which, had he opened it, might have led him in that clear and marked way; but I apprehend he did not fairly open it; but, discovering that the way to which it led was not the plaintiff's way, or his way, he " passed by on the other side." Near the close of his argument he encounters the question, " What is the State?" and affirms that none of those who contend that the State must have power to protect itself, will give any intelligible definition of what they mean by " the State." He then presents his ideas on that subject, and says, " The State of Missouri is a political organization based upon specific principles." May it please the court, I am constrained to confess—and perhaps should do so with humiliation—that this definition of the State does not come to my mind with as clear a luminosity as I could desire. There are several kinds of political organizations based on specific principles, but this definition does not say to which this State belongs. True, Mr. Glover adds, that "the State of Missouri

is a free State based upon the principles of liberty"; but still
I do not find much light from that upon the subject under
discussion.    And yet, if your honors please, the question
" What is the State ?'' happens to be the very one, above all
others, most important to be rightly decided at the thresh-
hold of this debate; for as it is decided one way or another,
shall we go right or wrong toward conclusions.    Therefore,
as I do not find in Mr. Glover's definition the clearness and
exactness which appear to me necessary to a proper under-
standing of what the State is, I am compelled to attempt an
answer to that question myself.    I shall not at this point es-
say a definition.    Matters of history and constitutional inter-
pretation have first to pass in review ; and to them I will
now address myself.

Up to the year 1820 there was no State of Missouri.
People lived upon a part of the wide-spread region which
was afterwards included in the authorized limits of that
State; but they were not the inhabitants of a State.    There
was a government over that region ; but it was not the gov-
ernment of a State, but of a body of people constituting a
part of the American Nation, and having that government
provided for them by the Nation's authority.    So far as they
exercised any power of self-government, it was not of natu-
ral right, but under the licence of the Nation, granted by
law.    They had, for some purpose a corporate capacity, not
inherently, but by the express authority of the Nation.    In
this condition of *quasi* minority they remained until the Con-
gress of the Nation, by law, authorized them " to form for
themselves a Constitution and Sate government."    The only
limitation imposed by Congress upon this power was, that
the Constitution, when formed, should " be republican, and
not inconsistent with the Constitution of the United States."
If it fulfilled those conditions, there was no limitation or re-
straint upon their volition as to the organism and principles
of the State they were about to form.

In pursuance of the authority of the act of Congress of
March 6, 1820, the inhabitants of a certain defined portion
of the Territory of Missouri elected delegates to a Convention
to form a Constitution for the new State; and those dele-
gates assembled in Convention, and formed that Constitution
which was the fundamental law of this State until superseded
by that now in force, and which this court is urged to assail
with deadly thrust in its most vital part.

Here, then, we are at the very inception of the new State.

The People, through their representatives, were to form it. A *carte blanche* was before them, upon which to write such a Constitution as they pleased, subject only to the limitation before mentioned. Principles, organizations, agencies, rights, duties, privileges, enfranchisements, disfranchisements, were all in their hands, to declare, shape, and enforce in the new State, just as they saw fit.   The Nation of which they were a part, and all its authorities, Legislative, Executive, and Judicial, recognized that right as fully, to every legal intent, as the people could have asserted it.   There was, therefore, at the very birth of the new State, a universal recognition of the complete and absolute power of the people over every matter pertaining to the internal organization and government of the Republic about to be introduced into the family of States in the Union. That recognition has continued from that day to this.

The people, through their representatives, proceeded to form the Constitution which was to organize them into a State, and in its very first sentence defined what the new State was, in the following terms:

"We the People of Missouri, inhabiting the limits hereinafter designated, by our Representatives in Convention assembled, at St. Louis, on Monday, the twelfth day of June, one thousand eight hundred and twenty, do mutually agree to form and establish a free and independent Republic, by the name of 'The State of Missouri'; and, for the government thereof, do ordain and establish this Constitution."

Now, if your honors please, there are contained in this first sentence of that Constitution the following five propositions:

1. That the People of Missouri are the State;
2. That they become a State by mutual agreement;
3. That they as a State are a body politic;
4. That they as a State are free and independent; and,
5. That, for the government of themselves as a State, they ordain and establish that Constitution.

And here is the answer to Mr. Glover's nervous inquiries, hurled at imaginary adversaries, who, he intimates, are shirking the question "What is the State?"  Says he, "Is it the militia?  Is it the Governor or the Legislature?  Is it the Union pary?  Is it the Radical party?"   All of which bantering questions are quite impertinent; for the only true definition of the State, as furnished by itself, is—The people, organized by mutual agreement into a free, independent and self-governing Commonwealth.   It cannot then be true,

as said by Mr. Glover, that "the State is a mere instrument for promoting the popular well-being;" for that is meaningless, if it do not affirm that the government of the State, that is, the magistracies to which "the powers of government" are by the Constitution "confided," is the State itself; when, in fact, it is but the agent or instrument of the State, namely, the people.

If, then, the people are the State, that fact furnishes a broad and impregnable foundation for their claim of right to protect the State from its enemies, by excluding them from all participation in its government. I fearlessly say that they have that right to the very utmost limit of its widest meaning. The State is no State without it. It can no more be questioned by any earthly authority than one man can question another's right to breathe.

Let us now see upon what principles the people organized themselves into a State, so far as their own rights and powers were concerned. Two are set forth in the "Declaration of Rights" in the Constitution of 1820, as "general, great, and essential principles of liberty and free government," which the people declared should be "recognized and established."

The first is—"That all political power is vested in, and derived from, the people."

The second is—"That the people of this State have the inherent, sole and exclusive right of regulating the internal government and police thereof, and of altering and abolishing their Constitution and form of government, whenever it may be necessary to their safety and happiness."

These two great American political axioms have a powerful bearing upon the questions now before the court. If I mistake not, they are the upper and nether millstones to the plaintiff's case and the argument of his counsel.

Regarding them as axioms which are not and cannot be disputed, there grows out of them this important inquiry—what is meant there by "the people?" In ordinary parlance, when we speak of the people of a State, we may, in regard to some matters, mean the whole body of its inhabitants; but never so when we allude to the people in connection with the exercise of political power. Then, the mind instantly turns from the whole body of the inhabitants to that portion of them in whom is constitutionally vested the right to exercise that power. And who are they? To ask that question, is to bring at once to the mind of every man the only answer

that can be given—that none of the inhabitants but qualified voters can exercise political power ; for it is only through the ballot that such power is or can be exercised by the people. That this was the sense in which the words " the people" were used in the axioms above quoted, does not, to my mind, admit of a doubt. That Constitution, by its very terms, so demonstrates ; for, while it affirmed the people to be the only source of political power, it cut off from any exercise of that power about eight-tenths of the whole body of the inhabitants of the State, comprised in the following classes, to-wit : persons of color, women, minors, unnaturalized foreigners, persons whose residence in the State was not at the time of an election of a year's duration, and persons whose residence in a county was not at such time of six months' duration. For the Constitution to affirm that all political power is vested in the people, and that the people have the sole and exclusive control over their Constitution, and at the same time to exclude eight-tenths of the inhabitants .from the right to exercise any such power or control, and to confer the right upon the other two-tenths, leaves not the least room for questioning, that, by " the people," in this connection, were meant the qualified voters of the State. Any other deduction is simply impossible.

Looking, then, at the body of the qualified voters of the State as in this sense " the people," we come to inquire, next, how they were to exercise the political power residing in them ? As I before remarked, they could do so only through the ballot. The periodical elections provided for by the Constitution and laws of the State, gave the occasions for its exercise ; when eight-tenths of the inhabitants stood aside, while a majority of the rest wielded, through the elective franchise, the whole political power of the State. Thus, the very first act of the people of Missouri Territory, when they came to form a State government, was to assert their unbounded supremacy in that matter by excluding from any voice in the control of that government some eight-tenths of the entire population of the infant State.

Now, may it please the court, if the whole power to regulate the internal government of this State resided in the people, and was their " inherent, sole, and exclusive right," it follows that chief among the matters over which they must necessarily exercise that power, would be the definition of what should constitute any inhabitant of the State a qualified

voter. Over that subject, above all others, it was their right to exercise control. And it was equally their duty; else there would have been exhibited the extraordinary spectacle of a State still-born, for the want of an original governing power. That, they did in their Constitution declare the qualification of voters, of course we all know. In doing so, they exercised their declared right to say who should be voters, and who should not. They not only excluded those not included in the terms defining the qualifications of voters, but ordained positive disqualifications. Thus, both negatively and affirmatively, they wielded the power excluding thousands from the ballot-box. And now, I would ask, where was the limit to their power over this subject? Was it in the Constitution of the United States? Not in any possible way; for there is not in that instrument one word which gives the Nation power over the qualifications of voters in any of the States. On the contrary, that Constitution affirms the exact opposite, in that clause wherein it declares that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." That there was nothing in the provisions of the first Constitution of Missouri on the subject of the qualifications of voters, which was inconsistent with the Constitution of the United States, was settled beyond dispute by the admission of Missouri into the Union, with the Constitution framed by her people in Convention. If, then, the Constitution of the United States imposed no restraint upon the power of that people over the qualifications of voters, what restraint was there? May it please your honors, you know, I know, the plaintiff knows, his counsel know, the whole people know, that there was not, and, in the nature of things, could not have been, any such restraint; that the people were as almighty over that subject as they could be over any; and that it was as absolutely a necessity that they should be so, as that you or I should have the right to protect the lives that God has given us.

The next point to be noticed is, that these great fundamental truths as to the political power of the people, were not adopted for a time, but for all time; that it was the will of the people that they should be "established"; that they ever since continued to constitute a part of the fundamental law of the State, and that they are absolutely unchangeable, save by the will of the people themselves. Every child born in Missouri, every immigrant into her borders, since that

Blair v. Ridgely et al.

first Constitution took effect, came under the sway of those great truths. The people of Missouri in 1864–5 had the same " inherent, sole, and exclusive right of regulating the internal government and police thereof, and of altering and abolishing their Constitution and form of government," that the people had in 1820. And thus panoplied in the right which they themselves had asserted, and which the Nation had expressly assented to and affirmed by admitting this State into the Union, the people of Missouri, in 1864, inaugurated a movement for the exercise of that right; not by any unauthorized or revolutionary action, but by every sanction of law, and with a full and fair expression of the popular will.

Before adverting particularly to the details of that movement, let us for a moment glance at the circumstances under which it was made. It was early in the fourth year of the great rebellion that the movement was begun, under the sanction of law. Says Mr. Glover eloquently, in regard to that rebellion, " The nations of the earth, profoundly moved by the issue, ranged themselves on either side and watched with anxious solicitude the progress of the momentous struggle. Almost the whole family of lords, and kings, and despots— the friends of right divine, the advocates of arbitrary government—were upon the side of the rebellion. Openly or secretly they lent their favor to the enemy, and aided and comforted the insurrection, and earnestly prayed for the death of this Republic." May it please the court, with all respect for the learned counsel, I wonder that in this passage he should have referred only to the relations of the foreign world, in fact and feeling, to that rebellion, when he had been so familiar with the exhibition in Missouri of just such feelings and acts as he attributes to " almost the whole family of lords, and kings, and despots." Let me recall his gaze from those distant regions to our own State. In doing so, I beg the court to believe that I am not seeking an opportunity for declamation or display. Every word I shall utter is intended to have, and I hope will be seen by your honors to have, a direct connection with, and bearing upon, the main argument.

The outbreak of the rebellion shook Missouri from centre to outmost boundary. In a day, as it were, the whole framework of society was wrenched, distorted, and shattered. Where peace had reigned, war reared its bloody crest; where friendship had bound together, distrust and hatred separated; where law had regulated, anarchy bred confusion;

10—VOL. XLI.

where love of country had burned bright, the love of slavery, inciting rebellion, quenched it in blood; where the Nation's flag had been blessed and honored, it was cursed, spit upon, and trodden underfoot. Treason stalked abroad with defiant front, and in secret set its devilish enginery in motion. Falsehood, treachery, and perjury pervaded the whole social fabric. Few of the loyal could say with certainty who of their neighbors, or even their friends, was not infected with the virus of treason. Only traitors knew each other, always and everywhere : they enrolled themselves by thousands under the rebel flag, and turned their arms against their country and their former friends;—other thousands banded themselves together in secret organizations, to give aid, comfort, countenance, and support to the armies of traitors that were battering at the ramparts of the Constitution, and hacking at the golden bands of the Union;—other thousands dispersed themselves through every ramification of official and social life, to become the pimps and spies of the rebellion;—other thousands took to the bush, to waylay and shoot down unsuspecting patriots—to murder them in their habitations in presence of their wives and children—to set the firebrand to their dwellings, and make night lurid with flames which left them houseless, homeless, and beggared;—other thousands still, became the harborers, informers, guides, and purveyors of the bloody any merciless bushwhacker;—other thousands still, who, claiming to be American citizens, had for years exercised at the ballot-box the highest privilege of citizenship, when the struggling Nation was compelled to resort to a draft to recruit its wasted armies, flocked to the office of the British Consul to obtain a certificate of their being subjects of the British Queen, that they might not be compelled to fight for the flag under which they had voluntarily sought a home, and had lived in peace and prospered; —others, not so numerous, but still large in numbers, fled the State, to avoid being drafted into the army, for whose defeat and destruction they nightly prayed, and in secret labored;—other thousands, to escape service in the militia of the State, for the protection of our own soil and people, shamelessly enrolled themselves as "disloyal" or as "Southern sympathizers," and so, in faith of final triumph of the rebellion, put themselves on record as traitors in heart. In short, there was hardly any form in which treason to country, treachery to friends, faithless to obligations, and disregard of all laws, divine and human, could be manifested,

that was not exhibited daily, for years, in this unhappy State. Could there be written a full account of all the crimes of the rebels of Missouri, and the wrongs and outrages inflicted by them upon her loyal inhabitants, during the four years of the rebellion, the world would shrink aghast from a picture which has no parallel in the previous history of any portion of the Anglo-Saxon race.

If it be asked, what has all this to do with the argument of the questions of law involved in this case? I answer, it has much. When a legislature adopts laws, contemporaneous history oftentimes sheds light upon the spirit and intent of those laws. And so, when the people of a State adopt great changes in their fundamental law, it is important, and sometimes indispensable, to consider the circumstances which led them to do so; that the world, the courts, and history, may know the *why* of proceedings which would otherwise be difficult of explanation. Mr. Glover in his argument says, in regard to the provisions of the Constitution now under discussion, " every principle belonging to the ordinary course of judicial proceedings known and practised in Missouri for more than half a century, has been thrown aside in framing these sections, with the cunning of ambitious, sharp-sighted and remorseless tyrants, or with the stolid and vulgar ignorance of Goths and Vandals." If the truth of this invective were in any fair proportion to its bitterness, it would be a stinging sentence to pass into history; but, fortunately, there is more of the partisan than the lawyer in it. It is a violent misrepresentation of the spirit which animated the Convention that framed the present Constitution of Missouri. Its intent was to intensify the colors with which he has sought to depict that Constitution as all that is intolerant and proscriptive, and its framers as all that is inhuman, remorseless, and tyrannical. To vindicate the Constitution and its framers from such injustice is not the province of the judiciary; nor is it mine to defend either here, except in so far as it is necessary to show that the Constitution is a legitimate expression of the will of the people, in the exercise of their indisputable right; is morally justified before God and man by the surrounding circumstances; and is not in conflict with any provision of that national Constitution to which it is unquestionably subject. To do this, the *intention* of the people in framing this Constitution is an important subject of inquiry, necessarily involving a view of the history of the State leading to their action in this respect; and he

who looks at the Constitution without the light cast upon it by that history, is sure to misinterpret its spirit, and to slander, as vengeful, what was only designed to protect the loyal people of Missouri against their wily, bloodthirsty, and implacable foes.

Now, may it please the court, as has already been shown, one of the fundamental declarations in the Constitution of this State has always been, the right of the people to alter their Constitution " whenever it may be necessary to their safety and happiness"; and the motto of the State proclaims, " *Salus populi suprema lex esto.*" In obedience to this supreme law, and for their own safety and happiness, the people of this State began, through their delegates in Convention, in a little more than a year after the outbreak of the rebellion, to devise measures to protect themselves from the future domination of traitors. That the rebellion would finally be overthrown was inevitable; and that, when overthrown, its whole gang of Missouri officers, soldiers, guerrillas, bushwhackers, spies, pimps, aiders and abettors, would rally everywhere in solid force at the ballot-box, to secure there the power they had failed to obtain by war, was equally inevitable to the mind of any man whose knowledge of men was equal to that of a twelve-year old boy. It required but the smallest modicum of sagacity to foresee this; and, foreseen, the very instinct of self preservation would prompt the adoption of measures to guard against a humiliation so deep, an evil so incalculable in its extent and disastrous in its effects. That such measures should have been extraordinary, was the inevitable result of the extraordinary circumstances which evoked them. That a " test oath," " an oath of innocence," or almost any other kind of oath, should have been resorted to, was most natural, and perfectly justifiable; for, unless some constitutional barrier were interposed, there was no earthly power that could prevent rebels, fresh from southern battle-fields, from exercising, the very hour they came back, the franchise which, in every moral aspect, they had utterly and most justly forfeited.

But, if the court please, I will diverge a moment from the historical review upon which I had partially entered, to notice a point made by Mr. Glover, viz.: that he has been unable, after some research, to find any precedent in England or America for such a "device" as an oath of innocence of crime to enable a citizen to enjoy political rights. This assertion by him surprises me, as much as his reference to precedents

seems to me out of place. The right of the people to insti-
tute in their Constitution such an oath is wholly independent
of precedents; it exists, though in the whole world such a
"device" had never before been thought of. Unprecedented
exigencies may well demand unprecedented resorts. Admit
that no precedent for our test oath exists—has Mr. Glover
found a precedent for the Southern rebellion, in its magni-
tude, principles, and aims? I judge not. Would it have
been wonderful, then, if in this State measures were taken
in reference to rebels, which had never before been resorted
to against citizens? Would it not rather have been wonder-
ful if they were not? But, if the court please, though the
test oath prescribed here have no precedent in England, it is
abundantly sustained by precedent in the United States, and
in this very State. Let us look into recent American history,
and see what there is there of a test oath " device."

1. I find that Congress, by an act passed June 17, 1862,
provided that at any term of any court of the United States,
the district attorney, or other person acting on behalf of the
United States in said court, may move, and the court in their
discretion may require the clerk to tender to each and every
person who may be summoned to serve as a grand or petit
juror, or venireman, or talesman, in said court, the following
oath:

"You do solemnly swear, that you have not, without du-
ress and constraint, taken up arms, or joined any insurrec-
tion or rebellion against the United States; that you have
not adhered to any insurrection or rebellion, giving it aid
and comfort; that you have not, directly or indirectly, given
any assistance in money, or any other thing, to any person
or persons whom you knew, or had good ground to believe,
had joined, or was about to join, said insurrection and rebel-
lion, or had resisted, or was about to resist, with force of
arms, the execution of the laws of the United States; and
that you have not counselled or advised any person or per-
sons to join any rebellion against, or to resist with force of
arms, the laws of the United States."

2. I further find that Congress, by an act passed July 2,
1862, required every person elected or appointed to any of-
fice of honor or profit under the Government of the United
States, excepting the President thereof, before entering upon
the duties of such office, to take and subscribe the following
oath:

"I, A. B., do solemnly swear that I have never volunta-

rily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel, or encouragement, to persons engaged in armed hostility thereto; that I have neither sought nor accepted nor attempted to exercise the functions of any office whatever, under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power, or constitution, within the United States, hostile or inimical thereto."

3. I further find that Congress by an act passed January 24, 1865, required this last oath to be taken by all persons practising law in the courts of the United States.

Here, then, may it please the court, are three instances in which this test oath "device" was resorted to by Congress before the present Constitution of Missouri was framed; and, as Mr. Glover in his argument continually parades before the court the "eighty-six crimes" which, by a most ingenious and extraordinary mode of computation, he has discovered to be defined in sec. 3 of art. 2 of the Constitution, it may be of interest to the court to be informed, as I take the liberty of informing it, that, by his mode of computation, the first of those oaths covers sixteen and the second twenty-two crimes.

Turning from the national precedents to those established by State authority, I find in the Constitution of Maryland, adopted in September, 1864, a test oath, or oath of innocence, prescribed to voters in the following terms: "I do swear that I have never given any aid, countenance or support to those in armed hostility to the United States, [and] that I have never expressed a desire for the triumph of said enemies over the arms of the United States." And that Constitution provides, as does ours, that " any person declining to take said oath shall not be allowed to vote."

May it please the court, the precedents which I have thus presented are enough to justify our test oath, if any such justification were needed. But, as I said before, the people of this State had a perfect right to institute this oath, had nothing like it ever before been conceived of. I present the precedents, because Mr. Glover said that he had been able to find none in England or America. And I hold that they are all the more forcible, for having been the offspring of the same circumstances which dictated the incorporation of the test oath into our Constitution. The rebellion brought them

into being, as it did that. The rebels, therefore, have no right to complain of what their own acts brought about ; on the contrary, they should rejoice that the only inconvenience resulting to them from their matchless crime, is. exclusion from office, from the ballot-box, and from certain employments and positions.

It will be observed by your honors, that Maryland was in advance of Missouri in adopting a Constitution prescribing a test oath ; but Missouri was more than two years in advance of Maryland in resorting to that "device," as I will now proceed to show. This will bring me back to the line of historical retrospect from which I just now diverged, and which is designed to present the circumstances which led to the adoption of our present Constitution, and thereby to explain and illustrate the intention of .the people in its adoption. I call your honors' attention to the following sentences in Mr. Glover's argument :

" The Convention has directed the judges of election to disfranchise the citizen on sundry charges of treason and *ex post facto* offences, and suffer no one to demand accusation, or notice, or proofs, but to require an oath of innocence. May it please the court, at no time in Missouri since the existence of the State government has any department save the judicial exercised the powers employed by the Convention in those sections."

Is it, indeed, the first time in Missouri that the judges of election have been " directed to disfranchise the citizen on the charge of treason"? Is it the first time that they have been directed to "suffer no one to demand accusation, or notice, or proofs"? Is it the first time that they have been directed to require of the citizen " an oath of innocence" ? Yes, says Mr. Glover ; but will his assertion obliterate history? What does that history say ? It says this, that the Convention elected in 1861, wisely foreseeing that the time would come when " Price's army," and thousands of other Missourians in the rebel army, would come straggling back, whipped and disarmed, but still as bitter rebels in heart as ever, and as ready as ever to struggle for supremacy over Union men, determined to interpose, in advance, a test oath —yes, that atrocious "device" of a test oath—between such traitors and the ballot-box ; and, to that end, passed the ordinance of June 10, 1862, which required every voter to take an oath of innocence, at the time of voting, as a condition precedent to the reception of his ballot ; and every judge

and clerk of election was required, in addition to his ordina-
ry official oath, to swear that he would not record, or permit
to be recorded, the name of any voter who had not first-taken
that oath. True, the oath prescribed was not as wide-spread-
ing or as searching as that of the Constitution; for, as to the
past, it only required the party to swear that "he had not,
since the 17th day of December, A. D. 1861, wilfully taken
up arms or levied war against the United States, or against
the provisional government of the State of Missouri"; but,
so far, was it not a direction to the judges of election to "dis-
franchise the citizen on the charge of treason" committed
after the day named? Did it not enjoin upon them to "suf-
fer no one to demand accusation, or notice, or proofs"? Did
it not command them "to require an oath of innocence"?
All these things it did, just as much as the Constitution now
does, except that the grounds of disfranchisement were lim-
ited to the act of taking up arms or levying war against the
United States, or the provisional government of this State,
after a certain date: a very feeble protection, since there
were probably more dastard traitors in Missouri who had not
taken up arms or levied war, but yet had been most active
and efficient friends of the rebellion, than there were fight-
ing Missouri traitors in the whole rebel army.

Now, if your honors please, what was that oath of June
10, 1862, but a measure of protection to Missouri's loyal
people? Was it not the legitimate offspring of a well found-
ed apprehension—nay, an assured and justifiable conviction
—that the men who had renounced their homes here, and
taken up arms against their country, would at some future
day return, and demand to exercise at the polls the right of
citizens, though they had, in every moral view, forfeited that
right by their unequalled crime? Was it not, beyond all
cavil, an exigency which made it "necessary" for the peo-
ple to "alter their Constitution," for the protection of "their
safety and happiness"? Did any one then hear that it was a
bill of attainder, or an *ex post facto* law, or a punishment?
Did any ex-Major-General, or any one else, then swagger up
to the polls, and demand to vote without taking that oath?
Did any lawyer then proclaim that that ordinance was "bind-
ing on nobody, affected nobody's rights, was in violation of
the Constitution of the United States, and a mere nullity"?
No such thing was seen or heard; but, on the contrary, the
mass of the people accepted cheerfully the change in the
Constitution contained in that ordinance, and for three years

voted under it without ever discovering that they were thereby subjected to punishment, attainted, or deprived of their liberties.   And why not?   Was it not a test oath—an oath of innocence ?   Was there not in it, to use Mr. Glover's language, " a total absence of the *accusatorial* method so well understood and so much loved by free nations, and the substitution of the hated *inquisitorial* in lieu thereof"?  In what, save its scope, does it differ from the present oath ?   Is not the principle the same in both ?   Did it not exclude from the ballot-box him who refused to take it ?   Is there anything charged by Mr. Glover upon the present oath  (save always the "eighty-six crimes" which figure so largely in his argument)  that might not have been charged also upon that ? Let us see.   He charges that the Constitution " assumes judicial magistracy"; that it "acts on the past"; that "the disfranchisement of a great number of citizens for treason was an object in view"; that it " changes the rule of evidence"; that in "providing that silence is guilt, it is only a special law, aimed at a class of persons—a legislative judgment against those persons"; that it "was enacted against domestic rebels, and is enforced in a summary manner, without indictment or trial by jury"; and that it "affects the punishment by creating a disability not incurred in the ordinary course of law."

Now, may it please the court, every one of these charges against the present oath might have been just as well made against the former, so far as they were concerned who had, after the 17th of December, 1861, wilfully taken up arms or levied war against the United States, or against the provisional government of the State of Missouri."   Why were not such charges made against it ?  Simply because in the throes of the mighty struggle then progressing, all realized the great truth in our State motto, that the welfare of the People is the Supreme Law ; and unprincipled politicians had not then scented the game, that, after the suppression of the rebellion, might be hunted down, by the aid of returned rebels, at the ballot-box.   No loyal man then saw in it anything but a just and necessary measure of self-defence ; and the judgment, conscience, and common sense of all good men approved the effort of that Convention to throw up even that slight breastwork against the refluent tide of blood-stained traitors that all knew would sometime roll back upon Missouri's devoted soil.   And such ought to be, and, in my opinion, must be, the judgment, conscience, and common sense of this or any other court before which the matter may ever come.

Unfolding further the political history of Missouri in those years of her bloody and fiery baptism, I come now to the facts connected with the formation and adoption of that Constitution which the court is asked to assail, by its judgment, in the very citadel of its life. That history is no unmeaning tale in its relations to this case, and to the argument now in progress. It pours a flood of light upon the intention of the Convention that framed, and the people that adopted, that Constitution. Never was a popular intention more clearly defined, or more unmistakable.

In November, 1862, the entire number of Senators and Representatives of the General Assembly of Missouri were chosen by the people, and assembled, in regular session, on the 29th of December following. They were elected by the voters under the ordinance of June 10, 1862. During that session an effort was made to pass an act authorizing the people to elect delegates to a Convention to revise and amend the Constitution; but it was not then successful. The General Assembly adjourned on the 23d of March, 1863, over to, and re-assembled on, the 10th of the succeeding November. The question of calling a Convention of the people was before the members and the public during the recess. At the adjourned session it was again brought before the Assembly, and, after full discussion and the most mature deliberation, an act was passed on the 13th of February, 1864, providing for calling such a Convention.

Some of the terms of that act require notice here. *First*— Its preamble recites that, "in the opinion of the General Assembly, the condition of affairs in the State demands that a Convention of the people be called to take such action as the interest and welfare thereof may require"; that is, an occasion had, in the opinion of that body, arisen, for the exercise by the people of the State of their "right to regulate the internal government and police thereof, and to alter their Constitution and form of government." But the General Assembly, though of that opinion, did not, like the previous one, authorize the Convention to be elected without regard to the will of the people themselves;—but, *Secondly*, they referred that question to the direct vote of the people, at the general election to be held on the 6th of November, 1864; thus giving the people almost nine months to consider and discuss whether the Convention should be held. At that election they decided by a majority of 39,586 votes, that it should be; and at the same time elected delegates to repre-

sent them in that body.   The significance of this fact is in
its connection with the point to be mentioned, *Thirdly*, viz. :
that the act distinctly stated the particular matters which the
Convention, when assembled, should consider and act upon ;
and is therefore to be regarded as the declaration by the peo-
ple of the powers conferred upon the delegates, by electing
them under it.   Three matters were so stated ; to only one of
which is it necessary to refer in this connection ;  and I refer
to it because it is the key to the spirit, intention, and meaning
of the constitutional provisions now in question.   I have
pointed out to the court the first movement by the people, in
1862, to protect the ballot-box from the intrusion of traitors.
The second was under this act, in 1864, and there was no
mistaking its character ; for the act declared that one of the
distinct objects for the Convention's action was, " to consider
such amendment to the Constitution of the State as might
be by them deemed necessary to preserve in purity the elec-
tive franchise to *loyal* citizens."   It was the well-considered,
fixed, and unalterable purpose of the people, that those who
had, in their country's great struggle for existence, shown
themselves its enemies, should not thereafter have a voice in
the government of this State.   They boldly avowed that the
control of that government rightfully belonged to the *"loyal*
citizens."   They denied that privilege to traitors, open or
secret.   They claimed the right to demand of every man
who sought to exercise the right of suffrage, to clear his
skirts of past participation in treason, and of acts or words
manifesting his disloyalty to the country ; just as the ordi-
nance of June 10, 1862, required him to expurgate himself
of past treason, manifested by taking up arms or levying war
against the United States.   This was indicated, not secretly
or covertly, but by proclamation, as it were, from the house-
tops, that the people of Missouri, in the exercise of their "in-
herent, sole, and exclusive right," were about to " alter their
Constitution," because they deliberately and solemnly consid-
ered it "necessary to their safety and happiness."   That it was
necessary, no man of true loyalty could for a moment doubt.
The moral sense of all patriots revolts at the thought of the
government of a State being controlled by those who, in a
war of unheard-of atrocity, had traitorously sought to destroy
the Nation of which that State is a part ;  had ravaged the
State itself ;  had waged cruel and relentless strife against
its citizens, solely because they were loyal and faithful ;  had
imbrued their hands for years in the blood of unoffending

patriots; had made the land howl with the wails of widows and orphans of murdered loyalists; and yet, after all this, would, with the impudence of the arch-fiend himself, demand equal rights at the ballot-box with those whose hands were "guiltless of their country's blood," and who in every hour of that country's peril were found faithful and true to its cause.

Only one more historical fact needs mentioning in this connection. In probably fifty places in his argument Mr. Glover refers to the Convention that framed the Constitution, and always with words intended to cast opprobium upon it. The impression is sought to be produced, that that body was but an assemblage of Neros, intent solely upon wielding with fanatical fury and implacable tyranny the power committed to them. The Constitution is continually referred to as if, like that of 1820, and the ordinances of the Convention of 1861–'63, it had been ordained and promulgated as the mere fiat of the body that framed it. And yet your honors know, and we all know, that the Convention was the mere framer of the instrument, and that it submitted its work to the people for their ratification or rejection, and that the People ratified it, after one of the fiercest contests ever known in this land. This is one more historical fact to which I referred, and it is a great fact in the case. The Convention was not only ordered and elected by the people, but its work was ratified by the people. The Constitution, therefore, is in every way, by every right, the work of the people, in the lawful, deliberate, and solemn exercise of their "inherent, sole, and exclusive right" to ordain and establish their own Constitution, in such form as they might deem "necessary for their safety and happiness."

May it please your honors, it is under that Constitution, so framed and ratified, that you occupy the bench this day; and you are asked—gravely asked, by your judgment, to defy and annul the will of the People, to blow up the foundations of the organic structure of their government, and to declare that the safeguards which they adopted " to preserve in purity the elective franchise to loyal citizens," " are no constitutional provisions at all; are binding on nobody, and affect nobody's rights; and are in violation of the Constitution of the United States, and mere nullities!"

If the court please, since the day this action was brought, King Solomon has ceased to be authority on a point concerning which he had, for near three thousand years, been held

in high repute.  As far back as the year 975 B. C., he declared, and wrote it down, and sent it to posterity, that "there is no new thing under the sun"; and posterity has accepted the saying as applicable, in a general way, to all times.    Its charm is now broken—was broken when this suit was brought; for, beyond all peradventure, this suit *is* a new thing under the sun.   I cannot say that, "take it all in all, we ne'er shall look upon its like again"; but of a certainty we have never seen its like before.    Men, who were qualified voters, have sued judges of election for rejecting their votes; but nowhere on earth did any man ever bring such a suit, and tell the court in his declaration, complaint, or petition, that he was *not* a qualified voter, and showed himself not to be so when he offered to vote.    Nor was it ever before known, that a man had the assurance to claim damages from judges of election for refusing to violate the express terms of the Constitution, by receiving his ballot, when he avowed, in offering it, that he was not a qualified voter, and would not make himself so.    But, above all, never was it before known, that such a man based his action upon a demand that the court should adjudge to be "mere nullities" the provisions in the Constitution of his State, defining and regulating the qualifications of voters.    The whole case stands out in bold relief on the page of jurisprudence, as the *ne plus ultra* of litigious impudence.

Such being its description, it is not surprising that the grounds assumed by the plaintiff's counsel to sustain the action should partake largely of its novel and extraordinary character.    Though I have an assured conviction, that neither this court, nor any other before which the case may go, will ever for a moment seriously think of assuming to nullify and abrogate the vital provisions of the Constitution of this State, and to wrest from the people their inherent, absolute, unrestricted, and exclusive right to prescribe the qualifications of voters; yet a proper respect for the learned counsel for the plaintiff forbids that I should pass unnoticed the main positions taken in the argument, in support of his general position, that the constitutional provisions in question are "mere nullities."    Those positions are but two, as follows:

I.  "That sec. 3 of art. 2 of the Constitution is a bill of attainder, in the meaning of the Constitution of the United States, and being null and void for that reason, all other sections in aid of it are also null and void."

II. That the said section "is an *ex post facto* law in the meaning of the Constitution of the United States, and being void for that reason, the other sections in aid must fall with it."

Let us examine the two positions. In doing so, I will use only definitions taken from Mr. Glover's argument.

*First.* As to the bill of attainder. Judge Story's definition of this, as cited by Mr. Glover, is as follows: "Bills of attainder, as they are technically called, are such special acts of the Legislature as inflict capital punishment upon persons supposed to be guilty of high offences, such as treason or felony, without any conviction in the ordinary course of judicial proceedings. If an act inflict a milder degree of punishment than death, it is called a bill of pains and penalties. But, in the sense of the Constitution, it seems bills of attainder include bills of pains and penalties."

Now, may it please the court, I do not desire to go beyond this definition, to make it clear that sec. 3 of art. 2 of the Constitution, under any fair and legitimate construction, has no single feature of a bill of attainder. Before proceeding, however, to discuss that point, I will briefly recall to the notice of the court the principles of construction which govern, or should govern, in every judicial interpretation of any law, be it merely an ordinary legislative act, or the more solemn provisions of a Constitution.

Your honors will at once recognize as a cardinal legal doctrine, that the object and the only object of judicial investigation in the construction of any legislative or constitutional provision, is to ascertain the intention of the legislature which framed the statute, or the body which ordained the Constitution. This is done principally, and usually exclusively, by the terms of the statute or Constitution; but there is no doubt that courts are sometimes justified in receiving light from the public history of the times, particularly in the case of a Constitution. In Hamilton v. St. Louis County Court, 15 Mo. 3, Gamble, J., in delivering the opinion of the court, said: "If there be in the Constitution any language of doubtful import, we must, of course, look to the circumstances and condition of the people, and to the history of the instrument itself, to find the meaning of the clause in question; but where the language is plain and intelligible, and consistent with all other parts of the instrument, we cannot allow ourselves to find, in any reference to facts out of the instrument, any authority for interpolating either a

grant of power or a restriction upon power granted." I quote this passage, not because I am willing to admit that there is in sec. 3 of art. 2 any language of doubtful import as to its being a bill of attainder or not; but simply to show, that if there be in the mind of the court a doubt as to the import of that section in that particular, the court may "look to the circumstances and condition of the people, and to the history of the instrument itself, to find the meaning of the clause in question." I have referred at some length to the circumstances and condition of the people of Missouri, and the history of this Constitution, as a means of aiding in ascertaining the intention of the Convention in framing, and of the people in adopting, it; but with the full knowledge that at last it must be gathered mainly from the terms of the instrument itself.

When we come to interpret those terms, the first thing we are to seek is the thought which they express. To ascertain this, the first resort is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them—Newell v. The People, 3 Selden, 97. If thus regarded the words embody a definite meaning, the next point is to ascertain whether that meaning is consistent with the other parts of the instrument; for, in construing any part of it, the whole must be considered. The different parts reflect light on each other, and, if possible, such a construction is to be made as will avoid any contradiction or inconsistency. It is the duty of courts, as far as practicable, to give some effect to every part, and so to reconcile the different provisions as to make the whole consistent and harmonious—Sedg. on Stat. & Cons. Law, 238.

Now, may it please the court, all I ask is, that the rules of construction, thus stated, shall be fairly applied in the interpretation of sec. 3 of art. 2, and I have no doubt of the result. With the most unhesitating confidence I say, that it is impossible for the court to find in that section the least indication of an intention to ordain a bill of attainder; but that, on the contrary, to attribute such an intention is a harsh and uncouth perversion of its *expressed* purpose to deal with the qualifications of voters, not to define crimes or prescribe punishments.

Moreover, to make it a bill of attainder, violates the principles of construction just stated, by adopting an interpretation which brings that section in direct conflict with other

parts of the Constitution ; when, to reject that interpretation, leaves the whole harmonious and consistent. Of course, if the section be a bill of attainder, it violates the Constitution of the United States. Now, such a violation cannot be justly imputed without developing a glaring inconsistency between that section and two clauses in the Declaration of Rights, with which otherwise it is in entire coincidence. They are the fifth and seventh clauses, in the following terms :

" 5. That the people of this State have the inherent, sole, and exclusive right of regulating the internal government and police thereof, and of altering and abolishing their Constitution and form of government, whenever it may be necessary to their safety and happiness ; but every such right should be exercised in pursuance of law, and consistently with the Constitution of the United States."

" 7. That every citizen of this State owes paramount allegiance to the Constitution and Government of the United States ; and that no law or ordinance of this State, in contravention or subversion thereof, can have any binding force."

May it please the court, is it within the range of any conceivable probability, that the framers of the Constitution, after adopting those clauses so unqualifiedly expressing the subjection of the people of this State in all things to the paramount authority of the national Constitution, could have intended to violate that Constitution in the very next article of their work ? Most manifestly not. When, therefore, it is attempted to give a construction to section 3 which imputes such an intention, it can only be done by producing an irreconcilable antagonism, where otherwise there would be harmony. Under such circumstances, I hold it to be the clear duty of the court to reject that interpretation which produces the contradiction, and to adopt that which causes none ; in other words, to repudiate the idea of any intention to ordain a bill of attainder, and consequently to reject the idea of there being any such thing there.

But it may be contended that there is, nevertheless, an attainder there, though not intended. Well, let us examine that point. I maintain that there is nothing in that section which has a single feature of an attainder. The court will please bear in mind, that the clause in the Constitution of the United States which forbids any State to pass a bill of attainder, has no meaning, except as to such a bill of attainder as was known to the authors of that Constitution at the time it was framed. It is not for us to enlarge or modify the

meaning attached in that day to such a bill. Much less is it for us to say, that because the attainder known to our fathers, in 1787, inflicted certain disabilities on account of past acts, therefore a law now passed inflicting, on the same account, certain other disabilities, is also an attainder. And yet that is Mr. Glover's position. He shows that, at the common law, a judicial attainder is the stain or corruption of blood of a criminal capitally condemned; that such criminal is no longer of any credit or reputation; that he cannot be a witness in any court, nor is he capable of performing the functions of another man; and that he can neither inherit lands nor other hereditaments from his ancestors, nor retain those he was already in possession of, nor transmit them by descent to any heir. Now, I hold the learned counsel to his own description of an attainder, and say that in the section under discussion there is not one single feature of an attainder as he describes it. But, arguing by generalization, he claims that because an attainder in England consists of the "disabilities, disqualifications, and disfranchisements annexed to the conviction," therefore any provision of a Constitution which imposes, in reference to the right of suffrage, any disability, disqualification, or disfranchisement, on account of a past act, is an attainder. I totally deny this proposition, and hold the gentleman to his own definition, as derived from the works of English authors. It is to them we are to look for information on that point, for it was from England that the framers of the national Constitution received all the knowledge they had of an attainder; and it was to the attainder *they knew of* that they referred in framing that instrument. No court has the right now to enlarge the scope of the attainder known to them in 1787, and to establish, *arguendo*, an attainder different from that. Holding to that, I say that there is no attainder in the section in question; for it puts no stain upon any one; corrupts no one's blood; deprives no one of credit or reputation; does not render any one incompetent as a witness; does not prevent any one from inheriting and transmitting estate; does not work a forfeiture of any one's property. If it does none of these, it is, according to the gentleman's own definition, no bill of attainder.

But, may it please the court, I have a word more to say about the definition of an attainder given in Mr. Glover's argument. It is taken from Stephen's Commentaries, and is stated in these words: "This attainder is the stain or cor-

ruption of the blood of a criminal capitally condemned. He is no longer of any credit or reputation. He cannot be a witness in any court, neither is he capable of performing the functions of another man." This would have been more complete, if the gentleman, in transferring it into his argument, had copied the whole of the last sentence as found in Stephen. I beg leave to supply the omission by adding to that sentence the words—"for, by an anticipation of his punishment, he is already dead in law." Now, if your honors please, a grave question arises here. If sec. 3 of art. 2 is a bill of attainder, somebody is " capitally condemned " by it. If General Blair be not so condemned by it, then, so far as he is concerned, it matters nothing to the court whether it is a bill of attainder or not. If it "capitally condemns" somebody else, that gives him no cause of action : it must bear upon him, or he has nothing to say about it. It is, therefore, an important question here, whether General Blair has really been " capitally condemned," and is, " by an anticipation of his punishment, already dead in law." If he has been, then are the public authorities greatly remiss in suffering him to be at large. And how can he maintain this action ? One condemned to death is *civiliter mortuus*, and can maintain no action at all, and such an action as this dies with him. How, then, is this action now here ? Is General Blair dead in law for one purpose and not for another ? Can he come into court and say, " This Constitution has capitally condemned and attainted me, and I claim ten thousand dollars damages because I am, through it, dead in law"? May it please the court, I object to this thing of a man's being both dead and alive. I find no precedent for it in the books. It is another "new thing under the sun." I insist upon it that General Blair shall be either dead or alive ; I deny his right to be both. If he is dead, I demand that that fact shall appear, not with " certainty to a common intent," nor to a "certain intent in general," but " to a certain intent in every particular"; and that he shall not avail himself of an *absque hoc*, and say that he has been condemned, attainted, and put to death in law by the Constitution, *without this*, that he has not been so condemned, attainted, and put to death, and is still alive and recalcitrant. If I thought I could get it, I would move the court for a rule upon him to elect which he will be, dead or alive ; but as I hardly suppose that I could get such a rule, I shall have to make the election for him. I therefore protest that he has

not been capitally condemned, is not attainted, is not dead in law; but is a live man to-day, in fact and in law, in spite of the bill of attainder alleged by his counsel to be contained in sec. 3 of art. 2 of the Constitution of Missouri.

But, if your honors please, Mr. Glover says that a bill of attainder includes also a bill of pains and penalties. 1 will not dispute that; nor will I question the correctness of his definition of the latter description of bill, as "a special act inflicting a milder punishment than death." But it is important to obtain, if practicable, a more distinct conception of such a bill, as it had been resorted to in England prior to the formation of the Constitution of the United States; for the framers of that Constitution could have had in view only such bills of pains and penalties as had then been known in British legislation. It is requisite, then, to inquire what kind of punishments had theretofore been imposed in England by such bills. I have not examined the books on this subject, for my case did not demand it. But I did not hesitate to assume *a priori,* that such a bill would operate either upon the person, the property, or the natural rights of the party against whom it might be passed; for it is upon them that punishments ordinarily bear. I, therefore, concluded that no instance could be found in a British bill of pains and penalties, of a man being deprived of mere political franchises, which are received and enjoyed by the subject only through the grant of the sovereign; and I find in Mr. Glover's argument the proof of this, and therefore need not look for it elswhere. He sets out at large four different British statutes; two of which are respectively entitled "An act to inflict pains and penalties;" one is entitled "An act banishing and disabling the Earl of Clarendon"; and the fourth is "An act to incapacitate" certain named persons "from voting at election of members to serve in Parliament."

One of the bills of pains and penalties was aimed at Francis, Lord Bishop of Rochester, and 1. Deprived him of "all and singular his offices, dignities, promotions, and benefices ecclesiastical whatsoever;" 2. Forever disabled him from "taking, holding, or enjoying any office, dignity, promotion, benefice, or employment within this realm, or any other of his Majesty's dominions, and also from using or exercising any office, function, authority, or power, ecclesiastical or spiritual, whatsoever"; and, 3. Banished him the realm.

The other of the bills of pains and penalties was directed against John Plunket, and enacted that he "should be de-

tained and kept in close and safe custody, without bail or mainprize, during the pleasure of his Majesty, in any gaol or prison within the kingdom of Great Britain."

The act passed against the Earl of Clarendon banished him into perpetual exile, and forever disabled him "from having, holding, or enjoying any office or place of public trust, or any other employment whatsoever."

These three acts were selected by Mr. Glover, and they sustain my *a priori* position that British bills of pains and penalties acted only upon the person, the property, or the natural rights of the party. To be sure, in each of those cases the person would, by banishment or imprisonment, lose the opportunity of exercising the elective franchise if he had been a voter, but the deprivation of that privilege was not mentioned in either case.

The fourth of those statutes incapacitated the persons therein named from voting in any election of members of Parliament, because they belonged to " a weak and corrupt society in the borough of New Shoreham, the chief end of the institution of which was for the purpose of selling, from time to time, the seat or seats in Parliament for the said borough"; and the act says, "in order to prevent such unlawful practices for the future, and that the said borough from henceforth be duly represented in Parliament"—not in order to punish the persons therein named,—they are incapacitated as voters. The wide difference between this and the other acts will at once be perceived by the court. In them there are inflictions known in all countries as punishments, combined with deprivation of office and capacity to hold office ; in this, there is simply a deprivation of a political privilege, which had been enjoyed by the parties through an act of Parliament, and now was taken away by such an act, for reasons of state therein expressed.

Now, may it please the court, concerning mere political privileges or franchises, I hold that, as they are received and enjoyed by individuals in no other way than through the mere grant of the sovereign power, that power may give them, withhold them, or take them away, at pleasure; and that he from who they are withheld or taken away, has no possible relief, but through that sovereign power itself. The elective franchise is but a mere political privilege, granted in England by the King in Parliament ; in this country, by the people, the source of all political power. If the declaration in our Constitution, "that all political power is vested in and

derived from the people," be, as it claims to be, the fundamental axiom of this State, then no man can vote here, except as his right to do so is derived from them. The elective franchise is no natural right, in this or any other country. The very term franchise excludes the idea of natural right ; for a franchise is a privilege granted by the sovereign authority to an individual. Nor is it a personal right until so granted, and then only so long as the grant is unrevoked by the power that made it. Here, that power is the people. They make and unmake Constitutions, and make and unmake voters. Every man that lives in this State, lives here subject to the absolutely irresponsible power of the people over the qualifications of voters ; and by living here he consents to that subjection. If they see fit to-day, by a change of their Constitution, to allow women to vote, have they not the right to do it ? If they decide, a year hence, in the same way, that women shall not vote, have they not the right to do it ? May they not to-day allow negroes, unnaturalized foreigners, or boys of fifteen years old to vote, and to-morrow exclude them from the ballot-box ? In short, have they not unlimited power over the whole subject of qualifications of voters ? · If not, who has ? Such power must be lodged somewhere ; and where else is it but with the people ? And if they have it, who shall limit or restrain it ? Shall the people's courts ? Most assuredly, says Mr. Glover. But is not that setting the creature above the creator ?

But Mr. Glover says : "If the fastening upon the citizen the disability to vote, for some act of his, be attainder, when inflicted in the ordinary course of judicial proceedings, the same disabilities must certainly be an attainder, when, for some act of his, they are inflicted by a bill."

Suppose, for the sake of the argument, we admit this to be a sound position, it has no application to the case in hand, for the following reasons : 1. The privation of the right to vote was never, in England, a result of an attainder, except as the loss of all civil and political rights followed the sentence of death ; after which the convict was dead in law, as he is in this State, and kept in close custody, as he is here, until the day of his execution, and, of course, could not vote. 2. No British bill of pains and penalties, passed before the formation of our national Constitution, inflicted such privation. 3. British bills of pains and penalties always named the parties upon whom they were to bear. It follows, then, that sec. 3 of art. 2 has no resemblance to the British bill of

pains and penalties known, in 1787, to the framers of the national Constitution; because, 1. It is no "special act," but a general constitutional provision; 2. It names nobody as the subject of disfranchisement; and, 3. Disfranchisement was never a part of such a bill. Two essential elements of the British bill of pains and penalties, viz., its being a special act, and naming the party to be punished, are therefore wanting in that section; and an element, viz., disfranchisement, is contained in it, which never was in such a bill. Dealing only in general terms, that section fixes disqualifications upon all who had done certain acts. That the people had the right to impose such disqualifications, seems to me as clear and simple a truth, as that a straight line is the shortest distance between two points. Let us see.

If the court please, no proposition of law is more evident, than that the sovereignty which may grant a privilege, may say on what terms it shall vest in, and be enjoyed by, the grantee. In every State Constitution in this country, you will find terms annexed to the exercise of the elective franchise. Every definition of the qualifications of voters, is but a statement of the terms upon which men may vote; and in every instance such definitions refer to what the party has done, as well as to what he is. They say to the citizen, "If you have done certain things, you can vote." What is that, but looking to his past acts, to see if he has fulfilled the prescribed terms? And your honors are familiar with the fact, that, by law, when judges of election are not acquainted with the qualifications of a person offering to vote, they may put him on his oath, and demand of him whether he has done certain things; as, for instance, has resided a year in this State, or, if of foreign birth, has obtained naturalization. Now, if what he has done may be thus inquired into, and that under the application of a test oath, how is it that the State is precluded from shaping the terms another way, and saying to him, "If you have not done certain things, you can vote"? If it has a right to impose its own terms, who shall limit or abridge that right? What power may say to it, "You may put your terms one way, but not another; you may look to a man's past acts in one form, but not in another; you may apply a test oath as to what he has done, but not as to what he has not done"? May it please the court, if there is in this tribunal, or any other on earth, a right thus to fetter the sovereignty of this State in this matter, then the State is no sovereignty. It must, in the very necessity of the case, be

absolute in its authority over the terms on which its own grants of the elective franchise may be enjoyed, or it is the mere semblance of a sovereignty, wielding " a barren sceptre." The application to the case at bar is plain, and needs no enforcement. To my view, it enforces itself with resistless power.

But further, and to complete the *reductio ad absurdum*, our Constitution has always declared " that the people of this State have the exclusive right of regulating the internal government thereof;" and who does not know that an exclusive right debars all participation? An exclusive right of the people, participated in by some other power, is a monstrous solecism, peculiar to Mr. Glover's argument. To give his argument any force, he must in some way get rid of the people's exclusive right. He does not venture, in the face of the Constitution, to deny its existence, but claims for this court, created by the people, a higher power than theirs—a power to annul their action, and to set at naught the provisions of their Constitution. In other words, according to Mr. Glover, the people have that exclusive right, but, nevertheless, can hold it only until some court of justice, of their own creation, sees fit to assert its superior right to define the qualifications of voters in this State! May it please the court, if this be not the *ultima Thule* of absurdity, I know not where to look for it.

I come now to the second proposition taken by Mr. Glover in his argument—" That sec. 3 of art. 2 of the Constitution is an *ex post facto* law in the meaning of the Constitution of the United States, and being void for that reason, the other sections in aid must fall with it."

An *ex post facto* law is defined by him to be " one which punishes an act committed before it was made, in a manner it was not punished when committed; and this punishment may be capital, or it may consist in a mere forfeiture or disability."

Conceding the correctness of this definition, I shall endeavor briefly to show that sec. 3 does not come within the terms of that clause of the National Constitution which says that "no State shall pass an *ex post facto* law." For this purpose, I shall rely upon the following propositions:

1. The intention of the framers of the section is manifest on its face, not to impose a punishment, but to regulate the right of suffrage. The remarks previously made on the subject of looking to the intention of the framers of any law,

apply with the same force here as in reference to attainder, and need not be repeated. If any other is at all admissible, the court cannot adopt a construction which forces this section into conflict with other parts of the Constitution.

2. This section does not use such words as are generally considered apt for expressing the intention to punish. For more than thirty years the statutes of this State have clearly indicated what are apt words for that purpose, both as to felonies and misdemeanors. I select from the Revised Statutes of 1835, two out of the many like instances to be found there, and likewise in the criminal code from that time to this.

As to felonies, I take sec. 23 of art. 3 of the " Act concerning crimes and their punishments," approved March 20, 1835, in these words: — " Every person who shall be convicted of burglary, shall be punished by imprisonment in the penitentiary, if in the first degree, not less than ten years; if in the second degree, not less than five, nor more than ten years; if in the third degree, not exceeding five years."

As to misdemeanors, I take sec. 37 of art. 8 of the same act, in these words : " If any person shall wilfully open or read, or cause to be read, any sealed letter not addressed to himself, without authority so to do from the writer thereof, or the person to whom it is addressed, he shall, on conviction, be adjudged guilty of a misdemeanor, and shall be punished by fine not exceeding $250, or by imprisonment in a county jail not exceeding three months."

The court will observe the use in those sections of the phrase " shall be punished." It is used in similar provisions throughout the statute law of this State; not, I admit, in every instance where punishment is prescribed, but so nearly so, as to indicate that they are the words commonly employed to show the intention to punish. The same thing appears in sec. 14 of art. 2 of the Constitution, where it is provided that " whoever shall take said oath falsely, by swearing or by affirmation, shall, on conviction thereof, be adjudged guilty of perjury, and be punished by imprisonment in the penitentiary not less than two years."

Now, if your honors please, there is not only an absence from sec. 3 of apt words indicating a design to punish, but the whole terms of the section show that it was dealing with an entirely different subject. That which Mr. Glover relies on to sustain his position, viz., that this section " assumes,

on the part of the State, power and jurisdiction to punish offences against the United States," when, as everybody knows, the State has no such power, is strong evidence that the section has no punitive character, and never was designed to have any. The court cannot impute such a design, without holding that the framers of the Constitution, while in one article professing entire submission to the Constitution and Government of the United States, deliberately engaged, in another article, in usurping the attributes and functions of that Government, in direct violation of the Constitution which established it. Again, I say that it is a violent breach of all known rules of construction, to bring the different parts of the Constitution into such conflict with each other and with the National Constitution, when another construction is fairly open which leaves those parts entirely harmonious with each other and with the fundamental law of the nation.

3. No law is punitive, under which no criminal proceeding can be instituted before the judicial tribunals of the State, according to the legally prescribed modes of criminal procedure. It needs only a superficial reading of this section to satisfy any legal mind, of even limited comprehension and acquirement, that no such proceeding is possible under it. Though, according to Mr. Glover, it enumerates and defines no less than "eighty-six crimes," it names no punishment for any one of them, nor does it authorize any indictment, trial or sentence. Can any law be held to impose a punishment, when under it no officer has a right to arrest a person, to cause him to be examined before a committing magistrate, to hold him to bail, or to commit him to prison; and when no grand jury can indict, or court try or sentence him? If it can, then this action has developed a third "new thing under the sun," and Solomon is "nowhere."

4. But it is contended by Mr. Glover that the punishment is inflicted when the party goes to the polls and offers to vote, and his vote is rejected. But, in the name of all the books on criminal law that ever were written, is that a punishment which can by no possibility overtake a man, except just when he pleases, in the exercise of his own unconstrained volition, to walk up to and invite it; and when he can do that only on one or two particular days in any year? From the time of my first experience of parental castigation to the present, I have supposed that punishment was inflicted against the culprit's will; but here is one that never

can be visited upon any man, except when he voluntarily seeks it.

5. Admitting, for the sake of the argument—but for that only—that the disqualification for voting imposed by the criminal law upon one convicted of crime, is a part of the punishment of the crime, I deny that it at all follows that such a disqualification, imposed by the people in forming their Constitution, is likewise a punishment, unless expressly so declared. I take the broad ground, that where the people, by a general constitutional provision, withhold or take away a political privilege, which they have a right to bestow on whom they please, and refuse to whom they please, there is no room for basing the idea of punishment upon any denial of such privilege, unless the people themselves declare the intention thereby to inflict punishment. Primarily, the withholding or taking away is merely the exercise of an absolute and unlimited discretion ; and the intention to punish can only be known from the people themselves, by the words they use in their Constitution. No court has a right to strain out such an intent by inference ; it must be declared and manifest. And the moment any tribunal or power, assuming to have discovered an intent to punish where it is not declared, interferes with the discretionary power of the people over this matter, that moment the people's authority is annihilated, and another power wields it.

If these positions be sound, there is no punitive character in the section in question ; and the assumption that there is, is as indefensible, in a legal point of view, as many other charges against the Constitution and its framers are false in fact.

In conclusion, if the court please, I return to the great question in this case : Have the People of Missouri the right to prescribe in their Constitution the qualifications of voters? And yet I hold that this is really no question at all, as there is nothing, in fact, upon which to hang a question. That the people of a State, in framing their Constitution, have unlimited and absolute power over that whole subject, and the right to exercise that power when they please, how they please, in favor of whom they please, against whom they please, without accountability to, or subjection to the revision of, any tribunal or authority in the wide world, is one of those propositions which has never before, so far as I know, been disputed in this land, and concerning which I insist that there can be no question in this court. But if

there is such a question, I agree with Mr. Glover that it is "the greatest ever yet submitted to an American court." This action is a deliberate, not to say audacious, attempt to strike, through the courts, a fatal blow at a State right, which all men in this land, of every section, every party, and every political creed, have always united in holding beyond the reach of interference, and which the Constitution of the United States recognizes, in the plainest terms, as belonging to the people of every State, to the utter exclusion of every other power and jurisdiction on earth.

Did I for a moment suppose that this or any other court would venture upon the experiment of annulling, by its judgment, the constitutional provisions by which the people of this State have sought to shield the ballot-box from the approach of rebels and traitors, I should tremble for the result. The man does not live who could forecast it. With the ambitious and unscrupulous politician, to whom the safety and happiness of the people are but a bauble compared with his own selfish aggrandizement, it may seem a small matter to trample this universally acknowledged right of a State in the dust; but when it is done—if that could be conceived possible—it will assume features and proportions so appalling, that even he would fly from his own work in confusion and terror. But I have no apprehension of such a result. Calmly reposing on the impregnable right of the people of a State, under any and all possible circumstances, to declare in their Constitution who shall and who shall not vote—to enfranchise and disfranchise whom they please, with or without cause by others deemed sufficient—I submit the case to the court, with too high a confidence in the soundness of its judgment, and too correct a sense of the proprieties of the occasion, to permit of an intimation of "anarchy and bloodshed," as the result of a decision adverse to that great right.

WAGNER, Judge, delivered the opinion of the court.

This case comes before us on a writ of error from the Circuit Court of St. Louis county. The plaintiff brought his action against the defendants, who were judges of an election held in the city of St. Louis on the 7th day of November, 1865, for rejecting his vote, and claimed damages in the sum of ten thousand dollars. In his petition he avers his

qualifications as a voter, and states that he offered to take a certain oath which is therein set out, but which is not the oath required to be taken by voters by the Constitution of this State, and there was no authority for receiving any such oath by the judges of election. It may therefore be considered, for the purposes of this case, as a refusal to take the' constitutional oath. The defendants demurred to the petition of the plaintiff because it did not state facts sufficient to constitute a cause of action in this, that it did not state that the plaintiff, when he offered to vote, took, or offered to take, the oath of loyalty required by the Constitution of the State of Missouri to be taken by all voters as a condition precedent to their exercise of the right of suffrage at any election held in this State. This demurrer was sustained by the court below.

The question raised for consideration is of the gravest importance, and involves a consideration of the constitutionality of the oath of loyalty, so far as the same is applicable to voters. It is contended that the third section of the second article of the Constitution of this State, which prescribes the oath, is a nullity, because it is a bill of attainder in the meaning of the Constitution of the United States, and because it is an *ex post facto* law in the meaning of the Constitution of the United States. *Ex post facto* laws and bills of attainder have been so much discussed of late, in connection with acts springing out of the troubles through which the country has just passed, that it is unnecessary to enter upon an argument concerning their nature and character. The real point to be determined is, whether the constitutional oath which is prescribed as a condition precedent to every man's right to vote falls within the inhibitions of the Constitution of the United States forbidding the States to pass such laws.

The tenth section of the first article of the Constitution of the United States declares that no State shall " pass any bill of attainder, *ex post facto* law, or law impairing the obligation of a contract." The tenth amendment to the Constitution of

the United States provides that "the powers not delegated
to the United States by the Constitution, nor prohibited by it
to the States, are reserved to the States respectively, or to
the people." The States, when they entered the Union, re-
tained all their original power and sovereignty, except such
as were expressly surrendered to the General Government,
or they were expressly prohibited from exercising. Subject
to these exceptions, they are independent commonwealths,
and the exclusive judges of what is just and proper for their
own safety, welfare, and happiness. From the foundation
of the government, the Supreme Court of the United States
as well as the courts of the respective States have always ab-
stained from declaring a law unconstitutional unless it was
a case free from all doubt. The co-ordinate departments are
all equal, each acts under the same solemn sanctions, and one
will not assume the responsibility of annulling the work of
the other except upon the clearest evidence that it has tran-
scended *its powers*, or violated the organic law of the land.
To justify a court in pronouncing a legislative act unconsti-
tutional, or a provision of a State Constitution to be in con-
travention of the Constitution of the United States, "the case
must be so clear," to use the language of a learned author,
"that no reasonable doubt can be said to exist"—Sedg. on
Stat. & Const. Law, 592. The judiciary will not be justified,
nor indeed will it be authorized, to nullify and abrogate a law
merely because it deems the law unwise, unjust, or impolitic
—those being questions purely within the cognizance of the
law maker, the remedy not being through the agency of the
courts, but in the hands of the people by the exercise of their
political power. Any other practice would tend to produce
continual conflict and dissension between the different
branches, where mutual respect and harmony should prevail,
and ultimately paralyze the functions of government. But,
notwithstanding these considerations, where any law, or any
provision or clause of a State Constitution, clearly and un-
questionably violates the Constitution of the United States,
the courts can no more shrink from declaring it void and of

no effect, than they can refuse to pass upon and determine any ordinary matter which comes within the admitted circle of their jurisdiction.

When the Federal Constitution was adopted, we derived our whole system of common law from the parent country, and the prohibition against *ex post facto* laws and bills of attainder was levelled against such laws as known and practised in England. In those cases in English history where bills of attainder have been passed, they have generally referred to the parties by name; for they are in the nature of judicial sentences, and directly affect those against whom they are aimed, wthout the formality of a trial. We have seen no case (and it would seem to be an impossibility) where such laws have been passed, having universal application, and were laid down as rules comprehending the whole people of a State. In the act for banishing and disenabling the Earl of Clarendon, the law designated him by name, and proceeded to inflict upon him certain penalties without trial. So, too, in the cases of the Bishop of Rochester and John Plunket, and in the act disfranchising John Burnett and his associates from voting at election of members to serve in Parliament, and for the preventing bribery and corruption in the election of members to serve for the borough of New Shoreham. The Earl of Kildare and his adherents were attainted without specifying their names, but sentence was absolutely passed upon them, and execution followed whenever they were identified, without reference to any act on their part. But the section of the Constitution we are now considering has been before the Supreme Court of the United States in the Cummings case, and it was there held by a majority of the judges, reversing the decision of this court, that the provision was in the nature of pains and penalties so far as it related to the oath required to be taken by preachers, and was as to them consequently void. Five of the judges concurred in this opinion, and four dissented; and Mr. Justice Miller, on behalf of the minority of the court, delivered an opinion which for ability, logic, and admirable juridical criticism,

has rarely been excelled even in that august tribunal. It is now claimed that that decision is decisive, and also concludes this case. Did we think so, we should unhesitatingly follow it, although our opinions and convictions remain unchanged; for it is to the interest of the country that an end should be put to litigation and principles of law settled, and whenever the courts of last resort fairly decide a question coming within their jurisdiction, it is the duty of inferior courts to submit and to obey the paramount authority, though they may not be satisfied with the result. There was but one question presented to the court for adjudication in the Cummings case, and that was the constitutionality of the oath of loyalty so far as the same applied to preachers and ministers of the Gospel. It is true, Judge Field, who delivered the opinion of the majority of the court, *arguendo*, speaks of other pursuits, professions and trusts, for the following or holding of which the oath is exacted as a condition precedent, and condemns them all as liable to the same objection.

Now, in a case where the principle is identical with the one in the decision, we feel bound to follow it; but arguments or illustrations on different points, not necessary to the decision of the case, constitute no part of the judgment of the court, and can no more be deemed binding authority than the animadversion which the learned justice sees fit to pass upon the whole constitutional provision. It is not for us to determine whether the law is just or unjust, politic or impolitic —that is the appropriate function of another body. Nor is it within the sphere of our duties to go into an inquiry, or speculate as to the effect it may have on future political parties. Mr. Justice Iredell, who possessed an unclouded intellect and unbiassed judgment, after stating in Calder v. Bull, that a statute in violation of the Constitution is void, continues: "If, on the other hand, the Legislature of the Union, or the Legislature of any member of the Union, shall pass a law within the general scope of their constitutional power, the court cannot pronounce it to be void merely because it is, in their judgment, contrary to the principles of natural

justice. The ideas of natural justice are regulated by no fixed standard; the ablest and purest men have differed on the subject; and all that the court could properly say, in such an event, would be, that the Legislature (possessed of an equal right of opinion) had passed an act which, in the opinion of the judges, was inconsistent with the abstract principles of natural justice." There is no fixed and certain standard of reference by which the expediency or justice of a measure can be ascertained, and in order to form a correct judgment it is necessary to have a knowledge and acquaintance with all the facts and circumstances which originated it or led to its adoption.

The decision of the Supreme Court of the United States in the Cummings case proceeds on the idea, that the right to pursue a calling or profession is a natural and inalienable right, and that a law precluding a person from practising his calling or profession on account of past conduct is inflicting a penalty, and therefore void. There are certain rights which inhere in and attach to the person, and of which he cannot be deprived except by forfeiture for crimes, whereof he must be first tried and convicted according to due process of law. These are termed natural or absolute rights. Blackstone says: " By the absolute rights of individuals, we mean those which are so in their primary and strictest sense; which would belong to their persons merely in a state of nature, and which every man is entitled to enjoy whether out of society or in it." These rights may be arranged under the following heads: 1. The right of personal security; 2. The right of personal liberty; and 3. The right to acquire and enjoy property. To these the distinguished commentator on American law has added a fourth head, which found no place under the English system, viz.: The free exercise and enjoyment of religious profession and worship.

When the sturdy barons wrested from a despotic king *magna charta*, they put into that great instrument, "No freeman shall be taken (arrested) or imprisoned, or be disseized of his freehold, or liberties, or free customs, or be outlawed

or exiled, or any otherwise destroyed ; nor will we pass upon him, nor condemn him, but by lawful judgment of his peers, or the law of the land. We will sell to no man, we will deny to no man, we will delay to no man, either justice or right." The words "by the law of the land," as used in the great charter, are understood to mean due process of law—that is, by indictment or presentment of good and lawful men. And Story remarks that the better and larger definition of " due process" is, that it means law, in its regular course of administration, through courts of justice. Lord Coke, in commenting upon the above passage in *magna charta,* says that it enunciated no new principle, but was declaratory of the common law. The illustrious author of the Declaration of Independence embodies the same inestimable axioms, when he declares that " all men are endowed by their Creator with certain inalienable rights, among which are life, liberty, and the pursuit of happiness." Essentially the same principles are inserted in the amendments to the Constitution of the United States, and in the bills of rights of the respective States. The right, then, to life, liberty, and private property, is natural, absolute, and vested, and belongs as well to the individual in a state unconnected with society, as in the most carefully guarded and well arranged system of government. He cannot be deprived of life but by due process of law; he can be restrained of his liberty only by the same means ; and his right to acquire and enjoy property, reap the fruits and earnings of his own industry, should be fully guaranteed and protected. A man may be said to have a special property in his profession or calling, by which means he makes his support, and that he can be deprived of it only in the usual manner, according to the common forms of law. In a state of nature, if he had never entered into society he would undoubtedly have the right to select his avocation, whereon to depend for maintenance, and he cannot be said to have surrendered it by coming into the social compact, only so far as may be necessary for the general good, in manner to be regulated by law.

But, is the right to vote, or to exercise the privilege of the

elective franchise, a right either natural, absolute, or vested?
It is certain that in a state of nature disconnected with gov-
ernment, no person has or can enjoy it; whilst his right of
breathing, free locomotion, and the acquisition and enjoyment
of property, is perfect and complete. And here it is worthy
of observation, that Judge Field, in the Cummings case,
while enumerating several of the classes to which the oath
extends, all of which he considers renders it obnoxious to
the constitutional inhibition, carefully and guardedly refrains
from including the right to vote in the category.

That the privilege of participating in the elective franchise
in this free and enlightened country is an important and in-
teresting one, is most true; but we are not aware that it has
ever been held or adjudged to be a vested interest in any in-
dividual. Judge Washington, in Corfield v. Coryell, 4 Wash.
C. C. 371, speaks of it as one of the fundamental franchises
under our form of government, to be regulated and estab-
lished by the laws or constitution of the State in which it is
to be exercised. The leading case on the subject is Ashby
v. White, 2 Ld. Raym. 938 (S. C.); 1 Sm. L. C. 342, where
the plaintiff averred that he was a "burgess" and an inhabit-
ant of the borough of Aylesbury when the election was held;
that being such burgess and inhabitant he had the right to
vote; and that the defendants, who were constables of said
borough, and officiating as judges of the election, were then
and there requested to receive and allow his vote, but that
they absolutely refused to receive and allow the same, where-
upon he brought his suit and claimed damages in the sum of
£200. Upon a plea of not guilty, there was a verdict for
the plaintiff, which was afterwards arrested in the King's
Bench.

Powell, Powys and Gould, justices, held that the action
could not be maintained; but Holt, C. J., dissented, and
gave an opinion for the plaintiff. An appeal was prosecuted
to the House of Lords, where the judgment of the King's
Bench was reversed, and the views of Holt adopted and
sustained. But the Chief Justice did not proceed upon the

idea of a natural and inherent right in the citizen to vote, for he expressly says that before the statute of 8 Hen. VI., ch. 7, any man that had a freehold, though never so small, had a right of voting; but by that statute the right of election was confined to such persons as had lands or tenements to the yearly value of forty shillings, because, as the statute said of the tumults and disorders which happened at elections by the excessive and outrageous number of electors. But he states that the right of election in that case was a direct grant, incident to and inseparable from the freehold. It was the case of a burgess, and the plaintiff claimed the right to vote by reason of his burgesship, and Littleton in his chapter of tenure in burgage, 162, c. 1. 180 b. 109, was quoted, where he says: "Tenure in burgage is, where an ancient borough is, of which the King is lord, of whom the tenants hold by certain rent, and it is but a tenure in socage." And also, sec. 164, where he says: "And it is, to-wit, that the ancient towns called boroughs be the most ancient towns that be within England, and are called boroughs because of them come the burgesses to Parliament." So that the tenure of burgage was from the antiquity, and their tenure in socage was the reason of their estate, and the right of election was annexed to their estate. There is no such annexation or grant of franchise as to elections in this country.

It will now be necessary to inquire by what charter or authority, and upon what terms, the citizen is invested with the ballot in this State. As before remarked, outside of society and disconnected with government, no person either has or can exercise the elective franchise as a natural right, and he only receives it upon entering the social compact, subject to such qualifications as may be prescribed. Prior to the adoption of the Federal Constitution, the respective States possessed unlimited and unrestricted sovereignty, and retained the same ever afterwards, except so far as they granted certain powers to the General Government, or prohibited themselves from doing certain acts. Every State

reserved to itself the exclusive right of regulating its own internal government and police. Previous to the year 1820, Missouri was a mere Territory, not a State clothed with the power of self-government; but in pursuance of the authority of the act of Congress of March 6, passed in that year, the inhabitants of the Territory of Missouri elected delegates to a Convention to form a Constitution for the State. The only limitation imposed by Congress was, that the Constitution, when formed, should "be republican, and not inconsistent with the Constitution of the United States." Subject to these conditions, there was no limitation or restraint upon their action as to the organism and principles of the State they were about to form. The people, through their representatives assembled in Convention, proceeded to form the Constitution which was to organize them into a State, and in the "Declaration of Rights," embodied in that Constitution as general, great and essential principles of liberty and free government, we find the following: 1. "That all political power is vested in, and derived from, the people." 2. "That the people of this State have the inherent, sole, and exclusive right of regulating the internal government and police thereof, and of altering and abolishing their Constitution and form of government whenever it may be necessary to their safety and happiness." With these provisions in her Constitution, Missouri was admitted in the Union, and recognized as one of the sisters in the republic, on the same terms, and with the same powers, as the original States. Her admission was a direct and positive declaration that her Constitution was republican in form, and not inconsistent with the Constitution of the United States. There was, then, a complete reservation by the people to exclusively regulate and control the internal government and police of the State; and to alter, amend, or abolish their Constitution whenever they might deem it necessary for their safety and happiness. Now, what is meant by the "people," as used in this connection? Ordinarily, it may be true, that when we speak of the people, the entire body of

the inhabitants of the State is comprehended. But this cannot be so in a political sense. It can only mean that portion of the inhabitants who are entrusted with political power. Neither in this, nor in any of the American States, did the inhabitants, other than qualified voters, ever exercise political power, and it is only through the instrumentality of ballots that such power is or can be exercised. This truth is exhibited by the fact that, whilst the Constitution declared that all power resided in the people, less than one-fourth of all the inhabitants exclusively exercised the political power, and more than three-fourths were always disfranchised.

The people, for political purposes, must be considered synonymous with qualified voters, and their very first act in the formation of a State Government was to exclude from the right of suffrage more than three-fourths of the whole inhabitants. The exclusion of women, children and negroes is purely arbitrary, and fixed and regulated by law. If the power to regulate the internal government and police of the State resided in the people, and was their "inherent, sole, and exclusive right," the conclusion is inevitable that it was their peculiar and exclusive province to say and determine what should constitute any inhabitant of the State a qualified voter. The power must reside somewhere, and it can only be with the people, and they have always exercised it, both negatively and affirmatively.

It is not perceived that there is any restraint over the power on this subject. Certainly not in the Constitution of the United States, for there is not to be found in that instrument a single sentence, paragraph, or word, which gives the National Government power over the qualifications of voters in any of the States. But the direct opposite is affirmed in that clause cited in the former part of this opinion, which declares "that the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

When the people, in 1865, formed and adopted a new Constitution as their organic law, they exercised an unques-

tioned power—an undisputed right. They altered and abolished their Constitution, and formed a new one, in which, in pursuance of their exclusive right in regulating their internal government, they prescribed certain qualifications and conditions for the exercise of the elective franchise.

Of their perfect and exclusive right to do this, we do not entertain the slightest doubt. The right to vote is not vested —it is purely conventional, and may be enlarged or restricted, granted or withheld, at pleasure, and with or without fault. If a person loans another certain property gratuitously, and the possession is resumed on account of abuse or ill treatment, is the taking it from the borrower a penalty or punishment within the meaning of the Constitution of the United States?

But it is said that the oath of loyalty cannot be regarded as a qualification, because it is not attainable by all. Judge Field expresses this idea in the Cummings case, but it is sufficient answer to say that the remark was not made on a question like the one now under consideration. The illustrations put by Judge Miller in the same case are exceedingly apposite, and seem to be incontrovertible. He says: "The Constitution of the United States provides as a qualification for the office of President and Vice President, that the person elected must be a native born citizen. Is this a punishment to all those naturalized citizens who can never attain that qualification? The Constitutions of nearly all the States require, as a qualification for voting, that the voter should be a white male citizen. Is this a punishment for all the blacks who can never become white? It was a qualification required by some of the State Constitutions for the office of judge, that the person should not be over sixty years of age. To a very large number of the ablest lawyers in any State this is a qualification they can never attain, for every year removes them further away from the designated age. Is it a punishment? The distinguished commentator on American law, and Chancellor of the State of New York, was deprived of that office by this provision of the Constitu-

tion of that State. He was, just in the midst of his usefulness, not only turned out of office, but he was forever disqualified from holding it again by a law passed after he had accepted the office."

It is well known that in the early history of this Government, several of the States admitted free negroes to vote on an equality with whites, and subsequently they divested them of that right, denied them that privilege, and confined the elective franchise solely to whites. They were disfranchised because they were black, and a white qualification was imposed, which it was physically impossible for them to attain. The privilege was withdrawn from them; they were disfranchised because they were black. We apprehend that it will not be contended that depriving them of the right of suffrage was a punishment, or in the nature of pains and penalties. The law-makers, we presume, owing to peculiar circumstances, thought they were not discreet persons to be entrusted with the ballot, just as the framers of our Constitution, we suppose, considered that those who had betrayed our flag, and exhibited their hostility to the Government, were, for the time being, unsafe and unfit repositories of political power.

The principle of the provision in the Constitution is involved in the power, and flows from the duty of the State to protect itself, that is, the welfare of the people. It proceeds upon the distinction between laws passed to punish for offences, in order to prevent their repetition, and laws passed to protect the public franchises and privileges from abuse by falling into unworthy and improper hands. The State may not pass laws in the form or with the effect of bills of attainder, *ex post facto* laws, or laws impairing the obligation of contracts; it may and has full power to pass laws, restrictive and exclusive, for the preservation or promotion of the common interests, as political and social emergencies may from time to time require, though in certain cases disabilities may directly flow as a consequence. It should never be forgotten that the State is organized for the

public weal, as well as individual purposes; and while it may not disregard and violate the safeguards that are thrown around the citizen for his protection by the Constitution, it cannot neglect to perform and do what is demanded for the public good.

It has grown into an axiom of the law, that public grants are to be construed strictly; and in the absence of any power expressly conceded to the United States, or where its exercise is not directly denied by the Federal Constitution, the State is not to be presumed, in any grant, to part with any of the power inherent in it for the protection and promotion of the common welfare. The power in the State to preserve the general good, and promote the public welfare, is inherent and supreme; and deny and destroy this cardinal maxim, and the very foundation of our system is sapped, and the State is shorn of all power for self-protection.

Believing that the provision in the State Constitution prescribing an oath for voters is not in opposition to the Constitution of the United States, we affirm the judgment. Judge Fagg concurs.

HOLMES, Judge. The ground of the demurrer was that the petition did not state facts sufficient to constitute a cause of action—R. C. 1855, p. 1231, §§ 6, 7, 10.

The petition stated that on the 7th day of November, 1865, " and long prior thereto," the plaintiff was " a native born free white male citizen of the United States, and of the State of Missouri, residing in the city and county of St. Louis, and over the age of twenty-one years." The statements of the petitioner concerning his services in the armies of the United States (which were, doubtless, highly meritorious,) I regard as surplusage in the pleading. It is further stated that there was an election held on that day for a county auditor and a judge of the County Court in the Sixth judicial district, and that the defendants were the legally appointed judges of election "for the eastern election precinct of the sixth ward of the city of St. Louis, within the said county of St. Louis,

in which ward the plaintiff had resided continuously for several years, and was then residing.'' It is then stated that the plaintiff offered his ballot together with "an affidavit, being an oath of allegiance," (which he set forth in the petition,) and requested the judges to receive his vote, and that the same was wilfully rejected.

There is no distinct averment in the petition that the plaintiff had resided in this State one year next preceding the election, nor that during the last sixty days of that period he had resided in the county, city, or election district, where he offered to vote. It is averred that on that day, and long prior thereto, he was a citizen of the State, residing in the city and county of St. Louis, but it is not said how long prior thereto. It is also averred that the defendants were judges of the election for the eastern election precinct of the sixth ward of the city, in which ward he had resided continuously for several years, and was then residing; but it is not stated that any one of those several years was the year next preceding the election, nor that during the last sixty days of that year he had resided in the county, city or district in which he had offered to vote. All that is averred here may be true, and yet it may be also true that the continuous residence for several years (of which the petitioner speaks) may have been at some indefinite period prior to the commencment of his military services, and that his then present residence in the ward may have commenced within the sixty days next preceding the election.

A qualified voter does not lose his residence by reason of his being absent from his place of residence, while serving in the volunteer army of the United States—Const. of Mo., Art. II., § 21.

But there is still no averment that the plaintiff had been a resident of this State, or had a place of residence in this State, for one year next preceding the election, or within the county, city, or district, for the last sixty days of that year. For all that is stated in the petition he may have become a non-resident, though he may have been at some pri-

or time a resident, and he may actually have been a non-resident within the time specified. In the case of Pryce v. Belcher, 3 Com. B. 58, the plaintiff was a registered voter of the borough of Abingdon, but it was said that if in consequence of his having become a non-resident he had lost his right to vote there under the existing laws, he could not maintain an action against the judges of election for refusing to receive his vote—1 Smith's Lead. Cas. 309 (131) ; 3 Man. G. & S. 77 (S. C.)

The cause of action is founded upon the legal right to vote. The action is maintainable where that right has been wilfully, maliciously or wrongfully denied by the judges of election, and for the reason that where there is a right there is a remedy. When the British Parliament by the statute of 8 Hen. VI., ch. 7, disfranchised all freeholders under forty shillings yearly value, because their voting had led to tumults and disorders at elections (there being no higher constitutional authority to forbid it), the legal right was gone, and they could no longer maintain an action for a refusal to receive their votes—Ashby v. White, 2 Ld. Raym. 938. All the facts that are necessary to constitute the right under the law, and show that it exists as a legal right, must be stated in the petition. The plaintiff cannot be allowed to judge of the facts both for himself and for the court, nor to state his own conclusions of law as the foundation of his rights ; and unless the facts stated in the petition are sufficient to show that the plaintiff was by law entitled to vote, and had a subsisting legal right to vote, the rejection of his ballot by the judges of election cannot amount to anything which the court can consider to be an infrigement of his right. If there be no right there is no injury, or it is merely *damnum absque injuria*—Curry v. Cabliss, 37 Mo. 330 ; Blanchard v. Stearns, 5 Metc. 298 ; Ashby v. White, 2 Ld. Raym. 938 ; 1 Smith Lea. Cas. 290–308. It has been held that a man may be disfranchised for an indictable offence without his being convicted of it—4 Com. Dig. (tit. *Franchises*, F. 20) p. 270.

The statute provides that " when any person offers to vote

with whose qualifications neither of the judges is person-
ally acquainted, either of the judges may administer an oath
and examine him touching his qualifications as a voter"—
R. C. 1855, p. 703, § 41. It is not stated in this petition
that either of the judges was personally acquainted with
the plaintiff's qualifications as a voter, nor that he offered to
be examined under oath touching his qualifications. It is
averred in effect that he presented an affidavit, called an oath
of allegiance, and demanded that his vote should be received.

It is averred also, that the defendants, "well knowing that
the plaintiff was a lawful voter at said election, and entitled
to deposit his ballot," refused to receive his vote. This is
a conclusion of law, which the facts stated do not warrant—
Curry v. Cabliss, 37 Mo. 330.

Where a plaintiff is asking judgment for ten thousand dol-
lars damages against the judges of election for wilfully and
wrongfully rejecting his vote, the court may properly con-
sider, with some technical precision, whether the facts which
alone can constitute a lawful ground for such demand, have
been stated with sufficient fullness and certainty in his peti-
tion to authorize the rendering of such judgment.

Now, the eighteenth section of the second article of the
Constitution of this State, defining the qualifications of vo-
ters, required that the plaintiff should not only be a white
male citizen of the United States over the age of twenty-one
years, but that he should have "resided in this State one year
next preceding the election," and that, "during the last sixty
days of that period" he should have "resided in the county,
city or town" where he offered to vote, as well as that he
should not vote "elsewhere than in the election district of
which he was at the time a resident," before he could have a
legal right to vote in this State, or at this election—Const. of
Mo., Art. II., § 18. These were necessary qualifications of
all voters, without which neither he nor any other person
could be legally entitled to vote. In my opinion, the facts ·
stated in the petition, if true, do not show that the plaintiff
had a right to vote at this election; and for this reason I

think the demurrer was rightfully sustained, and concur in affirming the judgment.

If this disqualification referred to in this eighteenth section were held to be void as being a bill of pains and penalties within the prohibition of the Federal Constitution, the qualifications therein required would (as I conceive) still remain unaffected by the decision. The question whether or not the plaintiff's vote could lawfully have been refused merely because the oath of allegiance, which he offered to take, omitted the first clause of the prescribed *oath of loyalty*, is one which I have deemed it unnecessary for me to consider at large herein, and I give no opinion on that point. The decision of the court places the case in a condition that will enable the plaintiff, if he chooses, to bring the subject before the higher tribunal, to which it more peculiarly belongs to put a final construction upon the Constitution of the United States, and to decide upon questions of conflict between that instrument and the Constitution of a State.